IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | | |
|---|---|---|
| MARIA RAMIREZ and PEDRO | § | |
| RAMIREZ, as Representatives of the | § | |
| Estate and Statutory Death Beneficiaries | § | |
| of DANIEL ANTONIO RAMIREZ, | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:17-CV-00193 |
| | § | |
| RUBEN ESCAJEDA, JR. and | § | |
| CITY OF El PASO, TEXAS, | § | |
| | § | |
| *Defendants*, | § | ***JURY TRIAL DEMANDED*** |

# PLAINTIFFS' ORIGINAL COMPLAINT

### INTRODUCTION

This case concerns the unjustified, brutal tasering of an unarmed young man with mental health issues who an officer killed in violation of his Fourth and Fourteenth Amendment rights.

### JURISDICTION AND VENUE

1.      This Court has jurisdiction over all causes of action herein pursuant to 28 U.S.C. §§ 1331 and 1343.  Plaintiffs' claims for relief are created by 42 U.S.C §1983.

2.      Venue is proper in this court under 28 U.S.C. §1391.

### PARTIES

3.      Plaintiffs, MARIA RAMIREZ and PEDRO RAMIREZ, are residents of El Paso County, Texas.  They are the natural parents of DANIEL ANTONIO RAMIREZ ("Daniel"), Deceased.  This suit is brought in their capacity as wrongful death beneficiaries and sole heirs of the Estate of Daniel Antonio Ramirez.

4.       Defendant RUBEN ESCAJEDA, JR. was at all times herein relevant employed as a Police Officer by the City of El Paso Police Department ("EPPD"). He is being sued in his individual capacity.

5.       Defendant CITY OF EL PASO, is a Texas municipal corporation.

6.       At all times herein relevant, the individual Defendant was acting within the course and scope of his authority as an employee of the City of El Paso and under color of state law and the custom and usage, patterns, and practice of the State of Texas and the City of El Paso.

<u>FACTUAL BACKGROUND</u>

### I.       THE DEATH OF DANIEL ANTONIO RAMIREZ

7.       On June 23, 2015, Daniel Antonio Ramirez was 30 years old and lived with his family at 234 Liberty St. in El Paso, Texas.  Daniel was five foot four inches tall and weighed only 137 pounds.

8.       Prior to June 23, 2015, Daniel routinely exhibited signs of mental health issues. His parents had called the police a number of times before June 2015 due to his threats of suicide.

9.       On June 23, 2015, Maria Ramirez called 911 reporting that her son, Daniel, was threatening to kill himself and needed help.  Maria told 911 dispatch that Daniel was threatening to hang himself, but she did not tell dispatch that he had a weapon because he did not have a weapon.

10.      The first officer to respond to the call was Officer Escajeda. He had limited experience as an officer and no training on how to engage persons suffering from a mental health crisis.

11.     After arriving at the house, Escajeda went to the backyard and immediately saw Daniel in the process of hanging himself from a basketball net.  Escajeda saw that Daniel was clearly still alive when he arrived.

12.     After entering the backyard, Escajeda saw that Daniel was grabbing the rope around his neck and touching the ground with his tiptoes—trying to save his own life.  Both of his hands were around the rope.

13.      Escajeda could see that Daniel was not armed and was not making any aggressive movements.  Escajeda also plainly saw that Daniel was in the process of hanging himself and did not present a threat to Escajeda or others.  Escajeda also saw that there was no risk that Daniel was going to escape or resist arrest.  There were sufficient lighting conditions for Escajeda to observe that Daniel was alive, did not have a weapon and was not a threat to anyone.

14.     Despite clear signs that Daniel was alive and in the throes of hanging himself, Escajeda deployed a taser on him.

15.     The taser connected with Daniel's chest and abdomen causing Daniel's body to immediately go limp.

16.     After deploying the taser and watching Daniel's body go limp, Escajeda removed Daniel from the noose.   At that time, other officers had arrived. Officers conducted cardiopulmonary resuscitation to no avail.

