**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISION**

| | | |
|---|---|---|
| **MARIA RAMIREZ and PEDRO** | § | |
| **RAMIREZ,** *as Representatives of the Estate* | § | |
| *and Statutory Death Beneficiaries of* | § | |
| **DANIEL ANTONIO RAMIREZ**, | § | |
| | § | |
| *Plaintiffs*, | § | **EP-17-CV-00193-DCG** |
| **v.** | § | |
| | § | |
| **RUBEN ESCAJEDA, JR. and CITY OF** | § | |
| **EL PASO, TEXAS,** | § | |
| | § | |
| *Defendants*. | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Presently before the Court are Defendants City of El Paso, Texas (the "City") and Ruben Escajeda's ("Escajeda") (collectively, "Defendants") three motions to exclude or limit expert opinions: (1) "Motion to Exclude or Limit Opinions of Michael Leonesio" (ECF No. 79) ("Leonesio Motion"), filed on August 24, 2020; (2) "Motion to Exclude or Limit Opinions of Valentina Ngai" (ECF No. 80) ("Ngai Motion"), filed on August 24, 2020; and (3) "Motion to Exclude or Limit Opinions of W. Ken Katsaris" (ECF No. 85) ("Katsaris Motion"), filed on August 26, 2020.  Also presently before the Court is Plaintiffs Maria Ramirez and Pedro Ramirez's ("Plaintiffs") "Motion to Exclude or Limit Opinions of Robert Taylor" (ECF No. 101) ("Taylor Motion"), filed on September 18, 2020.  For the reasons that follow, the Court:

- **DENIES** the Leonesio Motion;

- **DENIES** the Ngai Motion;

- **GRANTS IN PART, DENIES IN PART** the Katsaris Motion; and

- **GRANTS IN PART, DENIES IN PART** the Taylor Motion.

# I.   BACKGROUND[1]

This case arises from the circumstances surrounding the death of Daniel Antonio Ramirez ("Ramirez").  Plaintiffs are Ramirez's parents.  Compl. at 1.  Escajeda was employed as a police officer by the El Paso Police Department ("EPPD") at the time of Ramirez's death.  *Id.* at 2.  On June 23, 2015, Plaintiffs called 911 to report that their son was threatening to hang himself and needed help.  *Id.*  Escajeda was the first officer to respond to the call.  *Id.*  After arriving at the house, Escajeda proceeded to the backyard to look for Ramirez.  *Id.* at 3.

According to Plaintiffs, after entering the backyard, Escajeda saw that Ramirez was in the process of hanging himself from a basketball net.  *Id.*  Escajeda also saw that Ramirez was grabbing the rope with both hands and touching the ground with his tiptoes to try and save his own life.  *Id.*  After seeing Ramirez struggling to save himself, Escajeda deployed his taser on him, striking him in the chest and abdomen, which caused his body to go limp.  *Id.*  After deploying the taser and watching Ramirez's body go limp, Escajeda finally removed him from the noose.  *Id.*  By the time Escajeda removed Ramirez from the noose, other officers had arrived, and cardiopulmonary resuscitation was conducted to no avail.  *Id.*  Subsequently, Ramirez was transported to Del Sol Medical Center where efforts to resuscitate him continued, but he was eventually pronounced deceased.  *Id.*

On June 22, 2017, Plaintiffs filed the instant lawsuit against Escajeda and the City, claiming they are both liable for the deprivation of Ramirez's constitutional rights.  *Id.* at 18–20.  By their complaint, Plaintiffs allege that Escajeda used excessive force against Ramirez and make six additional distinct allegations asserting that the City was "directly responsible" for Escajeda's alleged misconduct by:

---

[1] The following facts are derived from Plaintiffs' Complaint.  *See* Compl. at 2–20, ECF No. 1.

A) maintaining a policy or custom of excessive force by officers that is so common and widespread as to constitute a custom that fairly represents municipal policy;

B) maintaining a policy or custom of excessive force by officers when the officer is on notice of a victim's mental health problems that is so common and widespread as to constitute a custom that fairly represents municipal policy;

C) failing to properly train, supervise, or discipline members of the [EPPD], including . . . Escajeda, not to use intermediate force, such as a taser, against an individual who does not pose a threat to the officer or others and does not display active aggression or defensive resistance;

D) failing to properly train, supervise, or discipline members of the [EPPD], including . . . Escajeda, on mental health issues and how to properly assess the situation and take action to de-escalate the situation and bring the crisis to a non-violent conclusion where their officers have notice and knowledge that the person for whom they are called has mental health issues;

E) failing to institute proper procedures to ensure that EPPD officers use appropriate de-escalation tactics so as to bring the crisis to a non-violent conclusion in situations in which it is known that an unarmed resident has mental health issues; and

F) failing to pursue criminal or disciplinary charges or support criminal or disciplinary action against officers, including Escajeda, who have deprived citizens and residents of El Paso of their constitutional rights.

*Id.*

Over a span of six weeks, starting from August 24, 2020, to October 2, 2020, the parties submitted their respective motions and all relevant briefing to exclude the opinions of the opposing expert witnesses. For the sake of clarity and brevity, the Court will address the background and arguments from each of the instant motions in the discussion section below.

## II.   STANDARD

Federal Rule of Evidence 702 governs the admissibility of expert witness testimony and provides that a witness "who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion." Fed. R. Evid. 702. Before allowing an expert to testify, a court must find that the following criteria have been met:

(a) the expert's scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based upon sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

*Id.* The district court must also make a preliminary inquiry into whether proposed expert testimony is relevant and reliable. *Vargas v. Lee*, 317 F.3d 498, 500 (5th Cir. 2003) (citations omitted). In doing so, the district court acts as a "gate-keeper" of expert witness testimony, and this "gate-keeping obligation applies to all types of expert testimony." *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002) (citation omitted).

## A. Experts Must Be Qualified.

Rule 702 provides that a witness may offer "an expert opinion only if he or she draws on some special 'knowledge, skill, experience, training, or education' to formulate that opinion." *Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999) (citing Fed. R. Evid. 702). The basis of an expert's specialized knowledge may come from a variety of sources, including academic training and credentials or practical experience. *S. Cement Co. v. Sproul*, 378 F.2d 48, 49 (5th Cir. 1967).

## B. Expert Testimony Must Be Relevant.

Additionally, pursuant to Rule 702, expert testimony must "assist the trier of fact to understand the evidence or determine a fact in issue." Fed. R. Evid. 702; *Bocanegra v. Vicmar Servs.*, 320 F.3d 581, 584 (5th Cir. 2003). Relevant evidence is evidence "which has 'any tendency to make any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" *Mathis v. Exxon Corp.*, 302 F.3d 448, 460 (5th Cir. 2002) (quoting Fed. R. Evid. 401). To be relevant, expert testimony must use "reasoning or methodology [that] properly can be applied to the facts in issue." *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 352 (5th Cir. 2007) (quotation omitted).

### C. Expert Testimony Must Be Reliable.

The reliability requirements of Rule 702 reflect the considerations set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). *Daubert* provides the "analytical framework for determining whether expert testimony is admissible under Rule 702." *Pipitone*, 288 F.3d at 243. The *Daubert* analysis must consider "whether the reasoning or methodology underlying the testimony is scientifically valid." *Knight*, 482 F.3d at 352 (quoting *Daubert*, 509 U.S. at 592–93). To guide this inquiry into reliability, the *Daubert* Court set forth a non-exhaustive list of factors that the district court should consider in connection with proposed expert testimony. This includes "whether the expert's theory or technique: (1) can be or has been tested; (2) has been subjected to peer review and publication; (3) has a known or potential rate of error or standards controlling its operation; and (4) is generally accepted in the relevant scientific community." *Pipitone*, 288 F.3d at 244 (citing *Daubert*, 509 U.S. at 593–94). The *Daubert* analysis is "flexible," and the factors set forth in *Daubert* "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Kumho Tire, Inc. v. Carmichael*, 526 U.S. 137, 150 (1999) (citation omitted). Although the proponent of expert testimony need not show that the expert's conclusions are correct, he must show, by a preponderance of the evidence, that the proposed testimony is reliable. *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 276 (5th Cir. 1998). "The *Daubert* analysis should not supplant trial on the merits." *Mathis*, 302 F.3d at 461 (citing *Pipitone*, 288 F.3d at 250). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* at 461 (citing *Daubert*, 509 U.S. at 596). Nevertheless, district courts have wide discretion in determining the admissibility of expert testimony. *Gen.*

*Electric v. Joiner*, 522 U.S. 136, 139 (1997); *St. Martin v. Mobil Exploration & Producing U.S. Inc.*, 224 F.3d 402, 405 (5th Cir. 2000)).

**D.  Experts May Not Provide Legal Conclusions.**

Federal Rule of Evidence 704(a) instructs that "[a]n opinion is not objectionable just because it embraces an ultimate issue."  Rather, Rule 704(a) "does not allow a witness to give legal conclusions."  *United States v. Williams*, 343 F.3d 423, 435 (5th Cir. 2003) (quoting *United States v. Izydore*, 167 F.3d 213, 218 (5th Cir. 1999)).  Therefore, "while witnesses may testify in the form of an opinion or inference that 'embraces an ultimate issue to be decided by the trier of fact,'" such testimony may not "tell the jury what result to reach."  *Sophin v. United States*, 153 F.Supp.3d 956, 965 n.6 (W.D. Tex. 2015) (quoting *Williams*, 343 F.3d at 435; *Owen v. Kerr-McGee Corp.*, 698 F.2d 236, 240 (5th Cir. 1983)).

**E.  Expert Testimony May Be Excluded If Its Probative Value Is Substantially Outweighed By Its Prejudicial Effect.**

Pursuant to Federal Rule of Evidence 403, a court may exclude otherwise admissible relevant evidence "if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly cumulative evidence."  "Relevant evidence is inherently prejudicial; but it is only unfair prejudice, substantially outweighing probative value, which permits exclusion of relevant matter under Rule 403."  *United States v. Patterson*, 431 F.3d 832, 839 (5th Cir. 2005) (internal quotation marks omitted).  Furthermore, "[t]he application of Rule 403 must be cautious and sparing."  *United States v. Fields*, 483 F.3d 313, 354 (5th Cir. 2007).  "Rule 403 is not designed to 'even out' the weight of the evidence."  *Baker v. Canadian Nat'l/Ill. Cent. R.R.*, 536 F.3d 357, 369 (5th Cir. 2008).

# III.   DISCUSSION

## A.  Plaintiffs' Expert Witnesses.

On February 24, 2020, Plaintiffs designated Mr. Ken Katsaris, Mr. Michael Leonesio, and Dr. Valentina Ngai as retained expert witnesses in support of their claims against Defendants.  Pls.' Expert Designations at 1–3, ECF No. 68.  On April 2, 2020, Plaintiffs also designated these same three expert witnesses as rebuttal witnesses.  Pls.' Designation of Rebuttal Experts, ECF No. 76.

### 1.  Michael Leonesio.

Defendants deposed Leonesio on July 27, 2020.  Leonesio Mot. at 2, ECF No. 79; *see also id.*, Ex. A [hereinafter "Leonesio Deposition Transcript"], ECF No. 79-1 (transcript of Leonesio's deposition, totaling 140 pages of testimony).   Leonesio has provided a curriculum vitae, *id.*, Ex. A [hereinafter "Leonesio CV"], at 166–80; and a report and opinion on his conclusions, *id.*, Ex. A [hereinafter "Leonesio Report"], at 150–65.  Plaintiffs assert that they designated Leonesio as an expert who offers the following opinions in support of their claims:

> Leonesio will testify as to the use of force policy by the EPPD, the effect of that policy on the use of force by EPPD officers, an analysis of the use of the taser by Office Escajeda and other actions taken by Officer Escajeda in this matter, including his tactical response.