17.     No firearm, knife, or any other weapon was found at the scene.

18.     Daniel was then transported to Del Sol Medical Center where resuscitation efforts continued but he was pronounced deceased.   Escajeda's deployment of a taser in these circumstances caused Daniel's death.

19.     Escajeda tased Daniel when the use of a taser was not necessary nor justified. Daniel posed no threat to Escajeda or anyone else and did not have a weapon.  He was in the process of hanging himself when Escajeda discharged the taser.  The officer had no reasonable basis to seize Daniel.   Moreover, Escajeda tased Daniel when intermediate force was not authorized under EPPD policy.  EPPD policy provides that the use of a taser is a "Level 4" use of force only authorized to control active aggression or defensive resistance when other lesser means have failed or where the officer reasonably believes lesser means would be clearly ineffective.  Daniel was not engaged in active aggression or defensive resistance.  Escajeda used a taser when its use was not objectively reasonable to defend himself, defend others, or overcome resistance.  Defendant Escajeda had no reason to believe that the use of a taser was authorized or that lesser means would be clearly ineffective.  The use of the taser was objectively unreasonable and grossly excessive.  No reasonable officer would believe that what Escajeda did was right.

20.      Following the incident, the EPPD never reported Daniel's death to the Texas Office of Attorney General as a death that occurred in police custody despite it clearly falling within the definition of a death that occurred in police custody.

21.     Similarly, upon information and belief, Chief Allen had actual knowledge of this incident and the EPPD failed to take any disciplinary action against Escajeda and failed to bring the incident to the attention of the Disciplinary Review Board (DRB).

## II.     THE EL PASO POLICE DEPARTMENT'S CUSTOM, POLICY, AND/OR PRACTICE OF USING EXCESSIVE FORCE.

22.     The policies, practices, and/or customs of the EPPD constituted moving forces of the unconstitutional conduct that proximately caused Daniel's death.  EPPD fails to discipline officers who use excessive deadly or intermediate force (such as the taser) against El Pasoans in

general and when they are on notice of a victim's mental health crises.  EPPD fails to properly train officers.  EPPD has failed to implement effective procedures for officers in response to mental health crises.  All of these policies actually caused the death of Daniel.  Chief Allen persisted in these policies and practices in knowing disregard that constitutional violations were likely to occur.  For this reason, these policies and procedures were the moving force of the constitutional violations that resulted in Daniel's death.

23.     The EPPD also has a persistent and widespread practice of officers using excessive deadly or intermediate force (such as the taser); using excessive deadly or intermediate force against El Pasoans when they are on notice of a victim's mental health issues; and using excessive force against El Pasoans generally.  These practices are so widespread that they constitute a custom that fairly represents municipal policy and are so obvious that they demonstrate the EPPD policymaker's deliberate indifference toward El Pasoans' constitutional rights.

24.     The policymaker responsible for all policies, practice, or customs listed below is Police Chief Gregory Allen.  Chief Allen is a decision-maker who possesses final authority to establish municipal policy with respect to the actions of the EPPD.  EPPD policy and City law designate him as the final authority on all matters of policy, operations, and discipline of the EPPD.

   A.     EPPD'S FAILURE TO DISCIPLINE OFFICERS FOR USE OF EXCESSIVE FORCE.

25.     The City has a policy of failure to discipline or investigate cases involving excessive use of force.  Discipline of all officers for any citizen complaint is the decision of the policymaker, Chief Gregory Allen.  He makes these decisions with the recommendation of a DRB.

26.     The DRB takes action by a majority vote on whether or not to find that an officers' actions are outside policy and the sanction to apply.

27.     All decisions by the DRB are subject to the discretion of Chief Allen who may reverse or mitigate discipline as he sees fit.

28.     The DRB is comprised of officers and a few civilians.  At times over the last ten years, the DRB has had no civilian members at all.  At most, the DRB had two to three civilian members – which was nowhere near close to enough to sway the Board's decisions.  The makeup of the DRB ensures that officers will always comprise a majority of its members creating a built in bias in favor of the officers.