Pls.' Expert Designations at 2.

In turn, Defendants seek to exclude Leonesio's opinions because they contend that:

1. Leonesio[ ] [sic] is not qualified to render opinions concerning the incident, or the use of force, training and discipline policies employed by the City.

2. Leonesio's opinions are based on very limited information, and as such, they are unreliable, speculative, conclusory and unduly prejudicial.

3. Leonesio's opinions on the status of . . . Ramirez [whether he was conscious or in fact dead] at the time Officer [Escajeda] [sic] approached him are based on

speculation and his conclusions are unfounded, irrelevant, unreliable and unreasonably prejudicial.

Leonesio Mot. at 2.  The Court addresses each Defendant's objections in that order.

### (a) Leonesio's Qualifications to Opine About the Incident, Use of Force, and the City's Training & Discipline Policies.

Defendants generally object to Leonesio's designation as an expert witness because they claim he is not qualified to render any expert opinions in the subject matter for which he was designated.  *Id.*  Defendants assert that Leonesio lacks the training and experience to render expert opinions in this case because he has neither a college degree nor any post-graduate studies and had no command staff level experience during his career as a police officer.  *Id.*  Instead, Leonesio appears to have based his opinions largely on "his personal experience as a police officer in two small police departments in two California cities"—the San Carlos and Oakland Police Departments.  *Id.*  Defendants further contend that  Leonesio obtained experience "in helping to write policies for the police departments where he served as a police officer" not due to any specialized education or training, but because he was the officer with the least seniority and "drew the short straw."  *Id.* at 5–6.

After reviewing the supporting documents and  Leonesio's deposition testimony, the Court concludes that  Leonesio is qualified under Federal Rule of Evidence 702 to render expert opinions about "the use of force policy by the EPPD, the effect of that policy on the use of force by EPPD officers, an analysis of the use of the taser by . . . Escajeda and other actions taken by . . . Escajeda in this matter, including his tactical response." Pls.' Expert Designations at 2.

The record shows extensive evidence of Leonesio's qualifications as an expert witness in the subject matter for which Plaintiffs designated him, serving in law enforcement as a police officer, instructor, and consultant over the span of two decades.  Leonesio CV at 1–2.  While

Defendants are correct that he has neither a college degree nor any post-graduate education, Leonesio has taken numerous advanced training courses relevant to his field, presented and published several works on the subject of police practices on the use of force and electroshock weapons, and earned many professional law enforcement certifications from multiple states and numerous professional awards over the course of his career. *Id.* 3–8.

To be sure, Leonesio did not achieve the rank of sergeant or commander during his law enforcement career because he started this career late in his thirties. Leonesio Dep. Tr. at 28:24–29:13. Yet, due to his age and previous experience as an instructor, the police departments he worked for sent him to train and get professionally certified in numerous use-of-force programs (many involving the use of electroshock weapons) so that he could research, develop, and implement policies and training programs on the use of electroshock weapons, and ultimately become the departments' subject matter expert on that topic and in the use of force generally. *Id.* at 29:9–34:15. Indeed, Leonesio's superiors specifically tasked him with writing the police procedure manuals for both the San Carlos and Oakland Police Departments about police use of force, defensive tactics, and electroshock weapons policy, deployment, and maintenance, etc. *Id.* at 50:14–51:20.

Further, Leonesio currently consults around the country with various international, federal, state, and municipal law enforcement agencies and associated organizations, Leonesio CV at 1–3; serves on numerous professional associations, *id.* at 5; is involved in medical and scientific research about the use of electroshock weapons, *id.* at 8–9; and has testified as an expert witness in twenty-five state and federal proceedings in areas of police practices and procedures, law enforcement best practices, use of force analysis and investigation, law

enforcement training, law enforcement policy, and all aspects of electroshock weapon use, training, policy, and testing, *id.* at 9–15.

Therefore, the Court determines that Leonesio has developed specialized knowledge in the fields for which Plaintiffs have designated him through practical experience and both professional training and credentials. *See* Fed. R. Evid. 702 advisory committee's note (2000 amendments) ("Nothing in this amendment is intended to suggest that experience alone . . . may not provide a sufficient foundation for expert testimony. To the contrary, the text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience. In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony.").

### *(b) Reliability of Leonesio's Opinions on the Use-of-Force Policy.*

Next, Defendants object to the reliability of the methodology Leonesio used in rendering his opinions because they claim he based his opinions on "very limited information." Leonesio Mot. at 7. Defendants claim that he did not examine all of the City's polices on the use of force and that he instead only reviewed one policy and analyzed Escajeda's actions solely under that policy. *Id.* Defendants also claim that he did not even examine the City's training materials related to that policy, for which he in turn made certain assumptions about the training Escajeda and other EPPD officers received without apparent factual support. *Id.* And finally, Defendants argue that Leonesio did not offer an opinion in either his report or testimony that the City's policy caused the alleged deprivation of Ramirez's civil rights. *Id.*

But after a thorough review of the record, the Court disagrees with Defendants' characterization of Leonesio's methodology and testimony at deposition. To begin, Defendants

appear to assert without any support that the EPPD has *other* use-of-force policies[2] in addition to the one they provided Plaintiffs and Leonesio—an excerpt from the EPPD Procedures Manual that Plaintiffs attached to their response in opposition. *See* Pls.' Resp. in Opp'n to Leonesio Mot., Ex. I, ECF No. 96-1. If so, Defendants may have failed to fully and adequately respond to Plaintiffs' relevant discovery request because Defendants only produced "a single use of force policy" in response to such request. *See* Pls.' Resp. in Opp'n to Leonesio Mot. at 7, ECF No. 96. What is more, an examination of the plain language in the excerpt strongly indicates that the policy therein is the only policy in that manual prescribed as *the* use-of-force policy for the EPPD. The excerpt further contains no cross-references or citations to other sections within the EPPD Procedures Manual revealing the existence of the other use-of-force policies to which Defendants appear to allude.

Moreover, the Court is of the view that Defendants appear to misread the exchanges they cite to support their contention that Leonesio based his opinions on "very limited information." To illustrate, Defendants cite, in relevant part, to the following exchange between the City's counsel and Leonesio:

Q. So by raising "red flags with me," what are you telling the court?

A. Well, I don't think that my -- my focus in this -- in this case -- *I wasn't asked to look at, review, analyze the policies.* All I'm saying is that based on what I have seen, these are concerns. That's all I'm saying. I'm not – *I'm not offering an opinion that -- that El Paso PD has bad policy. I'm not offering an opinion that El Paso PD has bad training*. I did not come into this – it's outside of my scope. What I'm saying is based on what I have seen in my analysis of -- of -- and in the scope that I was hired, these are concerns to me, and that's why I pointed those things out.

Q. Okay. You make a Use of Force Standards and Policy Conclusion, though.

---

[2] Specifically, Defendants assert that "Mr. Leonesio did not examine *all of the City's policies on use of force."* Leonesio Mot. at 7 (emphasis added); *see also* City's Reply to Leonesio Mot. at 2, ECF No. 110 ("Leonesio expressly would not criticize the City's policies in his deposition, the Court should strike Leonesio's opinions about the City's *use of force policies*." (emphasis added)).

A. My conclusion is that based on -- just as I said, is that based on -- *I mean, having not analyzed the materials in full, but just based on the -- what I have read -- now I can't speak to, you know, El Paso's arrest procedures policy or their pursuit driving policy. I didn't look at any of that. All I looked at was this particular policy,* and then I saw how Officer Cajeda -- Escajeda performed, and then I looked at the investigation, which tells me that the department thinks that Officer Escajeda performed within policy, within training, and I see a disconnect.

Leonesio Dep. Tr. at 116:20–117:23 (emphasis added).

At first glance and without context, Leonesio appears to testify that he was *not* hired to do exactly what Plaintiffs represent he was hired to do in part: "testify as to the use of force policy by the EPPD . . . [and] the effect of that policy on the use of force by EPPD officers[.]" Pls.' Expert Designations at 2. Yet, in apparent contradiction, Leonesio later does explicitly offer an opinion about the EPPD's use-of-force policy and its impact on EPPD officers, including Escajeda, in his expert report and deposition testimony. Specifically, Leonesio opined that the EPPD's use-of-force policy used a "foreign" or invented item, "objectively reasoned discretion", and failed to define what that term means, "leav[ing] a lot of ambiguity." *See* Leonesio Report at 6–8 ("Use of Force Standards and Policy Conclusion"); Leonesio Dep. Tr. at 106:17–113:8.

But upon reassessing Leonesio's testimony above with the benefit of context, the record reveals that, consistent with Plaintiffs' expert designations, Leonesio's testimony denotes that he is only rendering an expert opinion about the EPPD's use-of-force policy and that such opinion does not "wade into a broader opinion of training materials and other EPPD policies" which are outside his scope. Pls.' Resp. in Opp'n to Leonesio Mot. at 7. As mentioned above, Plaintiffs designated Leonesio as their use-of-force expert—who will testify, in part, about the EPPD's

use-of-force policy and its effect on EPPD officers, and Katsaris as their *Monell*[3] expert—who will testify about the EPPD's alleged custom, policy, or practice of use of excessive force and deadly force, as well as its alleged failures to properly train, to supervise, and to discipline. *See* Pls.' Expert Designations at 2. Hence, when Leonesio testified that he "wasn't asked to look at, review, analyze the [EPPD] policies" and that he was "not offering an opinion that [EPPD] has bad policy . . . [or] bad training", he was in fact clarifying that he was not testifying as Plaintiffs' *Monell* expert because they only hired him to analyze the EPPD's use-of-force policy. Indeed, Defendants' assertion that Leonesio did not review any relevant training materials is accurate *precisely* because Plaintiffs did not designate him to review the EPPD's training materials and testify about the City's alleged failure to train; instead, Plaintiffs' designated Katsaris for such purpose.

Concerning Defendants' two remaining arguments, the Court agrees with Plaintiffs that both arguments challenge the weight of the evidence and not admissibility. Pls.' Resp. in Opp'n to Leonesio Mot. at 7. First, Leonesio does not appear to have made assumptions without any support about the training Escajeda and other EPPD officers received. In their motion, Defendants specifically take issue with Leonesio's testimony about Escajeda's use of force under the unsupported assumption that Escajeda "was a certified TASER operator." *Id.* Leonesio testified that he made that assumption because, if Escajeda had not been trained to use a taser and certified to use one, then the EPPD would not have furnished him one to carry and use in the first place. Leonesio Dep. Tr. at 133:11–134:1. Leonesio explained that nationally recognized law enforcement standards require police officers to be trained and certified in the use of electroshock weapons before they are furnished one to use in the field. *Id.* at 134:21–135:10. In

---

[3] *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978) (setting the standard for determining whether a municipality may be held liable for a constitutional injury).

fact, when the City's counsel continued to challenge his assumption, Leonesio responded that if he assumed wrong, then he would even be more concerned because that meant the EPPD failed follow nationally recognized law enforcement standards. *Id.*

Thus, the Court is of the view that Leonesio did not improperly assume that Escajeda "was a certified TASER operator" without factual support. As noted above, Leonesio is a qualified a subject-matter expert on police use of force and especially in the use of electroshock weapons. As such, he may "draw a conclusion from a set of observations based on extensive and specialized experience[,]" *Pipitone*, 288 F.3d at 247, especially when he draws such conclusion based on his knowledge of national law enforcement standards and extensive experience as an instructor and policymaker on the use of electroshock weapons.