29.     This make-up and Chief Allen's overriding authority has resulted in an atmosphere in which officers accused of excessive force almost uniformly do not face sanctions. Upon information and belief, of the cases brought to the DRB from 2012 to 2016, less than 10% of those cases resulted in any action by the DRB against the officer.  Of that 10%, nearly every officer in question only received counseling as a consequence for their actions – which does not go on their disciplinary review card.

30.     Chief Allen also regularly mitigates discipline against officers against the recommendation of the DRBs.

31.     Chief Allen has continued to implement a DRB where membership consistently comprises a majority of law enforcement officers knowing that this composition leads to less accountability for officers engaged in the excessive use of force.  A DRB with a majority of civilian members not on EPPD payroll would ensure the independence of the DRB and reduce impunity for officers involved in excessive force incidents.

32.     By maintaining a DRB that lacks independence, EPPD's disciplinary policy allows officers to use excessive force and to specifically use excessive intermediate force (such as the taser) and deadly force where officers are on notice of a victim's mental illness without suffering any disciplinary action.  The DRB stands in stark contrast to other well-known models where there is more independent and meaningful oversight of police conduct because the review boards do not include members who work for law enforcement agencies, such as the Independent Police Oversight Board in Houston.

33.     Chief Allen's failure to properly discipline officers engaged in excessive use of force is obvious and has caused the disproportionately high incidents of excessive use of force and excessive use of intermediate (such as the taser) and deadly force when officers are on notice of mental illness described in, *infra,* Sections II(D, E, F).  Specifically, this failure to discipline actually caused the excessive use of intermediate force (the taser) against Daniel.  Chief Allen persisted in his failure to discipline his officers for excessive use of force and excessive use of intermediate and deadly force in situations involving persons with mental illness, in knowing disregard that such a failure presents an obvious risk that constitutional violations will occur. For these specific reasons, this failure to discipline was the moving force that caused the constitutional violation at issue.

34.     In the case of Daniel's death, Escajeda's actions were not even presented to the DRB and Chief Allen refused to take any disciplinary action against him.

35.     Decisions to discipline, or not discipline, all officers are made solely by Chief Allen.

36.     Therefore, EPPD's failure to discipline officers as described above is the actual cause of Daniel's death.  Chief Allen persisted in this failure to discipline in knowing disregard

that such actions would lead to constitutional violations such as the excessive use of force.  For this reason, it is a moving force behind the constitutional violations that led to Daniel Ramirez's death.

        B.     <u>EPPD'S FAILURE TO TRAIN OFFICERS ON RESPONDING TO MENTAL HEALTH CRISES.</u>

37.     EPPD has routinely failed to train its officers on how to make first contact with victims of mental health crises, and how to follow procedures to ensure the safety of victims of mental health crises.  EPPD failed to train its officers on responding to a victim of a mental health crisis in ways that de-escalate, rather than escalate the potential confrontation that EPPD officers might have with these victims.

38.     EPPD has failed to train officers on the steps needed to minimize the use of deadly or intermediate force, such as the use of a taser, when responding to a person with an obvious mental health crisis.  EPPD has also failed to train officers on how to respond to crisis intervention calls for persons with mental health crises and how to properly assess the situation so as to bring the conflict to a successful resolution.  Adequate mental health training is completely different than standard patrol officer training.

39.     The scope and content of EPPD training in this time period is ultimately decided by the policymaker Chief Allen.  He has had direct knowledge of this training failure and has been deliberately indifferent to its consequences- the use of excessive force against persons experiencing a mental health crisis.