And second, contrary to Defendants' contention, the record indicates that Leonesio did offer an opinion in that the City's policy caused the alleged deprivation of Ramirez's civil rights. In his report,  Leonesio opined that the EPPD's use-of-force policy had imprecise language that left its officers to navigate two different concepts of decision-making (objective reasonableness and discretion), which appear contradictory and to some extent inconsistent with the Fourth Amendment's objective reasonableness standard in *Graham v. Connor*, 490 U.S. 396 (1989). Further, Leonesio testified that after reviewing all together the EPPD's use-of-force policy, Escajeda's use of force on  Ramirez (which he opined violated the policy, accepted law enforcement practices, and failed to satisfy the *Graham* analysis), and the EPPD approving of Escajeda's use of force, he saw "a disconnect" and a "behavior reinforced by the department." Leonesio Dep. Tr. at 117:10–118:22.  Therefore, the Court overrules Defendants' objections to the reliability of Leonesio's opinions discussed above.

### (c) *Leonesio's Opinion About Tasing a Dead or Unconscious Person.*

Defendants' final objections against Leonesio concern the opinion in his report about the

tasing of a dead or unconscious person.  Leonesio Mot. at 8.  In his report, Leonesio wrote the

following in relevant part:

> It should also be noted, in light of the reported circumstances of this incident, that
> deployment of a TASER on a dead or unconscious person would be inconsistent
> with current policy and training, and would violate the objective reasonableness
> standard. And this only makes sense. Force may be deployed on an individual if
> they are presenting an immediate articulable threat to the officer or others, are
> actively resisting arrest, or are attempting to flee. A dead or unconscious person
> would offer no such dangers.

Leonesio Report at 9.  Defendants seem to argue that Leonesio's opinion touches upon the topic

of Ramirez's cause of death, for which they object because he is not a medical doctor qualified to

render such opinion.  Leonesio Mot. at 8.  Defendants also seem to object to the relevance of

Leonesio's opinion because they argue that he "could not come up with any reason why he

should include a reference to . . . Ramirez being dead or unconscious at the time he was tased."

*Id.*

After due consideration, the Court overrules Defendants' objections.  First, nowhere in

his report or testimony does Leonesio appear to opine about what caused Ramirez's death; much

less controvert what Dr. Mario Rascon, M.D. (the coroner in this case) concluded was the cause

of death here: death by hanging.  *See* Pls.' Resp. in Opp'n to Leonesio Mot., Ex. H, ECF No. 96-

1.  Leonesio's opinion only discusses whether using a taser on an unconscious or dead person is

a reasonable use of force, which he answers in the negative.  And second, such opinion is

relevant to the issue at hand because it counters one of Defendants' potential arguments against

Plaintiffs' claims—namely, that Ramirez was unconscious at the time Escajeda tased him.  In

effect, the record indicates that Defendants are relying on this argument because (1) Rascon

testified that his conclusion that the taser did not contribute to Ramirez's death by hanging was dependent on the fact that Ramirez was unconscious at the time of the tasing, *id.*; and (2) as Plaintiffs point out, Defendants seem to contend in their motion for summary judgment that Ramirez was unconscious at the time of the tasing in an attempt to refute Plaintiffs' alleged pattern of misconduct in support of their *Monell* claims, *see* Pls.' Resp. in Opp'n to Leonesio Mot. at 9 (citing Def.'s Mot. for Sum. J. at 16, 21, ECF No. 90).

Therefore, the Court overrules all of Defendants' objections to Leonesio's expert opinions and denies the pertinent motion.

### 2.  Valentina Ngai.

Defendants deposed Ngai on July 24, 2020.  Ngai Mot. at 2, ECF No. 80; *see also id.*, Ex. A [hereinafter "Ngai Deposition Transcript"], ECF No. 80-1 (transcript of Ngai's deposition, totaling 125 pages of testimony).  Ngai has provided a curriculum vitae, *id.*, Ex. A [hereinafter "Ngai CV"], at 190–98; and a report and opinion on her conclusions, Ngai Mot., Ex. A [hereinafter "Ngai Report"], at 171–85.  Plaintiffs assert that they designated Ngai as an expert who offers the following opinions in support of their claims:

> Dr. Ngai will testify as to the injury that Mr. Ramirez suffered when Officer Escajeda tased him and the impact of the device on Mr. Ramirez's movements. She will further testif[y] [sic] as to how the tasing of Mr. Ramirez contributed to his death by hanging.

Pls.' Expert Designations at 3.

In turn, Defendants seek to exclude Ngai's opinions because they contend that:

1. Ngai does not assert any opinions regarding a pattern or practice of inadequate training; inadequate supervision/discipline; inadequate investigation; or excessive force (i.e. the *Monell* issues). She is not qualified to do so and if she did, any such opinions would be unreliable; unduly and unfairly prejudicial; and speculative and inadmissible.

2.  Ngai[] [sic] is not qualified to offer an opinion as to the cause of [] Ramirez's death. Her opinions are unreliable, based on limited information, speculative and inadmissible.

Ngai Mot. at 2.

Notably, by their first objection, Defendants seek to "strike any opinion that Ngai *could or would* express" relevant to Plaintiffs' *Monell* claims, even though she herself already testified she did not intend to do such thing.  *Id.* at 5 (emphasis added) (citing Ngai Dep. Tr. at 121:2–8). Accordingly, the Court does not address Defendants' first objection because they fail to raise a specific challenge to an opinion that Ngai already proffered or seeks to proffer.  *See United States v. Makkar*, 13-CR-0205-CVE, 2014 WL 1385298, at *3 (N.D. Okla. Apr. 9, 2014) ("[T]he Court will not hold a *Daubert* hearing to determine generally what expert testimony may or may not be admissible at trial absent any specific challenge to the admissibility to the proposed expert testimony.").  Further, Defendants' second objection presents two distinct challenges, the first to Ngai's qualifications and the other to the reliability of her opinions.  The Court addresses each of Defendants' challenges in that order.

### (a) Ngai's Qualifications.

Defendants object to Ngai's qualifications to render opinions about Ramirez's cause of death because she is not a medical doctor.  Ngai Mot. at 6.  Defendants appear to argue that while Ngai may be qualified as a biomechanical engineer, she may not offer an opinion about what could have contributed to  Ramirez's cause of death simply because that opinion would involve the ultimate question of medical causation, which can only be rendered by a qualified medical doctor.  *Id.* at 6, 9; Defs.' Reply to Ngai Mot. at 1, ECF No. 109.  Defendants further object that Ngai has no experience conducting biomechanical studies on "hanging", tasers, or a combination of the two.  Ngai Mot. at 8.

Similar challenges about the extent of expertise of biomechanical engineers have been raised in other courts.  *See, e.g.*, *Okanovic v. Hayes*, 1:18-CV-957, 2019 WL 5692754, at *4 (M.D. Pa. Nov. 4, 2019); *Kern v. Purina Animal Nutrition, LLC*, No. 1:16-CV-1572, 2018 WL 8193884, *1-2 (M.D. Pa. May 14, 2018); *Bostick v. State Farm Mut. Automobile Ins. Co.*, 314 F. Supp. 3d 1265, 1276 (M.D. Fla. 2018), *aff'd*, 774 F. App'x. 600 (11th Cir. 2019); *Burke v. TransAm Trucking, Inc.*, 617 F. Supp. 2d 327, 332-34 (M.D. Pa. 2009); *Berner v. Carnival Corp.*, 632 F. Supp. 2d 1208, 1212 (S.D. Fla. 2009); *Bowers v. Norfolk S. Corp.*, 537 F. Supp. 2d 1343, 1377 (M.D. Ga. 2007); *Shires v. King*, No. 2:05–CV–84, 2006 WL 5171770, at *3 (E.D. Tenn. Aug. 10, 2006); *Yarchak v. Trek Bicycle Corp.*, 208 F. Supp. 2d 470, 501 (D.N.J. 2002); *Smelser v. Norfolk S. Ry. Co.*, 105 F.3d 299, 305 (6th Cir. 1997), *abrogated on other grounds by Morales v. Am. Honda Motor Co.*, 151 F.3d 500, 515 & n. 4 (6th Cir. 1998).

Biomechanical engineering applies "the principles of mechanics to the facts of a specific [event] and provide[s] information about the forces generated in that [event]," and may "explain how the body moves in response to those forces, and . . . determine what types of injuries would result from the forces generated."  *Bowers*, 537 F. Supp. 2d at 1377 (citations omitted).  'Thus, biomechanical engineering is closely related to, and may sometimes overlap with, the field of medicine."  *Id.* (citations omitted).  But the two disciplines remain distinct mainly because, unlike medical doctors, "biomechanical engineers do not diagnose and treat human physical ailments, conditions, diseases, pain, and infirmities."  *Id.* (internal quotations and alterations omitted).  As a biomechanical engineer testified in another case, biomechanical engineers are "qualified to determine what injury causation forces are in general and can tell how a hypothetical person's body will respond to those forces, but are not qualified to render medical opinions regarding the precise cause of a specific injury" because "each individual person has his

own tolerance level, and therefore, [biomechanical engineers] could testify only in general terms, *i.e.*, that 'X' forces would generally lead to 'Y' injuries and 'Y' injuries are consistent with those the plaintiff claims to have suffered." *Smelser*, 105 F.3d at 305.

Accordingly, biomedical engineers are qualified to render opinions "as to the forces generated in a particular [event] and the *general types of injuries* those forces may generate." *Bowers*, 537 F. Supp. 2d at 1377 (citations omitted) (emphasis added); *see also Yarchak*, 208 F. Supp. 2d at 501 (permitting biomechanical engineer to testify generally about types of injuries that may be caused by a bicycle seat). However, biomechanical engineers are not ordinarily permitted to offer opinions about "the precise cause of a specific injury." *Bowers*, 537 F. Supp. 2d at 1377 ("[A biomechanical engineer] may testify as to the effect of locomotive vibration on the human body and the types of injuries that may result from exposure to various levels of vibration. . . . [H]e may not offer an opinion as to whether the vibration . . . caused Plaintiff's injuries."); *Shires*, 2006 WL 5171770, at *3 ("[The biomechanical engineer] clearly should be allowed to testify regarding the forces applied to plaintiff's head . . . , and how a hypothetical person's body would re-spond [sic] to that force. He cannot offer opinions, however, 'regarding the precise cause' of plaintiff's injury.").

After reviewing the record, the Court concludes that Ngai is qualified under Federal Rule of Evidence 702 to render expert opinions as an expert on biomechanics. The record shows extensive evidence of Ngai's qualifications as a biomechanical engineer, having earned a Bachelor of Applied Science in Civil Engineering, a Master of Applied Science in Mechanical Engineering, and a Ph.D. in bioengineering. Ngai CV at 1–4. Notably, her Ph.D. studies focused on kinetics (human motion) and electromyographic studies (how electrical impulses move the body), Ngai Dep. Tr. at 60:15–61:5, and she has subsequently published books and

journal submissions about electricity, its impact on muscle impulses, and the forces that result from that muscle activity, *id.* at 75:1–79:25.