40.     This failure to train has caused officers to routinely respond to mental health crises using deadly or intermediate force, such as the use of the taser, to escalate the situation – actions that routinely result in excessive use of intermediate and deadly force including, but not limited to, the incidents described in, *infra,* Sections II(D, E, F).  Escajeda was responding to a

call that came in as a suicide in progress.  Daniel was suffering a mental health crisis.  Escajeda while observing Daniel in the process of hanging himself, immediately tased him when intermediate force was not authorized because Escajeda was not properly trained on how to assess and respond to these situations.  Therefore, this failure to train is a direct cause of the unlawful use of intermediate force against Daniel and Daniel's death.  Chief Allen has knowledge of this failure to provide mental health training and knows that his actions create an obvious risk that excessive intermediate and deadly force will be utilized yet Chief Allen disregards this known risk.  For these reasons, such a policy provides the moving force behind the constitutional violations that led to the death of Daniel Ramirez.

C.     EPPD'S FAILURE TO INSTITUTE DE-ESCALATION PROCEDURES FOR MENTAL HEALTH CRISES.

41.     EPPD has failed to institute procedures to ensure that when officers deal with persons in mental health crises, that they properly assess the situation and take action that brings the situation to a successful outcome, rather than escalate encounters with those persons.

42.     Police departments throughout the country – recognizing the increased number of dispatches by officers that are caused by persons in mental health crises – have successfully implemented mental health units and crisis intervention response teams that ensure that a mental health professional makes the first contact with persons in mental health crises.  Departments and sheriff's offices covering almost every major city in the country have crisis intervention teams as described herein.  In Texas, police departments and Sheriff's Offices covering Dallas, Houston, Austin, and San Antonio have all implemented crisis intervention teams.  *See, e.g.,* The City of Houston,  *Police     Department     Mental     Health     Division,*  available  at https://www.houstontx.gov/police/divisions/mental_health (last accessed June 6, 2017); Travis County     Sheriff's     Office*,     Crisis     Resolution     Teams*,     available     at

http://www.tcsheriff.org/departments/law-enforcement/central/crt (last accessed June 6, 2017);

Christina Rosales, *Team handles crisis that Dallas law enforcement can't solve,* The Dallas

Morning        News,        May        19,        2014,        available        at

https://www.dallasnews.com/news/news/2014/05/19/team-handles-crises-that-dallas-law-

enforcement-cant-solve (last accessed June 6, 2017).[1]

43.     These procedures also regularly ensure that dispatch personnel and officers first

contact with individuals who may be in a mental health crisis are able to screen potential

incidents for mental health crises that may require the use of a crisis intervention response team.

44.     The implementation of these policies in Houston, for example, has resulted in a

57% decrease in the likelihood that officers would use guns during a mental health crisis.

Anthony L. Colucci, John Patrick McCleary, and Yan Jie Ng, *Mathematical Methods in the*

*Social Sciences: Houston Texas Police Department Project on Officer-Involved Shooting,*

Northwestern        University,        June        4,        2014,        at        p.        86,        available        at

http://www.houstontx.gov/police/department_reports/ois/HPDThesis.pdf (last accessed June 4,

2016).  In Albuquerque, the implementation of CIT in the Police Department decreased the use

of SWAT teams by 58%.  Melissa Reuland, Matthew Schwarzfeld, Laura Draper, *Law*

*Enforcement Responses to People with Mental Illnesses: A Guide to Research-Inforced Policy*

*and Practice,* Council of State Governments Justice Center, at p. 12 (2009), available at

https://csgjusticecenter.org/wp-content/uploads/2012/12/le-research.pdf.

45.     Although he is aware of these initiatives, EPPD's policy maker, Chief Allen, has

refused to implement any comparable policy to de-escalate calls where police have clear notice

---

[1] *See also* Meg Kissinger, *Houston's solution to mental health problems offers a case study for*
*Milwaukee,* June 8, 2013, available at http://archive.jsonline.com/news/milwaukee/houstons-solution-to-
mental-health-system-problems-offers-a-case-study-for-milwaukee-b9928490z1-210715811.html, (last
accessed June 6, 2017) (describing the history of Houston's Mental Health Unit).

that a person is having a mental health crisis.  The failure to implement these procedures ensures that responding officers respond to mental health crises without the ability to properly assess the situation and bring the crisis to a non-violent conclusion.  He has full knowledge of the importance of these procedures and has been deliberately indifferent to the consequences of failure to implement these procedures.