Further, Ngai has over a decade of experience working for a forensic expert company in which she is now the "head of the biomechanics division", *id.* at 62:17–21; serves as a peer-reviewer in numerous peer-reviewing professional associations on biomedical and biomechanical engineering, *id.* at 69:1–70:25, and has testified as a biomechanical expert witness in twenty-four state and federal proceedings, Ngai Mot, Ex. A at 186–89.  Moreover, contrary to Defendants' assertions, Ngai explicitly testified that she has worked on other cases involving hanging incidents, including one involving a "full suspension" hanging.  Ngai Dep. Tr. at 64:1–66:66:9.  Accordingly, the Court concludes that Ngai is qualified "to testify about how forces may affect or injure an individual."  *Berner*, 632 F. Supp. 2d at 1213.  Yet, the Court agrees that she may not offer any opinion about "the precise cause of a specific injury" because she is not a qualified medical doctor.  *Bowers*, 537 F. Supp. 2d at 1377.

Contrary to Defendants' contentions, two things are salient from the opinions in Ngai's report and deposition testimony.  One, she is not diagnosing any injuries on Ramirez.  And two, she is not controverting or rebutting Rascon's opinion that Ramirez's cause of death was by hanging.  Indeed, like similar experts in other cases, Ngai testified that she is entirely relying on the diagnoses that Rascon (a medical doctor) included in his autopsy report to offer her own biomechanical opinion.  Ngai Dep. Tr. at 7:24–8:6; *see also Reynoso v. Ford Motor Co.*, CIV.A. B-03-120, 2005 WL 5994183, at *2 (S.D. Tex. Sept. 27, 2005) ("In the present case, Huston relied on Betty Payan's medical records to provide the list of injuries she sustained in the accident. . . . Nothing in Huston's testimony or report indicates an attempt to provide a diagnosis or a cause of death.").

But what is not so clear is whether Ngai's opinions improperly provide "the specific cause of [Ramirez's] injuries." For instance, in her report, Dr. Ngai uses the following language in rendering her opinion:

> Within the bounds of reasonable biomechanical and scientific certainty, and subject to change should additional information become available, my professional opinions are that:
>
> 1. The muscles penetrated by the taser probes caused Ramirez's torso to forward flex.
> 2. Forward flexion of Ramirez's torso generates tension on the rope that was located around his neck and connected to the basketball apparatus.
> 3. Tension of the rope results in mechanical compression of the anterior and bilateral structures of Ramirez's neck.
> 4. The mechanical compression of the anterior and bilateral structures of Ramirez' neck *contributed to Ramirez' diagnosed injuries* including the external neck abrasions, cardiac arrest, asphyxiation/strangulation, suffocation and Cause of Death due to hanging.

Ngai Report at 15 (emphasis added). Arguably, as Plaintiffs aver, Ngai does not appear to opine that the forces and motions caused by the taser "were *the* cause of death [but] merely that they contribute[d] to the *category* of injuries which Dr. Rascon identified as the cause of death." Pls.' Resp in Opp'n at 7 (emphasis added). Yet, Ngai's use of the word "contribute"—a verb that the Oxford Dictionaries define as to "help to cause or bring about"—which could improperly suggest to the jury that she is in fact providing a medical causation opinion which she is not qualified to offer. *See Oxford Dictionaries Online*, https://premium.oxforddictionaries.com/ (last visited March 3, 2021) (defining "contribute").

Therefore, out of an abundance of caution, the Court will allow Ngai to give her expert opinion about the energy, forces, and motions involved in the incident at issue and whether the same were *sufficient to have caused the type of injuries* that Rascon diagnosed on Ramirez. As such, Ngai's report is admissible *solely* to the extent that she is providing such an opinion. However, Ngai may not give an opinion, in either her report or testimony, that those *specific*

*diagnosed injuries on Ramirez* were caused or caused in part by the energy, forces, and motions involved here. *See Okanovic*, 2019 WL 5692754, at *4 (holding that the biomechanical expert in that case could only testify as to whether the "mechanism of injury" and "level of loads" *could cause* the type of injuries at issue, but not whether they *did* cause the plaintiff's injuries).[4] If Ngai's opinion crosses that threshold, Defendants may raise any relevant objections at trial.

### (b) Reliability of Ngai's Opinions.

Next, Defendants object to the reliability of Ngai's opinions because they are purportedly "not grounded in any testable technique, theory or methodology." Ngai Mot. at 9. Defendants argue that Ngai "does not draw on any theory of biomechanics, physics, or occupant kinematics that purports to connect the observations she makes with the ultimate conclusion that the tasering of Daniel Ramirez contributed to the external neck abrasions, cardiac arrest, asphyxiation/strangulation, suffocation and Cause of Death due to hanging." *Id.* They further contend that Ngai neither appears "to have conducted or consulted any independent testing or study as to the force of the rope and its effect on Daniel Ramirez' neck and body", nor "relied on any scientific literature, peer-reviewed or otherwise, addressing the causation issue—the physiological effect of hanging from a rope and the effects on the body." *Id.*

After reviewing Ngai's report and testimony, the Court overrules Defendants' objections because they challenge the weight of her conclusions and not their admissibility. As Plaintiffs correctly point out, in her report, Ngai "relies on nine biomechanical studies on the mechanism of hanging on the human body as well as the impact of taser electricity on the body." Pls.' Resp.

---

[4] In their response in opposition, Plaintiffs claim that Rascon improperly provided, and may improperly provide at trial, an expert opinion about the forces or motions that the taser imparted on Ramirez's body during the incident. Pls.' Resp. in Opp'n to Ngai Mot. at 7. Because Plaintiffs did not file a motion to exclude such opinions, the Court will not address them at this time. Plaintiffs may raise their objections at trial.

in Opp'n to Ngai Mot. at 9 (citing Ngai Report at 11–15), ECF No. 91.  Further, she relies on

Newton's Laws of Physics, the biomechanics of death by hanging, the biomechanics of a taser

imparting electrical currents on a human body, and on the application of simple principles of

human anatomy, engineering, and physics.  Ngai Report at 11–15; *see also Mohney v. USA

Hockey, Inc.*, 138 F. App'x. 804, 808 (6th Cir. 2005) (noting that Newton's Laws of Physics are

"a recognized and valid scientific method").  Indeed, the fact that another biomechanical

engineer peer-reviewed the opinion in her report as part of a required internal process within her

consulting group suggests that the methodology Ngai used to render her opinion is generally

accepted in the scientific community.  *See* Ngai Dep. Tr. at 41:11–43:22, 47:13–24, 99:25–

100:10.

To be sure, the record neither indicates that Ngai ever conducted any tests or experiments

in reaching her conclusions, nor that she included the myriad of factors listed in Defendants'

motion.  But "[t]he party proffering an expert's opinion testimony need not demonstrate that the

expert employed the best possible methodology[.]"  *Ingram v. Cty. of Camden*, CV 14-5519

(JBS-KMW), 2019 WL 1418119, at *7 (D.N.J. Mar. 29, 2019).  The proffering party need only

demonstrate "that the methodology that was selected is 'reliable' enough to not mislead the jury

and to achieve for the expert's opinion, a grounding in scientific or other specialized

knowledge."  *Id.*; *see also Mitchell v. Gencorp Inc.*, 165 F.3d 778, 781 (10th Cir. 1999) (holding

that the proponent of the expert "need not prove that the expert is indisputably correct or that the

expert's theory is 'generally accepted' in the scientific community" in order to establish the

admissibility of the expert's opinion under Rule 702).  As in any other field of science,

biomechanical scientific methodology has limitations in its methodology.  Among these

limitations include "the obvious fact that *in vivo* research data are unattainable."  *Id.* (emphasis in

original).  "No scientist would subject a human to an experiment to determine", for example, how much force must be applied to a healthy individual to manifest the type of injuries of the sort found in this case.  *Id.*

Thus, the Court agrees with Plaintiffs that Defendants' objections effectively challenge the weight of Ngai's opinion and not its admissibility.  Particularly telling is the fact that Defendants cite to no authority or provide any rebuttal expert testimony that Ngai's opinion would be unreliable without the purported deficiencies to which they allude.  Further, even if Ngai could presumably conduct comparable experiments in an attempt to approximate the circumstances of the incident here, any objections to the results of her experiments would nevertheless be challenging the weight of the evidence and not admissibility.  *See, e.g., Delgado v. Unruh,* 14-CV-01262-JAR, 2017 WL 957437, at *10–11 (D. Kan. Mar. 13, 2017) (overruling numerous objections to the reliability of crash experiments using healthy volunteers, embalmed cadavers, and test dummies, and concluding that these objections "relate to the weight of the evidence").  As such, any purported shortcomings that Defendants perceive in Ngai's methodology may be explored on cross-examination.  *Pike v. Premier Transportation & Warehousing, Inc.*, 13 CV 8835, 2016 WL 6599940, at *5 (N.D. Ill. Nov. 8, 2016); *see also Daubert*, 509 U.S. at 595 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

Therefore, the Court overrules all of Defendants' objections to Ngai's expert opinions and denies the pertinent motion.

### 3.  Ken Katsaris.

Defendants deposed Katsaris on July 27, 2020.  Katsaris Mot. at 2, ECF No. 85; *see also id.*, Ex. A [hereinafter "Katsaris Deposition Transcript"], ECF No. 85-1 (transcript of Katsaris's deposition, totaling 198 pages of testimony).   Katsaris has provided a curriculum vitae, *id.*, Ex. A [hereinafter "Katsaris CV"], at 253–80; and a report and opinion on his conclusions, *id.*, Ex. A [hereinafter "Katsaris Report"], at 281–99.  Plaintiffs assert that they designated Katsaris as a police expert who offers the following opinions in support of their claims:

> Mr. Katsaris . . . will testify as to violations, if any, of nationally recognized police practices throughout the [EPPD's] interactions with Daniel Ramirez and the Ramirez family. Specifically, Mr. Katsaris will testify about the Officers' presence at 234 Liberty St., entry into the backyard of the Ramirez home, use of the taser on Daniel Ramirez, actions taken after the tasing of Daniel Ramirez, and the investigation of the tasing of Daniel Ramirez.

> Mr. Katsaris will further testify as to the customs, policies, and/or practices of the [EPPD] and the City . . . that are outside nationally accepted and recognized procedures and were a moving force in the death of Daniel Ramirez. Specifically, he will testify as to the City's failure to train officers on how to interact with persons in mental health crisis, discipline officers when force is unjustifiably used, classify any custodial deaths as unjustified, and provide appropriate policies and institute procedures to deal with persons in mental health crisis.

Pls.' Expert Designations at 2.

In turn, Defendants seek to exclude Katsaris's opinions because they contend that:

1. Katsaris' opinions regarding use of force by . . . Escajeda; failure to discipline; CAP and IA; defective policies of dealing with persons in mental health crises; failure to classify shooting deaths as unjustified; and, failure to train officers on how to interact with persons in mental health crises (*i.e.* the *Monell* issues) are unreliable; unduly and unfairly prejudicial; speculative and inadmissible.

2. Katsaris' opinion regarding the cause of Daniel Ramirez' death is inadmissible because he is not qualified to render such opinions and they are unreliable, speculative, conclusory and unduly prejudicial.

Katsaris Mot. at 2.  The Court addresses each of Defendants' objections in that order.[5]

---

[5] As Defendants do not object to Katsaris's qualifications as an expert, the Court only addresses their objections to the relevance and reliability of his opinions mentioned in the motion.  *See generally* Katsaris Mot. at 6.