46.     The failure to implement these procedures has caused the disproportionately high incidents of excessive use of force and excessive use of force when officers are on notice of a mental health crisis as described in, *infra,* Sections II(D, E, F).  Chief Allen with full knowledge of his failure to implement the procedures described above and the inadequacy so likely to result in the violation of constitutional rights nevertheless proceeded with deliberate indifference to the consequences of that failure.

47.     The failure to implement these procedures was also an actual cause in the constitutional violations that resulted in Daniel's death.  Escajeda knew that the call came in as a suicide in progress and knew that the reporter did not indicate that Daniel had a weapon. Escajeda also saw that Daniel was alive and in the process of hanging himself and not a threat to Escajeda when he decided to deploy his taser.  If the EPPD had a proper crisis intervention response team, Escajeda would have immediately taken actions to save Daniel's life and would not have deployed his taser causing his death.  EPPD would have called in a mental health professional or an officer properly trained in mental health issues to properly assess and respond to a suicide in progress.

48.     Similarly, a similar crisis intervention response team would have reduced the likelihood that officers resorted to excessive force in the incidents described in, *infra,* Sections II(D, E, F).  Therefore, EPPD's failure to institute proper mental health procedures is a direct

cause of the constitutional violations that led to the death of Daniel Ramirez. Chief Allen had knowledge that the need for mental health training is so obvious that the inadequacy is likely to lead to the constitutional violations that took place with Daniel and for this reason he acted with deliberate indifference.

D.   USE OF DEADLY OR INTERMEDIATE FORCE WHEN OFFICERS ARE ON NOTICE OF VICTIM'S MENTAL ILLNESS.

49.   The EPPD also has a persistent, widespread practice of using excessive deadly or intermediate force, such as the taser, when officers are on notice that the victim is exhibiting signs of mental illness. This practice is so common and widespread as to constitute a custom that fairly represents municipal policy. EPPD Chief Gregory Allen has had direct knowledge of this practice and has failed to discipline officers involved, train them, or otherwise remedy the problem.

50.   From 2012 to 2016, close to 57% of persons who died while in EPPD custody exhibited signs of mental illness and the police were on notice of those signs.

51.   In 2015, over 66% of the residents shot and killed by EPPD officers exhibited signs of mental illness visible to officers prior to their deaths. Nationwide, only about 26% of victims shot and killed by the police in 2015 exhibited signs of mental illness visible to the police prior to their deaths.

52.   In 2016, 100% of the residents shot and killed by EPPD officers exhibited signs of mental illness visible to officers prior to their death. This rate was close to 300% greater than the national average of 25% for the same year.

53.   Examples of these deaths show a pattern by which officers consistently escalate situations where they are on notice of mental health issues rather than de-escalating the situation, thereby triggering the use of excessive deadly or intermediate force, such as the taser.

54.      On March 8, 2013, officers arrested Daniel Rodrigo Saenz after receiving reports that he was acting strangely and threatening people.  Officers were aware when called out that he had been at a mental health facility.  After his arrest, in police custody, outside the local jail, unarmed, and while handcuffed behind his back, officers started dragging Saenz on the ground to take him to a medical facility for treatment of injuries.  As they dragged him, he started to resist. An officer pulled out his gun and shot Mr. Saenz who died shortly thereafter as a result of the gunshot wounds.

55.      In this case, upon information and belief, the City's DRB considered the facts and recommended termination of the officer involved.    Nonetheless, Chief Allen kept the officer on payroll until he was reinstated by an independent arbitrator – despite the arbitrator's finding that the officer violated use-of-force policies.

56.      In October of 2013, police responded to a call that person was screaming outside a motel and was suffering from a mental health crisis.  When they arrived, they found Fernando Gomez, also known as Mercedes Demarco, unarmed outside the motel and screaming for help. The officers immediately tasered Ms. Demarco who allegedly died in the squad car shortly thereafter.