**(a) *Katsaris's Opinion on Escajeda's Use of Force.***

Defendants first object to the reliability of Katsaris's opinion on Escajeda's use of force because Katsaris does not rely on any methodology or analysis in reaching the conclusion that "Escajeda's use of force was not consistent with or justified under any recognized, accepted and trained police practices." *Id.* at 6. Specifically, Defendants argue that Katsaris' opinion about Escajeda's use of force entirely relies on the findings of another of Plaintiffs' experts, Leonesio, and did not result from any independent analysis. *Id.* at 6. In fact, Defendants assert that whenever they asked Katsaris about the topic of use of force during his deposition, he "repeatedly stated that he was not the use of force expert in this case." *Id.* Further, Defendants assert that when they asked Katsaris about the use of force section in his expert report during his deposition, he "did not state any conclusive findings and . . . couched his testimony in whether and who he believed." *Id.* Hence, Defendants ask the Court to exclude Katsaris's opinion on this matter because it is based on speculation and would only be cumulative and unhelpful to the jury. *Id.*

After due consideration, the Court agrees with Defendants that Katsaris's opinion on Escajeda's use of force must be excluded but not entirely for the reasons they set forth. To be sure, the Court agrees with Plaintiffs' assertion that Katsaris, as a qualified police expert, can review the opinions of another police expert and express agreement or disagreement, even if it serves just as background for his own opinion. Pls.' Resp. in Opp'n to Katsaris Mot. at 5, ECF No. 99. Indeed, the Federal Rules of Evidence and *Daubert* permit Katsaris to rely on another expert's report in forming his own expert opinion. *See Daubert*, 509 U.S. at 592 ("Unlike an ordinary witness, see Rule 701, an expert is permitted wide latitude to offer opinions, including those that are not based on first hand knowledge."); *see also* Fed. R. Evid. 702 advisory

committee's note (2000 amendments) ("The term 'data' also is intended to encompass the reliable opinions of other experts.").

However, in relying on Leonesio's opinion, Katsaris must make some independent findings of his own; he cannot act as a mere conduit for Leonesio and regurgitate his opinion on Escajeda's use of force. *See Eberli v. Cirrus Design Corp.*, 615 F. Supp. 2d 1357, 1364 (S.D. Fla. 2009). Otherwise, Katsaris's opinion will be of no assistance to the factfinder because he "merely parrots [Leonesio's] testimony" and is therefore, cumulative under Rule 403. *See Major Mart, Inc. v. Mitchell Distribg. Co., Inc.*, 46 F. Supp. 3d 639, 670 (S.D. Miss. 2014); *Hunt v. McNeil Consumer Healthcare*, 297 F.R.D. 268, 275 (E.D. La. 2014).

In his report, Katsaris only opines the following about Escajeda's use of force:

Along with all of the other materials listed in this report, I have reviewed the expert report of Michael Leonesio in this matter and agree with all of his opinions and findings. For the same reasons set forth in detail in Mr. Leonesio's report, I also conclude that Officer Escajeda's use of a taser was not consistent with recognized, accepted and trained police practices. Officer Escajeda responded to an unarmed suicide call, yet quickly brandished his weapon upon arrival. He arrived without the support of trained personnel. He approached Mr. Ramirez and resorted to force when it was not justified under recognized, accepted and trained police practices.

Katsaris Report at 4. On its face, Katsaris's opinion merely parrots Leonesio's opinion on Escajeda's use of force and does not offer any new findings which will assist the factfinder in deciding whether Escajeda's use of force was reasonable. Katsaris's deposition testimony confirms the same:

Q. In the course of studying and creating your report, you studied this particular incident involving Daniel Ramirez?

A. I looked at everything, but I wasn't rendering the opinions on it; that's correct. I looked at the file, and I reviewed mostly the report of Mr. Leonesio as a result of a somewhat cursory review of what occurred to see if I agreed with Mr. Leonesio, and I do. *So basically my opinions are, in this case, his opinions, because I wasn't asked to render opinions on this case in terms of the specificity of being the use of force expert.*

Katsaris Dep. Tr. at 56:8–18 (emphasis added).

Thus, to the extent that Katsaris's opinion merely acts as a conduit for Leonesio's opinion, then it must be excluded under Rule 403 as cumulative.  While Plaintiffs argue that his opinion is not cumulative, their own assertions betray their argument:

> While a separate use of force/taser expert was retained by Plaintiffs to provide a narrow opinion on Escajeda's tasing of Ramirez and the El Paso Policy Department's use of force policy, Mr. Katsaris was asked to offer broader opinions on the department's discipline, mental health policies, and training and whether those department-wide practices played a role in Escajeda's tasing of Ramirez.

Pls.' Resp. in Opp'n to Katsaris Mot. at 5.  Simply put, if Leonesio will already be offering his opinion to the jury about Escajeda's use of force and the EPPD's use-of-force policy during Plaintiffs' case-in-chief, then Plaintiffs have no need for Katsaris to regurgitate Leonesio's opinion.[6]  Thus, the Court sustains Defendants' objections to Katsaris's opinion on Escajeda's use of force to the extent that it is cumulative as presented.  However, as the record indicates that Katsaris is indeed qualified to render such an opinion, whether the Court admits or excludes this opinion at trial will depend on the manner in which it is offered.

### (b) Katsaris's Opinion on the City's Failure to Discipline / Failure to Investigate.

Next, Defendants seem to object to the reliability of the methodology Katsaris used in rendering his opinions about the City's alleged failure to properly investigate and discipline

---

[6] But to be clear, Katsaris may still refer to Leonesio's opinions on Escajeda's use of force and the EPPD's use-of-force policy, and their specifics, while he offers his own expert opinions about Plaintiffs' *Monell* claims and the other EPPD's policies, when relevant.

In fact, Plaintiffs appeared to have averred to this in their response: "[Katsaris's] opinion on whether these departmental practices played in role in Ramirez's death necessarily requires a review Mr. Leonesio's finding that the taser use against Ramirez was outside of accepted police practices because there was no immediate threat and Ramirez presented only passive resistance."  Pls.' Resp. in Opp'n to Katsaris Mot. at 5.

officers.  Katsaris Mot. at 7.  In brief, Defendants contend that Katsaris improperly (1) relies on Judge Martinez's decision denying the City's summary judgment motion in the companion case of *Sanchez, et. al. v. Gomez, et. al.*, EP-17-CV-133-DCG[7]; (2) considers cases that occurred after the tasing of Ramirez; (3) relies on "shooting" cases; (4) criticizes without evidence that the disciplinary process shows EPPD Chief Greg Allen's "deliberate indifference"; and (5) cites cases that are not sufficient to establish a pattern or practice.  *Id.* at 7–12.  But after scrutinizing the record, the Court overrules Defendants' objections because they all challenge the weight of Katsaris's opinions and not their admissibility.

First, nowhere in his report or testimony does Katsaris appear to rely on Judge Martinez's summary judgment decision.  To begin, the record shows that Katsaris provided his expert report on February 24, 2020, a week before Judge Martinez issued the relevant decision on March 3, 2020.  *See* Pls.' Resp. in Opp'n to Katsaris Mot., Ex. C, ECF No. 99-1.  Further, the Court agrees with Plaintiffs that all the deposition exchanges Defendants cite in support clearly indicate that Katsaris merely referred to Judge Martinez's decision to state "that he is offering opinions on the same cases considered in the *Sanchez* matter and [that] he agrees with Judge Martinez's conclusions."  Pls.' Resp. in Opp'n to Katsaris Mot. at 6.  As a matter of fact, immediately after one of these cited exchanges, Katsaris explained the same to the City's counsel:

> Q. Are you saying that the judge has made a determination that there was wrongdoing in each of these cases –
>
> A. He said that –
>
> Q. -- or that there -- or that there was sufficient information that it would go to a fact finder?
>
> A. When I answered your question, sir, you said where did I get the fact that I was using those cases. And I said those cases were the ones that went before a court

---

[7] After the sudden and unfortunate passing of Judge Martinez earlier this month, *Sanchez* was transferred to the undersigned judge for management.

> that said that a jury could find -- a reasonable jury could find constitutional
> violations. Those are the cases I evaluated. I was answering that question.

Katsaris Dep. Tr. at 99:3–14.

Second, Defendants cite to no authority precluding Katsaris's consideration of post-incident cases in rendering his opinion about whether a given pattern or practice exists in the EPPD.  As Judge Martinez found in his summary judgment decision in *Sanchez*, it is true that a plaintiff cannot rely *exclusively* on future instances to establish *Monell* liability based on a pattern of conduct.  *Sanchez v. Gomez*, EP-17-CV-133-PRM, 2020 WL 1036046, at *16 (W.D. Tex. Mar. 3, 2020) (citing *Valle v. City of Houston*, 613 F.3d 536, 548 (5th Cir. 2010)).  However, when a claim presents a mixed bag of events that occurred *before* and *after* the incident at issue—like Plaintiffs do here, the instances that happened *afterwards* could still be probative in determining whether a pattern existed at the time of the incident at hand.  *Id.*  Otherwise, as Judge Martinez eloquently wrote:

> Were the Court limited to only past instances, a hypothetical plaintiff from a future instance in the pattern could rely on Mr. Salas-Sanchez's death to survive summary judgment, while Plaintiffs in this case might lose summary judgment should the prior instances not reveal a pattern on their own.[]  Thus, the Court contemplates how many instances of excessive force are necessary before Defendant City of El Paso has earned the "requisite degree of culpability" for possible municipal liability.  Furthermore, the law is unclear on whether it requires Defendant City of El Paso to answer for all instances forming the pattern, or only the final few.  This challenge gets to the heart of the nebulous and ill-defined "deliberate indifference" standard, one that is difficult to apply when prior instances do not indicate an obvious conclusion.  Therefore, the Court is reluctant to deny a plaintiff access to justice       when       the       law       does       not       so       require.

*Id.*  While Defendants attempt to support their argument by citing to the Supreme Court case of *Board of County Commissioners of Bryan County, Oklahoma. v. Brown*, 520 U.S. 397, 410 (1997), the holding in that case does not undermine Judge Martinez's reasoning behind his conclusion above.  *See id.* ("As our decision in *Canton* [*v. Harris*, 489 U.S. 378 (1989),] makes

clear, 'deliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action.").

Third, Defendants cite to no authority precluding Katsaris's consideration of "shooting cases" in rendering his opinion about whether a given pattern or practice exists in the EPPD.  To be sure, it is undisputable that Escajeda used a taser and not a firearm on Ramirez during the night in question.  But the officers' choice of weapon in these incidents is immaterial because the issue Plaintiffs raise is whether the EPPD failed to properly investigate and discipline the officers for their alleged *excessive use of force* (specifically in cases involving people suffering a mental health crisis), not whether they properly used deadly versus non-deadly force in each of those cases.  As such, Defendants' argument effectively challenges the weight of Katsaris's opinion and not its admissibility—a challenge more appropriately addressed during cross-examination.

And fourth, the Court agrees with Plaintiffs that Defendants' last two rather unclear arguments are better addressed in a summary judgment motion or during cross-examination at trial.  For example, Defendants seem to argue that Katsaris failed to identify any evidence showing the EPPD's failures "in the investigative arena in any way that even comes close to what courts have found constitutionally deficient or suspect in the context of 'deliberate indifference' to investigative deficiency."  Katsaris Mot. at 9.  Defendants further seem to argue that Katsaris failed to consider more cases in rendering his opinion about the purported pattern they establish for that pattern to be sufficient for *Monell* liability.  *See* Katsaris Mot. at 12 ("With respect to his opinions in this regard, Mr. Katsaris relied upon three prior incidents, from 2010 until April 2015, one of which resulted in the termination of the officer. This is nowhere near sufficient to show a viable pattern practice or custom by any standard in the country." (citing *Pineda v. City of Houston*, 291 F.3d 325, 329 (5th Cir. 2002)).  Hence, the Court is of the view

Defendants' last two arguments effectively challenge the weight of Katsaris's opinions and not their admissibility.