57.      Upon information and belief, the officer(s) involved in this incident were brought to the DRB and Chief Allen.  Allen failed to sanction any of the officers involved.

58.      On April 28, 2015, officers responded to a 911 call reporting that Erik Salas Sanchez – 22 years old and 117 pounds -- was in his neighbor's house without permission.  He left when she asked him to leave but the officers proceeded to his mother's house across the street.  There, they learned from his mother that she was trying to obtain mental health support services for her son.  The officers talked with Erik's mother outside the home for some time.

Erik, unarmed and not posing a threat to anyone, told the officers to leave.  The officers then entered the home without a warrant, probable cause, consent, or exigent circumstances and pursued Erik.  One officer tased Erik even though he was not a threat to himself or others.  Then, as Erik retreated to the back of the house, another officer, Mando Kenneth Gomez, shot Erik three times in the back.  Erik died from the gunshot wounds.

59.    Upon information and belief, only Officer Gomez's actions were brought to the DRB.  Chief Allen failed to take any action against any of the officers involved – even though the District Attorney went on to indict Gomez of involuntary manslaughter for his role in the shooting.

60.    On May 21, 2015, officers received a 911 call reporting that a man was very distraught, crying, and threatening to kill himself – in the throes of a mental health crisis. Officers arrived and saw that David Alejandro Gandara did not have a weapon.   They immediately yelled at him to stop.  When he continued walking, the officers fired six shots at him, killing him on the scene.

61.    Upon information and belief, the officer(s) involved in this incident were brought to the DRB and Chief Allen.  Chief Allen failed to sanction any of the officers involved.

62.    On April 16, 2016, El Paso Police Officers received a telephone call from a distressed Eric Wilson.  Wilson had a rapport with the EPPD from previous calls related to his mental health.  They were aware he was suffering from a mental illness.  Nonetheless, five police officers arrived at his home to find him walking back and forth in front of his residence.  The officers ordered Wilson to show his hands.  According to reports, Wilson held up a cell phone in his hand in flashlight mode.  The officers shot several rounds at him which caused his death after another eight excruciating hours.

63.     Upon information and belief, the officer(s) involved in this incident were brought to the DRB and Chief Allen.  Allen failed to sanction any of the officers involved.

64.     On May 9, 2016, Arthur Williams' mother called the police and the police had notice of his mental health issues.  Officers arrived and spoke with his mother, who was outside the house.  Williams' mother asked him to leave the house and speak with the officers.  Williams exited the house holding a toy BB gun and was immediately shot multiple times by several officers.

65.     Upon information and belief, the officer(s) involved in this incident were brought to the DRB and Chief Allen.  Allen failed to sanction any of the officers involved.

66.     Several other events involving the use of intermediate force in 2015 and 2016 that did not result in death also show a custom and practice of officers escalating the use of force when confronted with situations involving victims with disabilities.  For example, Jose Angel Acevedo alleged excessive use of force involving his arrest on August 11, 2015. According to his report, Acevedo's wife called 911 so that emergency responders could take him to the hospital because he was in emotional distress. The responding officers entered Acevedo's residence without permission, probable cause, or exigent circumstances.  The officers allegedly beat Acevedo, threw him to the ground, and held him in a choke hold while he repeatedly told them that he was unable to breath. The officers also allegedly tased him several times.

67.     Upon information and belief, the officer(s) involved in this incident were brought to the DRB and Chief Allen.  Allen failed to sanction any of the officers involved.

68.     On December 6, 2015, Javier Ortega suffered a seizure while driving and crashed his vehicle into a rock wall.  Mr. Ortega was unarmed.  Allegedly, responding officers -- rather than treating him -- allegedly tased him multiple times and beat him with a police baton.  Upon

information and belief, after review of the case, Chief Allen refused to terminate or suspend the officers involved.