*(c)* ***Katsaris's Opinion on the City's Policies and Training on Dealing with People in Mental Health Crises.***

Defendants next object to Katsaris's opinions about the EPPD's allegedly deficient policies and training on dealing with people in mental health crises. Defendants complain that these opinions are "inaccurate, unreliable; blatantly contradicted by evidence; reek of rank lazy speculation with virtually no analysis or effort to examine the actual [EPPD's] training on mental health; the [EPPD's] relationship/compliance with TCOLE[8]; much less TCOLE requirements in this area." Katsaris Mot. at 13. They aver that Katsaris had almost no familiarity with Escajeda's training records, and that had he done "a cursory review of [the] evidence and the TCOLE requirements, he would have seen from the evidence that . . . Escajeda was a mentally health certified officer and has all of his required TCOLE training." *Id.* But reviewing the record, the Court overrules these objections.[9]

---

[8] TCOLE stands for the Texas Commission On Law Enforcement.

[9] Viewing the contents of the instant objection in context, it is unclear to the Court whether Defendants are also objecting to Katsaris's qualifications to render an opinion about the EPPD's allegedly deficient policies and training on dealing with people suffering of mental health crises. Specifically, Defendants contend in passing that Katsaris is "not sufficiently qualified to offer an opinion on requirements of mental health training in Texas" and that he "lacks the training, education and experience to testify regarding TCOLE or State of Texas-mandated training requirements for mental health and a failure on the part of the City of El Paso to comply." Katsaris Mot. at 13.

Assuming that Defendants are indeed objecting to Katsaris's qualifications to testify on these particular matters, the Court nevertheless finds that Katsaris is indeed qualified to testify on TCOLE training requirements. Notably, Katsaris testified that, as a law enforcement expert, he has had experience reviewing and analyzing the TCOLE requirements over the years in a number of cases he has been involved in, particularly in Dallas and Houston. Katsaris Dep. Tr. at 35:24–38:1. As such, the Court concludes that Katsaris is qualified to review the relevant TCOLE requirements at issue and offer an opinion to assist the jury in determining its constitutional adequacy.

First, the record contradicts Defendants' assertions that Katsaris had almost no familiarity with Escajeda's training records.  For example, Katsaris testified the following about his knowledge and review of Escajeda's training records:

> Q. Did you examine Officer Escajeda's training records?
>
> A. I believe that I reviewed -- I reviewed so many files that I'm trying to recall. I believe I saw that he attended Taser training and quarterly -- the every-two-year Taser training. He'd only been there -- he couldn't have taken more than one. He began with the department in 2014, this happened in 2016, he could not recall if he took one of the 40-hour in-service training courses, and I did not see it documented.
>
> Q. Do you believe this incident happened in 2016?
>
> A. I'm sorry? 2015. I said 2016?
>
> Q. Yes.
>
> A. I meant 2015. And he began in twenty -- I believe in twenty -- he went into the academy in 2013, I believe he graduated 2014, and this occurred in 2015. So he likely did not have any of the department's in-service training. He thought he may have had some online training, but he could not articulate it, and it wasn't documented either.

Katsaris Dep. Tr. 159:17–160:11.  And second, Defendants' remaining arguments once again are evidently all aimed towards challenging the weight of Katsaris's opinions and not their admissibility.  These latter arguments are better raised at trial during cross-examination.

### *(d) Katsaris's Opinion on the City's Failure to Classify Shooting Deaths as Unjustified.*

Next, Defendants appear to object to the reliability of Katsaris's opinion that the City's failure to classify shooting deaths as unjustified is outside nationally accepted and recognized police practices.  They claim his analysis is "conclusory; speculative; prejudicial; unreliable and constitutes inadmissible expert testimony."  Katsaris Mot. at 13.  But Defendants' instant objection is completely devoid of any supporting legal argument that would help clarify its basis.  Therefore, the Court overrules this objection.

### (e) *Katsaris's Opinion on Ramirez's Cause of Death.*

Lastly, Defendants object to Katsaris's qualifications to offer his purported opinion about Ramirez's cause of death.  They argue that Katsaris offered an opinion based on Ngai's own opinion that the taser could have sufficiently caused the type of injuries that Rascon diagnosed on Ramirez that led to his death by hanging.[10]  *Id.* at 14 (citing Katsaris Dep. Tr. 62:2–13; 64:8–23).  Hence, they contend that Katsaris's opinion should be excluded because he is not a qualified medical doctor who can testify on medical causation.  *Id.*  Defendants also complain that Katsaris cannot offer an opinion about whether Ramirez was conscious or alive when Escajeda approached him for the same reasons.  *Id.*  After due consideration, the Court overrules Defendants' objection.

Indisputably, Katsaris is not a medical doctor and he cannot offer an opinion on medical causation.  But nowhere in the exchanges that Defendants cite from his deposition does Katsaris himself offer a medical causation opinion or controvert what Rascon diagnosed as the cause of death: death by hanging.  As Plaintiffs correctly assert, in these exchanges, Katsaris merely refers to Ngai's biomechanics opinion in explaining what he believed occurred during the night at issue in response to questions that the City's counsel himself elicited.  *See* Katsaris Dep. Tr. at 56:19–21 ("Q. All right. Can you give us an overview of your understanding of what happened in this particular incident?").  As noted above, the Federal Rules of Evidence and *Daubert* allow Katsaris to rely on the expert opinions of others in rendering his own.  *See Daubert*, 509 U.S. at 592; Fed. R. Evid. 702 advisory committee's note (2000 amendments) ("The term 'data' also is intended to encompass the reliable opinions of other experts.").

---

[10] As noted above in the section addressing the objections against Ngai's expert opinions, the Court construes Ngai's opinion as such.

And finally, the record also shows that Katsaris at no point offers an opinion as to whether Ramirez was conscious or alive at the time Escajeda approached him.  The following exchange between the City's counsel and Katsaris indicates that Defendants misread Katsaris's answer to a question they themselves elicited:

> Q. Do you know if Daniel Ramirez was conscious at the time that Officer Escajeda went into that back yard?
>
> A. I already testified to that, asked and answered, and/or I answered, one or the other. I said that Officer Escajeda believe[d] that he saw signs of life. I said I don't know. I mean, I wasn't there. He said he saw the eyes were open; whether they may have been moving or not, I don't know. I'm not sure.
>
> Q. Do you know if he might have already been dead when Officer Escajeda entered that back yard?
>
> A. The best evidence is from Officer Escajeda who said that he believed he was alive.
>
> Q. Do you know if Officer Escajeda is a medical doctor?
>
> A. He is not a medical doctor, but he's a police officer who decided to use force against someone. And he was asked whether or not he would use the Taser on a person that was unconscious, and he was asked whether he would use the Taser on somebody that was dead, you know, and it appears that he would only use the Taser if there was a threat to him for potential injury. We've already got on record that it was passive resistance and he shouldn't have used it at all no matter what. I don't know how else to answer that.

Katsaris Dep. Tr. 66:2–25.  Thus, Defendants' objection is overruled.

Therefore, the Court sustains in part Defendants' objections to Katsaris's expert opinions and accordingly, grants in part, denies in part their pertinent motion.

## B.  Defendants' Expert Witness – Robert Taylor.

On March 9, 2020, Defendants designated Dr. Robert Taylor as a rebuttal witness to Plaintiffs' three expert witnesses.  City's Designation of Rebuttal Experts, ECF No. 70; Escajeda's Designation of Rebuttal Experts, ECF No. 71.  On March 19, 2020, Defendants also

jointly designated Taylor as their retained expert witness. Defs.' Designation of Expert Witnesses, ECF No. 74. Plaintiffs deposed Taylor on August 18, 2020; *see* Taylor Mot., Ex. B [hereinafter "Taylor Deposition Transcript"], ECF No. 101-1 (transcript of Taylor deposition, totaling 143 pages of testimony). Taylor included his curriculum vitae within his expert report, *id.*, Ex. A at 2–5 [hereinafter "Taylor CV"]; *see also id.*, Ex. A at 6–24 [hereinafter "Taylor Report"]. Defendants assert that they designated Taylor as an expert who offers the following opinions:

> Dr. Taylor will testify as to training, standards, policies, his examination of all of the materials he reviewed in connection with preparing his report and the conclusions, and the basis for the conclusions he reached in his report. Dr. Taylor may testify as to additional information to be disclosed by the Parties and how that additional information may change or support his conclusions. Dr. Taylor will testify as to the deficiencies in Plaintiffs' experts Ken Katsaris', Michael Leonesio's and Valentina Ngai['s] [sic] reviews, assumptions and conclusions.

Defs.' Designation of Expert Witnesses at 2.

In turn, Plaintiffs seek to exclude: (1) "Taylor's opinion on Escajeda's use of the taser against Ramirez", Taylor Mot. at 3, ECF No. 101; (2) "Taylor's improper bolstering of Escajeda's testimony", *id.* at 10; and (3) "Taylor's opinion on the pattern of cases identified by Plaintiffs in support of their claims regarding the City's failure to discipline, failure to train, failure to provide adequate policies to guide officers on how to interact with persons suffering a mental health crisis", *id.* The Court addresses each of Plaintiffs' objections in that order.[11]

### *(a) Reliability of Taylor's Opinion on Escajeda's Use of Force.*

Plaintiffs object to the reliability of Taylor's opinion on Escajeda's use of force because they argue his methodology in rendering that opinion is based on a misapplication of *Graham v.*

---

[11] As Plaintiffs do not object to Taylor's qualifications as an expert, the Court only addresses their objections to the relevance and reliability of his opinions mentioned in the motion. *See* Taylor Mot. at 3, n.11.

*Connor. Id.* at 3.  Plaintiffs contend that Taylor misinterprets the decision's "objective reasonableness" standard and then applies his flawed misunderstanding to the facts of this case, which ultimately will confuse the jury and undermine its ability to understand the evidence. *Id.* at 3–4.  Specifically, Plaintiffs quarrel with Taylor's purported reliance on Escajeda's subjective beliefs and fears in rendering his opinion that the use of force here was objectively reasonable under *Graham. Id.* Plaintiffs claim that Taylor repeatedly accepts Escajeda's subjective beliefs as true and does not test whether they are objectively reasonable under the facts and circumstances confronting Escajeda during the incident. *Id.* at 7–8.

After reviewing Dr. Taylor's report and deposition testimony, the Court agrees with Plaintiffs and concludes that Taylor's opinion on Escajeda's use of force must be excluded because he fails to apply the "objective reasonableness" standard as directed by the United States Supreme Court and the Fifth Circuit.

In *Graham*, the Supreme Court held that "[t]he officer's reasonableness in using force— deadly or non-deadly—is analyzed under an objective standard 'in light of the facts and circumstances confronting the officer, without regard to his or her underlying intent or motivation.'" *Mason v. Lafayette City-Par. Consol. Gov't.*, 806 F.3d 268, 275 (5th Cir. 2015) (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989) (alterations omitted)).  The reasonableness of an officer's conduct depends on the "facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Cooper v. Brown*, 844 F.3d 517, 522 (5th Cir. 2016) (quoting *Graham*, 490 U.S. at 396).