69.     Upon information and belief, the officer(s) involved in this incident were brought to the DRB and Chief Allen which both failed to recommend any sanction against the officers.

70.     Each of these incidences shows a pattern of the police, when called to help with or on notice of a victim's mental health issues, to use excessive force to subdue the victim rather than utilizing alternative means to de-escalate the situation.

F.      <u>USE OF EXCESSIVE FORCE IN GENERAL</u>

71.     A limited review of citizen complaints between 2014 and 2016 show a high rate of excessive force complaints reported by citizens against officers.  EPPD Chief Gregory Allen has had direct knowledge of this practice and has failed to discipline officers involved, train them, or otherwise remedy the problem.

72.     Public data regarding Citizen Complaints is extremely limited because the City has obfuscated efforts to obtain this information publicly.

73.     In response to a citizen request for public documents related to allegations of excessive use of force in August 2016, the City -- after five months -- only produced a fraction of the documents requested.  The initial requests sought Citizen Complaint Forms and related information as well as "Blue Team" and "IA Pro" reports.  The "Blue Team" and "IA Pro" software has previously been touted as new software that warehouses excessive force allegations and allows the department to "identify patterns of concern early on so that proactive action can be taken."  However, when asked for these documents, Defendant City claimed that this software does no such thing.

74.     After limiting the search, the City was only asked to provide citizen complaint information for a twenty-four month period.  The City only provided sixteen months worth of data and, of that data, the City did not fully produce incident information for almost 60% of the approximately 167 citizen complaint incidents allegedly reported in that period.  This lack of documentation makes it difficult to assess the factual basis of each complaint.

75.     There is also reason to believe that the 167 incidents is a drastic underreporting of actual incidents in the sixteen month period.  In its 2014 Annual Report, the Department stated that it had investigated 1,296 citizen complaints in that year.  It seems unlikely that the following 16 months would only see 167 complaints -- under 13% of the number of complaints investigated in 2014.

76.     The lack of willingness to produce this information makes it difficult to conduct a comparative analysis of the City's excessive force complaints.

77.     Nonetheless, based on the limited data provided, it is possible to identify a trend of comparatively high reports of excessive force among the El Paso Police Department.  Of the data provided, at least 20-27% of the Citizen Complaints involved officers' excessive force.  If this same percentage is applied to the reported 1,296 citizen complaints in 2014, it is reasonable to assume that between 259-349 complaints of excessive force were reported by officers in that year.   This number is high considering the size of the El Paso Police Department -- approximately 1,000 officers -- as it correlates to a rate of 25.9 to 34.9 citizen complaints of excessive force per officer.  The national average for such complaints is only 6.6 complaints per officer. Chief Allen's failure to discipline the officers involved, train them or otherwise remedy the problem is the moving force in the constitutional violations that took place against Daniel.

## CLAIMS FOR RELIEF

### EXCESSIVE FORCE

78.     Defendant Escajeda, acting under color of state law, deprived Daniel and Plaintiffs of their rights under the Fourth and Fourteenth Amendments to the United States Constitution by intentionally using an objectively unreasonable and excessive amount of force.

79.     These acts deprived Daniel of his clearly established and well-settled constitutional rights under the Fourth and Fourteenth amendments and in violation of 42 U.S.C. §1983.  This violation proximately caused Daniel's death for which Defendant Escajeda is liable.

### MONELL

80.      On information and belief, Defendant City of El Paso -- through the decisions of its policymaker Police Chief Gregory Allen – was directly responsible for the aforementioned misconduct, which proximately caused the damage to Plaintiffs, by:

A)     maintaining a policy or custom of excessive force by officers that is so common and widespread as to constitute a custom that fairly represents municipal policy;

B)     maintaining a policy or custom of excessive force by officers when the officer is on notice of a victim's mental health problems that is so common and widespread as to constitute a custom that fairly represents municipal policy;

C)     failing to properly train, supervise, or discipline members of the El Paso Police Department, including Defendant Escajeda, not to use intermediate force, such as a taser, against an individual who does not pose a threat to

the officer or others and does not display active aggression or defensive resistance;