In assessing an officer's reasonableness in using force, courts must adopt "the perspective of a reasonable officer on the scene rather than judge with the 20/20 vision of hindsight." *Id.* (quoting *Graham*, 490 U.S. at 396) (alterations omitted).  Courts must also make "allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97.  Hence, courts "only consider facts that were 'knowable' to [the officer]." *Winzer v. Kaufman Cty.*, 916 F.3d 464, 474 (5th Cir. 2019) (quoting *White v. Pauly*, 137 S. Ct. 548, 550 (2017)); *see also Hegarty v. Somerset Cty.*, 53 F.3d 1367, 1379 n.11 (1st Cir. 1995) ("[O]mniscience is not the presumed mind set with which an objectively reasonable police officer approaches life-endangering situations.").

But courts must question whether the officer's use of force was objectively reasonable in light of the facts and circumstances confronting him, "not whether the force was justified based on [the officer's] claimed interpretation of the situation at the time." *Autin v. City of Baytown*, 174 F. App'x. 183, 185 (5th Cir. 2005) (citing *Stroik v. Ponseti*, 35 F.3d 155, 158 (5th Cir. 1994); *see also Perez v. Suszczynski*, 809 F.3d 1213, 1219–20 (11th Cir. 2016) (noting that the "reasonable officer standard does not mean [courts] give the challenged officer's self-serving testimony more weight" than testimony of other witnesses or accept his subjective beliefs).  That is because an officer's subjective beliefs, however induced, are irrelevant.  *See Sevigny v. Dicksey*, 846 F.2d 953, 957 (4th Cir. 1988) (citing *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)).

Instead, the proper focus is upon whether another officer confronting the same objective facts could have also reasonably concluded that he or another person "was in danger *at the moment of the threat* that resulted" in the use of force.  *Bazan ex rel. Bazan v. Hidalgo Cty.*, 246

F.3d 481, 493 (5th Cir. 2001) (emphasis in original); *Gibson v. Officer, P.A.*, 44 F.3d 274, 277–

78 (5th Cir. 1995); *see also Escobar v. Harris Cty.*, 442 S.W.3d 621, 629 (Tex. App. 2014)

("Whether a sufficiently serious threat exists is a matter of objective reasonableness, not

subjective belief, which nonetheless takes into account the facts and circumstances faced by the

individual officer." (citing *Graham*, 490 U.S. at 396–97)).  While an officer's mistaken decision

to use force does not by itself transgress constitutional bounds, courts must still assess whether

the officer's mistake, misapprehension, or ignorance of fact leading to his use of force was

objectively reasonable in light of the facts and circumstances confronting him.  *See Romero v.

City of Grapevine, Texas,* 888 F.3d 170, 178 (5th Cir. 2018) (holding that "[i]n light of the

information available to him at the time of the shooting," officer's fear that subject was armed

and his subsequent use of force were reasonable despite subject ultimately being found to have

been unarmed).

　　Several circuit courts, including the Fifth Circuit, have applied the objective

reasonableness standard accordingly.  *See, e.g.*, *Autin*, 174 F. App'x. at 185 (noting that it was

irrelevant for the officer to claim he felt threatened by plaintiff just because she wielded a brick

when the facts indicated that plaintiff was "objectively unthreatening"); *Latits v. Phillips*, 878

F.3d 541, 550–51 (6th Cir. 2017) ("Phillips testified that he subjectively believed Officer Jaklic's

broadcast that Latits had tried to ram Jaklic's car, and thought Latits was trying to ram an officer

a second time when he saw Latits's car collide with Jaklic's car about five seconds before

Phillips fired at Latits. . . . [But] Phillips's life was never in imminent danger, and, under the

objective analysis of Latits's slow collision with Officer Jaklic's car, no other officer's life was

endangered in the moments before Phillips fired."); *Perez*, 809 F.3d at 1219–20 ("Suszczynski's

beliefs about his life or Hannigan's life being in danger are just that—his beliefs. They are not

'facts and circumstances' that we may rely on to objectively determine the reasonableness of his actions."); *Weinmann v. McClone*, 787 F.3d 444, 449 (7th Cir. 2015) (**"**A reasonable officer, he continues, would see this as an inherently dangerous encounter. But McClone does not explain why a reasonable officer would believe that he was in imminent danger simply because he was entering an enclosed garage with a single entrance."); *Clem v. Corbeau*, 284 F.3d 543, 551 (4th Cir. 2002) (**"**Moreover, whatever Corbeau thought he heard Clem say and whatever he understood about the earlier incident, there is considerable evidence that a reasonable officer in Corbeau's position could not have perceived that Clem was, in fact, armed on November 9.").

Here, as Plaintiffs correctly point out, Taylor's report and deposition testimony strongly suggest that he is misapplying the objective reasonableness standard.  To begin, in trying to explain the standard in layman's terms, Taylor analogizes the standard to the idiom of "beauty is in the eye of the beholder":

> Q. If you do not believe there are any standards governing the use of a taser, how did you reach your conclusion that the use of a taser was constitutional?
>
> A. Well, an officer has a right to protect himself. And the amount of danger associated within a situation is formed within the mind of that police officer. *And to use -- kind of the analogy is, The beauty is in the eye of the beholder. Right? The danger of a situation is within the eye of that police officer. That's precisely what the Supreme Court has offered in Graham versus Connor, that there shouldn't be any Monday morning quarterback. You know, no 20/20 hindsight, I believe, is the word they used.* That, indeed, what you look at is whether or not the individual violated a person's right, constitutional right by inflicting upon that individual some kind of force that was not appropriate.

Taylor Dep. Tr. at 32:18–33:9 (emphasis added).  But this idiom is inherently associated, in legal and layman terms, with *subjective* viewpoints.  *See, e.g.*, *Medina v. Ramsey Steel Co., Inc.*, 238 F.3d 674, 681 (5th Cir. 2001) (likening the idiom to an employer's subjective criteria in hiring its employees); *Brown v. Am. Intern. Group, Inc.*, 339 F. Supp. 2d 336, 346 (D. Mass. 2004) ("Logic, like beauty, is in the eye of the beholder and greatly depends upon the subjective mental

process of the reviewer."); *United States v. Bd. of Hamilton County Comm'rs*, 1:02-CV-107, 2013 WL 5722794, at *9 (S.D. Ohio Oct. 21, 2013) ("Finally, Mr. Kohus testified that the grading of trading cards is subjective as "beauty is in the eye of the beholder.").

Arguably, Taylor could have understandably misused the idiom accidentally at deposition without affecting his overall analysis of Escajeda's use of force. But a thorough review of his report and testimony effectively evinces a misapplication of the objective reasonableness standard. Notably, Taylor appears to repeatedly accept Escajeda's beliefs of the situation without objectively testing their reasonableness in light of the facts Escajeda was confronting at the time. For instance, in his report, Taylor states that

> Escajeda believed he heard dispatch describe the nature of the call-for-service as a 'suicidal subject with weapon.' . . . Escajeda's belief that . . . Ramirez was armed with a weapon was ultimately mistaken but nonetheless, was an important and *reasonable assumption* given the information [available] [sic] to . . . Escajeda.

Taylor Report at 10 (emphasis added). But nowhere in his report does Taylor provide the basis or identify the objective facts—namely, the contents of the actual dispatch that Escajeda heard— on which he relied for his finding that Escajeda's misapprehension of the dispatch was reasonable. Taylor also fails to do the same in his deposition testimony. *See* Taylor Dep. Tr. at 48:8–11; 93:5–16.

Also, throughout his report and testimony, Taylor discusses a situation known as "suicide by cop", "whereby suicidal subjects seek to bring about their own death by provoking armed police officers to shoot them." Taylor Report at 8; Taylor Dep. Tr. at 89:11–91:11. In his report, Taylor opines that Escajeda's "expressed fears about a potential [suicide by cop] encounter were valid, legitimate and reasonable based on his professional experience and on available, widely recognized, and scholarly research." *Id.* at 10. But nowhere does he provide the objective facts

which led Escajeda to reasonably conclude that Ramirez's case involved a "suicide by cop".

Notably, Taylor provides the following relevant analysis:

> Escajeda recalled a previous situation he had responded to just one month earlier in which a suicidal subject threatened to bring about his own death by provoking . . . Escajeda to shoot him. The experience of this previous episode is very real from the officer's perspective, and it helped formed the basis of a second factor that contributed to both the stress and uncertainty of the encounter with . . . Ramirez: The potential for a Suicide by Cop (SbC) situation.
>
> . . . .
>
> Escajeda's perception of the situation is not unreasonable, as these sorts of cases have been empirically verified within the research literature [citations omitted]. Interestingly, in this case . . . Ramirez clearly exhibited two of the three primary indicators identified by scholars to distinguish SbC situations. The first statistically significant indicator of SbC is "communicated intent" where the individual is known to have explicitly communicated a suicidal intention during or before the incident. . . . Ramirez had previously—indeed almost continually—communicated suicidal intent to members of his family over the course of the previous years. The second statistically significant indicator of SbC is "showed intent" where the individual indicates nonverbal suicide intent through life threatening or criminal behavior with a lethal weapon or what appears to be a lethal weapon. . . . Ramirez had previously tried to cut his own wrists; but also, and more uniquely, he had just days earlier strung a noose from the rim of the basketball pole in his family's own backyard. . . . Escajeda believed this case was potentially a SbC situation, and that belief was obviously reasonable based on the circumstances.

Taylor Report at 10, 18–19.

While it stands to reason that the reasonableness standard would allow officers to rely on their experience in determining whether to use force, the specific inferences they draw from the facts that they confronted in light of such experience must still be reasonable. *See Ohio v. Robinette*, 519 U.S. 33, 39 (1996) ("We have long held that the "touchstone of the Fourth Amendment is reasonableness."") (quoting *Florida v. Jimeno*, 500 U.S. 248, 250 (1991)); *see also Terry v. Ohio*, 392 U.S. 1, 27 (1968) ("And in determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is

entitled to draw from the facts in light of his experience."). However, Taylor neither identifies

the objective facts nor the specific inferences Escajeda could have drawn from those facts, in

light of his previous potential "suicide by cop" experience, which ultimately led him to

*reasonably* believe the incident here entailed a similar situation. Taylor fails to do the same in

his deposition testimony. *See* Taylor Dep. Tr. at 42:16–43:11; 45:8–46:17.

If anything, Taylor seems to rely on facts not available to Escajeda at the time of the

incident. Indeed, a comparison between Taylor's own understanding of the facts and the

"primary indicators" he identifies to distinguish "suicide by cop" situations reveals several

incongruencies. For one thing, at no point does Taylor indicate that Escajeda knew that Ramirez

had communicated his intent to commit suicide, much less that he did so "almost continually . . .

over the course of previous years." Taylor Report at 18–19. All that Taylor indicates Escajeda

supposedly heard at dispatch was that there was a suicidal subject with a weapon and that he had

to "speed it up"—not that Plaintiffs had told to the 911 operator that Ramirez told them he was

committing suicide. *Id.* at 8. Neither does Taylor indicate that Escajeda knew that Ramirez had

previously showed intent to commit suicide aside from the incident here, such as cutting his own

wrists and stringing a noose in his backyard days before the incident. *Id.* at 18–19. At

deposition, Taylor also appears to have testified that he relied on these facts not available to

Escajeda in rendering his own opinion. Taylor Dep. Tr. at 91:12–92:21.