D)      failing to properly train, supervise, or discipline members of the El Paso Police Department, including Defendant Escajeda, on mental health issues and how to properly assess the situation and take action to de-escalate the situation and bring the crisis to a non-violent conclusion where their officers have notice and knowledge that the person for whom they are called has mental health issues;

E)      failing to institute proper procedures to ensure that EPPD officers use appropriate de-escalation tactics so as to bring the crisis to a non-violent conclusion in situations in which it is known that an unarmed resident has mental health issues; and

F)      failing to pursue criminal or disciplinary charges or support criminal or disciplinary action against officers, including Escajeda, who have deprived citizens and residents of El Paso of their constitutional rights.

81.    The aforementioned customs, policies, practices, and procedures, the failures to properly and adequately hire, train, instruct, monitor, supervise, evaluate, investigate and discipline and the unconstitutional orders, approvals, and tolerance of wrongful conduct of the City of El Paso were adopted with deliberate indifference to the constitutional rights of citizens.

82.    The aforementioned customs, policies, practices, and procedures, the failures to properly and adequately hire, train, instruct, monitor, supervise, evaluate, investigate and discipline and the unconstitutional orders, approvals, and tolerance of wrongful conduct of the City of El Paso were a moving force and/or a proximate cause of the deprivations of Daniel's

clearly established and well settled constitutional rights under the Fourth amendment in violation of 42 U.S.C. §1983.

## COMPENSATORY DAMAGES

83.     Because of Defendants' actions, Plaintiffs are entitled to compensatory damages for their past and future pecuniary loss, past and future loss of companionship and society, past and future mental anguish, and all other compensatory damages to which they may be entitled. In addition, Plaintiffs are entitled to recover for the conscious pain and suffering of DANIEL ANTONIO RAMIREZ before he died.

## EXEMPLARY DAMAGES

84.     The use of a taser against Daniel – which caused his death – was acted willfully, deliberately, maliciously and with reckless disregard of the rights of Daniel entitling Plaintiffs to punitive damages.

## ATTORNEY FEES

85.     Plaintiffs are entitled to recover his attorney fees and costs necessary to enforce his rights pursuant to 42 U.S.C. § 1988.

## JURY TRIAL

86.     Plaintiffs demand trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully prays that this Court grant the following relief:

A.     Award Plaintiffs compensatory damages for the acts described above;

B.     Award Plaintiffs punitive damages against Defendant's Officer;

C.     Enter a finding that Plaintiffs are the prevailing party in this case and award attorney fees, litigation costs and expenses plus pre-trial and post-trial interest against Defendants pursuant to 42 U.S.C. § 1988; and

D.   Grant such other and further relief in law or in equity to which Plaintiffs may be entitled.


Dated: June 22, 2017                    Respectfully submitted,

                                        THE LAW OFFICES OF ENRIQUE MORENO
                                        701 Magoffin Avenue
                                        El Paso, Texas 79901
                                        (915) 533-9977
                                        FAX (915) 533-0033

                        By:      /s/Enrique Moreno
                                        ENRIQUE MORENO
                                        State Bar No.: 14430500
                                        emoreno@morenolaw.us

                                        -AND-

                                        THE LAW OFFICE OF LYNN COYLE, PLLC
                                        2515 North Stanton Street
                                        El Paso, Texas 79902
                                        (915) 532-5544
                                        Fax (915) 532-5566

                        By:      /s/ Lynn Coyle
                                        LYNN COYLE
                                        Texas Bar No. 24050049
                                        lynn@coylefirm.com
                                        CHRISTOPHER BENOIT
                                        Texas Bar No. 24068653
                                        chris@coylefirm.com

                                        *Attorneys for Plaintiffs*
                                        *Maria Ramirez and Pedro Ramirez, as*
                                        *Representatives of the Estate and Statutory Death*
                                        *Beneficiaries of Daniel Antonio Ramirez*