And finally, the Court notes that Taylor also considered other improper factors in

rendering his opinion that Escajeda's use of force was reasonable. For example, Taylor's

deposition testimony indicates that he considered for his reasonableness analysis the fact that

Escajeda was neither indicted nor disciplined, and that the EPPD's Internal Affairs division

found Escajeda's use of force was within policy. *See* Taylor Dep. Tr. at 28:13–29:21. But none

of these factors are relevant to the standard applicable in determining the reasonableness of Escajeda's use of force: the objective reasonableness standard.  In fact, the legal standards applicable to criminal liability and local police discipline are vastly different from the one applicable in this case.  As the Fifth Circuit has previously noted, "[u]nder § 1983, the issue is whether [the officer] violated the Constitution, not whether he should be disciplined by the local police force" or whether the state should pursue criminal charges against him.  *Stroik v. Ponseti*, 35 F.3d 155, 159 n.4 (5th Cir. 1994) (quoting *Smith v. Freland*, 954 F.2d 343, 347 (6th Cir. 1992)).  As such, any conclusions reached under those other standards are neither controlling nor relevant on the question of whether Escajeda's use of force was reasonable.[12]

Therefore, the Court finds that Taylor's opinion on Escajeda's use of force, as presented in both his report and deposition testimony, must be excluded based on its fundamentally flawed methodology.  The Court concludes that if such opinion is allowed at trial, it will likely confuse and mislead the jury into believing the objective reasonableness standard considers an officer's subjective beliefs, facts not known or available to him, and other improper factors that are not controlling or relevant in determining the reasonableness of Escajeda's use of force. Nonetheless, since the record indicates that Taylor is indeed qualified to render an opinion on the reasonableness of an officer's use of force, whether the Court admits or excludes his opinion about the issue at trial will depend on the manner in which Taylor offers it—namely, whether he applies the objective reasonableness standard correctly.

### (b) Taylor's Improper Bolstering of Escajeda's Character and Testimony.

---

[12] To be clear, nothing in this section prohibits Taylor from testifying about how he concluded that Escajeda's use of force was within the EPPD's policy and accepted law enforcement practices, as well as how the EPPD found Escajeda's use of force was within policy, for purposes of Plaintiffs' *Monell* claims.  Taylor just may not do so in an opinion about the reasonableness of Escajeda's use of force. Plaintiffs may raise any relevant objections at trial.

Next, Plaintiffs object to Taylor's alleged improper bolstering of Escajeda's character and testimony. Plaintiffs indicate that in his report, Taylor discusses in depth how Escajeda deserved a "commendation" for responding differently to an unrelated, dissimilar suicide call one year after the incident at issue here.[13] Taylor Mot. at 10. Hence, Plaintiffs argue that Taylor's testimony only serves as an improper character opinion which will give unwarranted weight and encourage the jury to give more weight to Escajeda's contentions and testimony. *Id.*

In response, Defendants concede that Taylor's opinion is not relevant to Escajeda's use of force during the night in question. City's Resp. in Opp'n to Taylor Mot. at 3, ECF No. 112. But Defendants contend that it is still relevant to Plaintiffs' claims that the EPPD has "an unwritten policy of using excessive force" against people who are suffering a mental crisis and that such policy caused Escajeda to use excessive force against Ramirez. *Id.* After due consideration, the Court agrees with Plaintiffs that Taylor's opinion at issue must be excluded because it only serves to in improperly bolster Escajeda's character and testimony.

As noted above, Federal Rule of Evidence 702 broadly requires that the testimony "assist the trier of fact to understand the evidence or determine a fact in issue" and that the expert be sufficiently qualified to give the opinion. Fed. R. Evid. 702; *Bocanegra*, 320 F.3d at 584. "An expert's testimony may take the form of an opinion if it 'serves to inform the jury about affairs not within the understanding of the average man.'" *United States v. Moore*, 997 F.2d 55, 57 (5th Cir. 1993) (quoting *United States v. Webb*, 625 F.2d 709, 711 (5th Cir. 1980)).

---

[13] This other incident involved "[a] distraught eighteen year old [who] stood on the ledge of an Interstate freeway overpass and told police that he intended to kill himself by jumping down to the speeding vehicular traffic below." Taylor Report at 18. Escajeda purportedly responded by climbing over the highway median, walking down an adjacent embankment undetected by the suicidal subject, and by making his way across the freeway to grab him and pull him away from danger. *Id.*

As such, "expert testimony may not be used to bolster the credibility of fact witnesses." *United States v. Lombardozzi*, 491 F.3d 61, 77–78 (2d Cir. 2007) (citations omitted).  Credibility determinations are an improper subject for expert testimony because it invades the province of the jury.  *United States v. Lukashov*, 694 F.3d 1107, 1116 (9th Cir. 2012) (citations omitted); *see also United States v. Adams*, 271 F.3d 1236, 1245 (10th Cir. 2001) ("[E]xpert testimony which does nothing but vouch for the credibility of another witness encroaches upon the jury's vital and exclusive function to make credibility determinations, and therefore does not 'assist the trier of fact' as required by Rule 702." (citations omitted)).

Moreover, expert testimony addressing credibility determinations is inadmissible because it "exceeds the scope of the expert's specialized knowledge and therefore merely informs the jury that it should reach a particular conclusion." *Adams*, 271 F.3d at 1245 (citations omitted).  Yet another reason why such testimony is improper is because "the testimony of impressively qualified experts on the credibility of other witnesses is prejudicial, unduly influences the jury, and should be excluded under Rule 403." *Id.* (citations omitted).

In this case, Taylor's discussion about Escajeda's actions in a dissimilar event unrelated to the incident here does nothing to "assist the trier of fact to understand the evidence or determine a fact in issue" about the subjects for which Defendants designated Taylor as an expert.  Taylor's discussion effectively "vouches" for Escajeda's character and credibility so that the jury can put more weight on his testimony, which unduly influences the jury on the question of whether he used force reasonably.

Further, Defendants' argument that Taylor's discussion is still relevant to Plaintiffs' *Monell* claims is meritless.  Nowhere in his discussion does Taylor make any connection of this unrelated and dissimilar event to his analysis of the EPPD's policies as applicable in this case.  If

anything, Taylor's own words indicate that he included this discussion to deliberately attack

Plaintiffs' credibility:

> [In this other event,] Escajeda risked his own life to save the life of another person.
> This is the same police officer that [P]laintiffs contend less than one year earlier,
> negligently and intentionally contributed to the death of . . . Ramirez through a
> Taser deployment. *The juxtaposition between these two encounters involving the
> same officer and a similar suicidal subject within a ten-month period strains
> plaintiffs' credibility, to say the least.*

Taylor Report at 18 (emphasis added).  Hence, even if Defendants were correct that this

discussion is still relevant to Plaintiffs' *Monell* claims, it still would be inadmissible under Rule

403 because its probative value is substantially outweighed by unfair prejudice—namely, it

unduly influences the jury in a credibility determination for which they need no assistance.

Therefore, in exercising its gatekeeping function, the Court excludes Taylor's entire

discussion of Escajeda's actions in that other event to prevent the "danger that the purported

expert testimony will receive unwarranted weight and will encourage the fact-finder to give more

weight to one side's contention than is warranted."  *Gage v. Jenkins*, CV 13-0638-SDD-EWD,

2017 WL 2190064, at *5 (M.D. La. May 18, 2017).

### (c) Taylor's Opinion on the Lack of Evidence of a Pattern of Misconduct.

Finally, Plaintiffs object to Taylor's opinion about how none of the other cases provided

by Plaintiffs establish an alleged pattern of misconduct to support their *Monell* claims.  Taylor

Mot. at 11.  Plaintiffs appear to claim that Taylor's opinion is not reliable because he did not

"study" them in rendering his opinion that "Plaintiffs provide no evidence to indicate that these

cases are in a manner related to this case."  *Id.* (quoting Taylor Report at 17).  But the Court

readily overrules Plaintiffs' objection.

As Defendants correctly point out, "[a] careful reading of Dr. Taylor's actual opinion"

shows that he did distinguish the cases Plaintiffs cite based on the facts presented.  City's Resp.

in Opp'n to Taylor Mot. at 4.  Contrary to Plaintiffs' assertions, Taylor testified the following

during his deposition:

> Q. Mr. Taylor, you have indicated in your report that Plaintiffs have provided no
> evidence to indicate that any of the other cases identified by Plaintiffs in this
> case as part of the *Monell* claims are related in any manner to this case. Do you
> recall that opinion you offered?
>
> A. Yes, absolutely. And that is correct.
>
> Q. What was your methodology in reaching that opinion?
>
> A. Well, first and foremost, I don't know how they were sampled. They were
> presented in this case and -- I think there were six, maybe eight of those cases
> that were presented, and I don't know why they were presented. In other words,
> how were they sampled? Why did just these specific cases and the like? So
> relevancy is an important issue.
>
> And then second, and most important, those cases involved the use of deadly
> force. They were officer-involved shooting cases. This is not an officer-involved
> shooting case and has little or no relevance at all to -- referring to those cases.
>
> . . .
>
> Q. On the list of materials on page 6, what did you review that formed the basis for
> your opinion in paragraph 61 of your report?
>
> A. Defendants' documents produced to Plaintiffs' First and Second RFP, Bates
> 208 to 1638. The second half of that document is about 700 pages, and it has
> these cases that you are talking about listed there. I think they were – I've got a
> list of those cases here: Saenz, the Salas case, Gomez case, Gandara, Wilson and
> Williams. They go back to 2013 to 2016, and those cases were use of deadly
> force, and this case is not.

Taylor Dep. Tr. at 65:12–66:7, 68:6–16.

Thus, the Court agrees with Defendants that Plaintiffs' objection effectively challenges

the weight of Taylor's opinion and not its admissibility.  "Neither *Daubert* nor the Federal Rules

of Evidence requires an expert to review all of the facts, only a 'sufficient' amount is required."

*Hoskins v. Gunn Trucking*, No. 4:07-CV-72 JD, 2010 WL 4000123, at *34 (N.D. Ind. Oct. 12,

2010).  To reiterate, any shortcomings that Plaintiffs perceive in Taylor's opinion may be

explored on cross-examination. *Pike*, 2016 WL 6599940, at *5; *see also Daubert*, 509 U.S. at 595 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

Therefore, the Court sustains in part Plaintiffs' objections to Taylor's expert opinions and accordingly, grants in part, denies in part their pertinent motion.

## IV.   CONCLUSION

**IT IS THEREFORE ORDERED** that Defendants City of El Paso, Texas and Defendant Ruben Escajeda's "Motion to Exclude or Limit Opinions of Michael Leonesio" (ECF No. 79) and "Motion to Exclude or Limit Opinions of Valentina Ngai" (ECF No. 80), are **DENIED.**

**IT IS FURTHER OREDERED** that Defendants City of El Paso, Texas and Defendant Ruben Escajeda's "Motion to Exclude or Limit Opinions of W. Ken Katsaris" (ECF No. 85), is **GRANTED IN PART, DENIED IN PART,** consistent with the reasoning mentioned elsewhere in this Order.

**IT IS FURTHER OREDERED** that Plaintiffs Maria Ramirez and Pedro Ramirez's "Motion to Exclude or Limit Opinions of Robert Taylor" (ECF No. 101), is **GRANTED IN PART, DENIED IN PART,** consistent with the reasoning mentioned elsewhere in this Order.

**So ORDERED and SIGNED this 24th day of March 2021.**

**DAVID C. GUADERRAMA**
**UNITED STATES DISTRICT JUDGE**