UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | | |
|---|---|---|
| **MARIA RAMIREZ and PEDRO RAMIREZ,** *as Representatives of the Estate and Statutory Death Beneficiaries of* **DANIEL ANTONIO RAMIREZ,** | § § § § § | |
| *Plaintiffs,* | § | **EP-17-CV-00193-DCG** |
| **v.** | § § | |
| **RUBEN ESCAJEDA, JR. and CITY OF EL PASO, TEXAS,** | § § § | |
| *Defendants.* | § § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Presently before the Court are Defendants City of El Paso, Texas (the "City") and Ruben Escajeda's ("Escajeda") (collectively, "Defendants") "Amended Motion for Summary Judgment Joined in Part by Officer Ruben Escajeda as to Causation" (ECF No. 90) ("Motion"), filed on September 2, 2020, and all relevant briefing filed thereafter. For the reasons that follow, the Court **DENIES** the motion.

## I.  UNDISPUTED BACKGROUND

**A. Factual Background.**

This case arises from the circumstances surrounding the death of Daniel Antonio Ramirez ("Ramirez"). Plaintiffs, Pedro and Maria Ramirez, are his parents.[1] On June 23, 2015, after receiving a call from Plaintiffs, dispatch called out to El Paso Police Department ("EPPD") officers to respond to a suicide in progress.[2] The reporter, Ramirez's mother, made clear that her

---

[1] Compl. at 1, ECF No. 1.

[2] Proposed Undisputed Facts ¶ 67, ECF Nos. 90-1, 115, 121 [hereinafter, "PUF"]. As the parties enumerated the same 476 proposed undisputed facts in three separate filings, the Court will cite to each of these proposed facts as if they were all in a single filing.

son was in the process of preparing to hang himself from the basketball net in their backyard.[3] She made no mention of a weapon.[4]  In relaying the emergency to the EPPD officers, dispatch announced the same: that it was a suicide in progress and made no mention of the presence of a weapon.[5]

Escajeda, then a police officer employed by the EPPD, responded to the call and arrived at the house alone.[6]  Upon arrival to the Ramirez home, Escajeda did not announce himself to anyone at the house to talk with Plaintiffs, but instead went directly to the backyard.[7]  As he approached the backyard, he drew his service weapon.[8]  Once in the backyard, Escajeda shined his flashlight on Ramirez and saw him with a rope around his neck that was connected to a basketball hoop.[9]

As he approached Ramirez, Escajeda reportedly saw Ramirez staring forward with his hands clenched with tight fists to the part of the rope that was around his neck.[10]  Escajeda then repeatedly ordered him to show him his hands.[11]  After perceiving that his verbal commands

---

[3] *Id.* ¶ 68.

[4] *Id.* ¶ 69.

[5] *Id.* ¶ 70.

[6] *Id.* ¶ 71.

[7] *Id.* ¶ 72.

[8] *Id.* ¶ 73.

[9] *Id.* ¶ 74.

[10] *Id.* ¶¶ 75, 78.  The Court rephrased the latter of Plaintiffs' proposed fact based on the portions therein that Defendants do not dispute.

[11] *Id.* ¶ 78.

were unsuccessful, Escajeda approached Ramirez within approximately five feet.[12]  Escajeda

then holstered his service weapon, drew out and deployed his taser on Ramirez.[13]  During the

tasing, Ramirez's body tensed, and Escajeda heard a "crunch" and saw Ramirez squeeze his fists

even harder.[14]  After tasing Ramirez, Escajeda removed the rope around Ramirez's neck and got

him down from the basketball net.[15]  Escajeda felt a faint pulse; however, Ramirez later arrived

to the emergency room at Del Sol Medical Center at 11:06 p.m., and was pronounced dead at

11:24 p.m.[16]

**B.  Procedural Background.**

On June 22, 2017, Plaintiffs filed the instant lawsuit alleging that Escajeda and the City

deprived Ramirez of his constitutional rights.[17]  Plaintiffs specifically allege that Escajeda used

excessive force against Ramirez and that the City was "directly responsible" for Escajeda's

alleged misconduct by:

> A) maintaining a policy or custom of excessive force by officers that is so common
> and widespread as to constitute a custom that fairly represents municipal policy;
>
> B) maintaining a policy or custom of excessive force by officers when the officer
> is on notice of a victim's mental health problems that is so common and widespread
> as to constitute a custom that fairly represents municipal policy;
>
> C) failing to properly train, supervise, or discipline members of the [EPPD],
> including . . . Escajeda, not to use intermediate force, such as a taser, against an

---

[12] *Id.* ¶ 79.  The Court rephrased Plaintiffs' proposed fact based on the portions therein that Defendants do not dispute.

[13] Pls.' Resp. in Opp'n, Ex. 5 (Escajeda Suppl. Report) at 22 [hereinafter "Plaintiffs' Exhibits"]; *id.*, Ex. 8 (Escajeda Depo.) at 133:4–136:21.

[14] PUF ¶ 81.

[15] *Id.* ¶ 83.

[16] *Id.* ¶ 84; Pls.' Ex. 120 (OME Investigator Report) at 3.  The Court rephrased Plaintiffs' proposed fact based on the portions therein that Defendants do not dispute.

[17] Compl. at 18–20.

individual who does not pose a threat to the officer or others and does not display active aggression or defensive resistance;

D) failing to properly train, supervise, or discipline members of the [EPPD], including . . . Escajeda, on mental health issues and how to properly assess the situation and take action to de-escalate the situation and bring the crisis to a non-violent conclusion where their officers have notice and knowledge that the person for whom they are called has mental health issues;

E) failing to institute proper procedures to ensure that EPPD officers use appropriate de-escalation tactics so as to bring the crisis to a non-violent conclusion in situations in which it is known that an unarmed resident has mental health issues; and

F) failing to pursue criminal or disciplinary charges or support criminal or disciplinary action against officers, including Escajeda, who have deprived citizens and residents of El Paso of their constitutional rights.[18]

At an earlier stage in the litigation, Defendants filed motions to dismiss under Federal Rule of Civil Procedure 12(b)(6), both of which the Court denied on January 11, 2018.[19]  On September 3, 2020, Defendants filed the instant motion.

As noted in the Court's January 26, 2021 Order (ECF No. 133), on November 4, 2020, Escajeda filed his individual reply, wherein he claims that he is entitled to qualified immunity.[20] To avoid prejudicing Plaintiffs and the risk of an improvident or ill-advised opinion, the Court afforded Plaintiffs "an adequate opportunity to respond" to Escajeda's qualified immunity arguments by granting them and Escajeda leave to file supplemental briefing *solely* to address such matter.[21]  Plaintiffs filed their supplemental brief on February 10, 2021; Escajeda filed his

---

[18] *Id.*

[19] *See* Order, ECF No. 29.

[20] Reply at 2–5, ECF No. 122.

[21] ECF No. 133 at 4–5.

own on February 16, 2021.[22]  The Court considers the arguments therein as if they were part of the instant motion.

## II.   STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A genuine dispute of fact exists when evidence is sufficient for a reasonable jury to return a verdict for the non-moving party, and a fact is material if it 'might affect the outcome of the suit.'"  *Willis v. Cleco Corp.*, 749 F.3d 314, 317 (5th Cir. 2014) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986))).  In deciding whether a genuine dispute as to material fact exists, a trial court considers all of the evidence in the record and "draw[s] all reasonable inferences in favor of the nonmoving party," but "refrain[s] from making credibility determinations or weighing the evidence."  *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) (citation and internal quotation marks omitted).  Instead, the court "only 'give[s] credence to the evidence favoring the nonmovant [and] that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'"  *Orr v. Copeland*, 844 F.3d 484, 490 (5th Cir. 2016) (second alteration in original) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000)).

Procedurally, the party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  *E.E.O.C. v. LHC Grp., Inc.*, 773 F.3d 688, 694 (5th Cir. 2014) (alterations in original) (quotation marks

---

[22] ECF Nos. 134 & 136.

and citation omitted).  When the nonmoving party will bear the burden of proof at trial, the moving party may satisfy this responsibility by "point[ing] out the absence of evidence supporting the nonmoving party's case." *Latimer v. Smithkline & French Labs.*, 919 F.2d 301, 303 (5th Cir. 1990); *see also Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 544–45 (5th Cir. 2005).

If the moving party succeeds, "the onus shifts to the nonmoving party to go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *LHC Grp.*, 773 F.3d at 694 (internal quotation marks and citation omitted).  However, the nonmoving party "cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *Davis v. Fort Bend Cty.*, 765 F.3d 480, 497 n.20 (5th Cir. 2014) (quotation marks and citation omitted).

## III.  DISCUSSION

By their motion, Defendants request that the Court grant summary judgment in their favor on all of Plaintiffs' claims because they argue that: (1) Escajeda is entitled to qualified immunity; (2) Escajeda's tasing of Ramirez did not cause his death; (3) the City's use-of-force policy was not the moving force behind Ramirez's death; (4) the City did not fail to institute proper policies and procedures to deal with people suffering from mental health crises; (5) the City did not fail to train its officers on how to respond to situations where people suffering from mental health crises are involved; and (6) the City did not fail to investigate or discipline its officers for excessive force.  The Court addresses Defendants' arguments in that order.

**A.  Escajeda's Entitlement to Qualified Immunity and Whether Escajeda Caused Ramirez's Death.**

**1.  <u>Whether causation is incorporated within or separate from the qualified immunity analysis.</u>**

As a threshold matter, Plaintiffs and Escajeda first contest whether proof of causation is necessary for determining qualified immunity or whether it is an issue that the Court must resolve separately.  Escajeda contends the former; Plaintiffs the latter.  Escajeda contends that causation is incorporated within the first step in the qualified immunity analysis—namely, whether the officer "violated a clearly established constitutional right."  Escajeda's Sur-Surreply at 5–6, ECF No. 135; Escajeda's Suppl. Br. at 2, ECF No. 136.  In evaluating the first step, given that the constitutional right involved here is the right to be free from excessive force, Escajeda avers that the Court must first necessarily determine, in relevant part, whether Ramirez's claimed injury "resulted directly and only from a use of force that was clearly excessive."  Escajeda's Suppl. Br. at 2.  Thus, he argues that Plaintiffs bear the burden of establishing causation to overcome his entitlement to qualified immunity.  *Id.* at 3–5.

In contrast, Plaintiffs argue that causation must be addressed before moving on to the qualified immunity analysis.  Pls.' Suppl. Br. at 2, ECF No. 134.  They claim that the Fifth Circuit Pattern Jury Instructions suggest the same, because at trial, "[o]nly after finding that the injury was caused by the unconstitutional conduct must the jury consider the affirmative defense of qualified immunity.  The qualified immunity defense focuses on the 'unlawfulness of the conduct'—not whether the conduct caused the injury."  *Id.* at 3.  Hence, Plaintiffs contend that at summary judgment, "[i]f the plaintiff has not shown sufficient evidence that the excessive use of force caused the injury, the affirmative defense of qualified immunity is not even reached because the plaintiff has failed to establish a Section 1983 claim sufficient to take to trial."  *Id.*

But after due consideration, the Court agrees with Escajeda that causation is incorporated as an element within the broader framework of the qualified immunity analysis.

Qualified immunity shields officers from liability unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  When officers invoke qualified immunity at summary judgment, courts ask two questions: (1) whether the evidence viewed in the light most favorable to the plaintiff shows that the officers violated a constitutional right, and (2) whether the unlawfulness of their conduct was "clearly established" at the time.  *District of Columbia v. Wesby*, ––– U.S. –––, 138 S. Ct. 589 (2018).

In analyzing the first step, the governing constitutional provision here is the Fourth Amendment, which protects the right to be free from excessive force during a seizure.  *Joseph on behalf of Est. of Joseph v. Bartlett*, 981 F.3d 319, 332 (5th Cir. 2020) (citing *Poole v. City of Shreveport*, 691 F.3d 624, 627 (5th Cir. 2012)).  Consequently, to overcome Escajeda's entitlement to qualified immunity and prevail on their excessive force claim, Plaintiffs must necessarily establish that Escajeda violated Ramirez's right to be free from excessive force by showing (1) an injury, (2) that resulted "directly and only" from a use of excessive force, and (3) that the force used was "objectively unreasonable."  *Flores v. City of Palacios*, 381 F.3d 391, 396 (5th Cir. 2004).

Hence, Plaintiffs' argument is circular because for their excessive force claim to prevail, regardless if qualified immunity is involved, the Court must necessarily analyze causation in determining whether the force Escajeda used was unconstitutional ("objectively unreasonable"). In other words, were it to address causation and qualified immunity in the order Plaintiffs

suggest, the Court would just be copying the same causation analysis from their excessive force claim into the consequent qualified immunity analysis. Therefore, the Court will consider causation when determining whether Plaintiffs overcome Escajeda's entitlement to qualified immunity.

## 2. <u>Qualified Immunity.</u>

As noted above, "[w]hen officers invoke qualified immunity at summary judgment, courts ask two questions: (1) whether the evidence viewed in the light most favorable to the plaintiff shows that the officers violated a constitutional right, and (2) whether the unlawfulness of their conduct was "clearly established" at the time. *Wesby*, 138 S. Ct. at 589. Once raised, "[a] qualified immunity defense alters the usual summary judgment burden of proof." *Renfroe v. Parker*, 974 F.3d 594, 599 (5th Cir. 2020) (citing *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010)). "[A]ll inferences are [still] drawn in [the plaintiff's] favor." *Brown*, 623 F.3d at 253. But "a plaintiff's version of the facts should not be accepted for purposes of qualified immunity when it is 'blatantly contradicted' and 'utterly discredited' by [the evidence]." *Renfroe*, 964 F.3d at 599 (quoting *Hanks v. Rogers*, 853 F.3d 738, 744 (5th Cir. 2017) (citation omitted)).

After due consideration, the Court concludes that when viewing the record in the light most favorable to them, Plaintiffs satisfy both steps of the qualified immunity analysis.

### i. *Step One: Constitutional Violation.*

To establish that Escajeda violated Ramirez's right to be free from excessive force under the Fourth Amendment, Plaintiffs must first show that Ramirez was seized. *See Graham v. Connor*, 490 U.S. 386, 388 (1989). "An officer seizes a person when he, 'by means of physical force or show of authority, has in some way restrained the liberty of a citizen.'" *Flores*, 381 F.3d

at 396 (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n. 16 (1968)).  Here, Defendants do not dispute that

the evidence shows that Escajeda seized Ramirez when he deployed his taser on him.

 Next, as already stated, Plaintiffs must establish (1) an injury, (2) that resulted "directly

and only" from a use of excessive force, and (3) that the force used was "objectively

unreasonable." *Flores*, 381 F.3d at 396.  Here, based on the parties' briefing, it appears there is

no dispute that the evidence shows that Ramirez's death is a sufficient injury to establish the first

element of their excessive force claim.  Accordingly, the Court focuses on the second and third

elements: causation and excessiveness.

> a.  *Causation.*

Defendants' main argument is that Escajeda is entitled to qualified immunity because

Plaintiffs do not satisfy the causation element in their excessive force claim.[23]  Mot. at 15–17;

City's Reply at 1–6, ECF No. 121; Escajeda's Reply at 3; Escajeda's Sur-surreply at 5–6;

Escajeda's Suppl. Br. at 2–5.  Specifically, Defendants assert that Plaintiffs "have not and cannot

produce admissible evidence on causation and [that] none of Plaintiffs' experts are qualified" to

contradict the opinions of their expert, Dr. Mario Rascon, M.D., the coroner in this case.  Mot. at

15.  They aver that causation must be shown by a reasonable medical probability and that Dr.

Rascon is the only qualified medical doctor in this case, who in turn opined that Ramirez died by

hanging and that the taser did not contribute to his death because he was unconscious at the time

of the incident.  City's Reply at 3–6; Escajeda's Suppl. Br. at 7–10.  As such, Defendants

contend that no evidence in the record, when viewed in the light most favorable to Plaintiffs,

---

[23] While Escajeda is the only one arguing that he is entitled to qualified immunity because
Plaintiffs fail to show causation, the City also generally argues that they cannot show causation in support
their excessive force claim—an argument which Escajeda joined upon the filing of the instant motion.
Thus, for the reasons mentioned above, the Court will address the issue of qualified immunity as if both
the City and Escajeda are arguing in favor of it.

shows that Ramirez's death resulted "directly and only" from Escajeda's use of force—in other words, that the taser was the *sole* cause of Ramirez's death.  City's Reply at 4–6; Escajeda's Sur-surreply at 5–7; Escajeda's Suppl. Br. at 4, 6–10.

Conversely, Plaintiffs assert that the record establishes a genuine issue of material fact as to whether Escajeda's use of force *proximately* caused Ramirez's death.  Pls.' Resp. in Opp'n at 10, ECF No. 115; Pls.' Suppl. Br. at 4–7.  First, Plaintiffs aver that the governing law does not construe the "direct and only" language in the excessive-force claim analysis as Defendants suggest—namely, that Plaintiffs must show that the taser was the *sole* cause of Ramirez's death.  Pls.' Suppl. Br. at 5–6.  Instead, Plaintiffs maintain that the applicable causation standard in a §1983 action is proximate causation, which allows for more than one legal cause of an event.  *Id.* at 5–6; Pls.' Resp. in Opp'n at 6–7.

And second, Plaintiffs argue that, viewing the evidence in the light most favorable to them, whether Ramirez was conscious at the time of Escajeda's tasing presents a factual issue for the jury to consider in determining proximate causation.  Pls.' Resp. in Opp'n at 8–9; Pls.' Suppl. Br. at 7–9.  Particularly, Plaintiffs point out that their biomechanical engineer expert, Dr. Valentina Ngai, opines that the taser set off forces and motions that could have sufficiently caused the type of neck injuries that Dr. Rascon diagnosed on Ramirez, which ultimately led to his death.[24]  Pls.' Resp. in Opp'n at 11; Pls.' Suppl. Br. at 8–9.   Plaintiffs further contend that the record does show expert medical testimony supporting their version of facts because Dr. Rascon in fact agrees with Dr. Ngai that if Ramirez was conscious when the taser fired, then the

---

[24] As the Court noted in its order dealing with the parties' motions to exclude certain expert opinions of the designated experts in this case, the Court admitted Dr. Ngai's general causation opinion as a biomechanical engineer solely to the extent that her opinion was construed as the Court has phrased it and not as she specifically did in her testimony and report.  *See* Mem. Op. and Order at 21–22, ECF No. 140 (Mar. 24, 2021).

taser contributed and played a role in Ramirez's death by hanging.  Pls.' Resp. in Opp'n at 12;
Pls.' Suppl. Br. at 8.  Thus, they argue that Defendants' causation arguments are meritless.

After scrutinizing the record, the Court concludes that the evidence viewed in the light
most favorable to Plaintiffs presents a genuine dispute of material fact as to whether Escajeda's
use of force caused Ramirez's death.

(1) Applicable standard of causation in excessive force claims.

To begin, Plaintiffs are correct that the applicable causation standard in §1983 cases is
proximate causation.  As the Supreme Court clearly noted in *County of Los Angeles v. Mendez*,
137 S. Ct. 1539 (2017), "plaintiffs can—subject to qualified immunity—generally recover
damages that are proximately caused by any Fourth Amendment violation."  *Cty. of Los Angeles,
Calif. v. Mendez*, 137 S. Ct. 1539, 1543 (2017) (citing *Heck v. Humphrey*, 512 U.S. 477, 483
(1994); *Memphis Community School Dist. v. Stachura*, 477 U.S. 299, 306, (1986)).  "Proper
analysis of this proximate cause question require[s] consideration of the 'foreseeability or the
scope of the risk created by the predicate conduct,' and require[s] the court to conclude that there
was 'some direct relation between the injury asserted and the injurious conduct alleged.'"[25] *Id.*
at 1548–49 (quoting *Paroline v. United States*, 572 U.S. 434, 444 (2014)); *accord Jones v.
Hosemann*, 812 F. App'x 235, 238 (5th Cir. 2020) ("Only when those individual actions
'proximately cause[ ]' the plaintiff's injury can that plaintiff seek relief under §1983.").

To that end, in the context of excessive force claims, "[a] requirement of proximate cause
thus serves, *inter alia*, to preclude liability in situations where the causal link between [the
excessive use of force] and [the injury] is so attenuated that the consequence is more aptly

---

[25] Courts simply refer to these two factors simply as (1) foreseeability and (2) cause in fact,
respectively.  *Gutierrez v. Excel Corp.*, 106 F.3d 683, 687 (5th Cir. 1997) (citations omitted).
Accordingly, the Court will refer to them as such.

described as mere fortuity." *Paroline*, 572 U.S. at 445.  As such, recognizing that an injury may have many causes (proximate or not), the law only requires a plaintiff to prove that an officer's excessive use of force had "a sufficient connection to the [injury]." *Paroline.*, 572 U.S. at 444.

And that is why, on a similar basis, Plaintiffs are also correct that the "direct and only" language in the excessive-force claim analysis does not require them to present evidence that Escajeda's use of force was the *exclusive* cause of the alleged injury.  As the Fifth Circuit has previously noted, defendants cannot isolate the "direct and only" language "to create a new and different rule of proof [of causation]."  *Mouille v. City of Live Oak*, 918 F.2d 548, 553 (5th Cir. 1990).  It is well established law in the Fifth Circuit that the "direct and only" language only prohibits compensation to a plaintiff for injuries caused by the use of reasonable force.  *See Dunn v. Denk*, 79 F.3d 401, 403 (5th Cir. 1996) (*en banc*) ("A trier of the fact can compensate only for the injury caused by the use of excessive force.  There can be no award for injury caused by reasonable force."); *accord Gutierrez v. City of San Antonio*, 139 F.3d 441, 450 n.8. (5th Cir. 1998) ("Walters also argues that he cannot be liable for using excessive force because Gutierrez's death did not result 'directly and only from the use of force that was clearly excessive to the need.' . . . [But] Walters' argument is misplaced. We recently interpreted the language that Walters cites only to prohibit compensation for injuries caused by the use of reasonable force."); *Goode v. Baggett*, 811 F. App'x 227, 231 (5th Cir. 2020) (noting that the "direct and only" language "was intended to distinguish between injuries caused by excessive force, which are actionable, and those caused by reasonable force, which are not."); *see also Bailey v. Quiroga*, 517 F. App'x 268, 268 (5th Cir. 2013) ("[P]laintiff in this case was not required to present evidence that Defendants' use of excessive force was the exclusive cause of her son's death; so long as the injury resulted from 'clearly excessive and objectively

unreasonable' force, her claim is actionable."); *accord Pratt v. Harris Cty., Tex.*, 822 F.3d 174,

189 (5th Cir. 2016) (Hynes, J., concurring in part) ("We have explained that a plaintiff need not

present evidence that a defendant's excessive use of force was the exclusive cause of the alleged

injury—rather, "so long as the injury resulted from 'clearly excessive and objectively

unreasonable' force, [the plaintiff's] claim is actionable."); *Est. of Sizer by and through Sizer v.*

*Cameron*, A-15-CA-01143-SS, 2017 WL 2418316, at *8 (W.D. Tex. June 1, 2017) (same).

Indeed, the Supreme Court's ruling in *Mendez* firmly supports the soundness of the Fifth

Circuit's interpretation of the "direct and only" language:

> The District Court found (and the Ninth Circuit did not dispute) that the use of force
> by the deputies was reasonable under *Graham* [*v. Connor*, 490 U.S. 386 (1989)].
> However, respondents were still able to recover damages because the deputies
> committed a separate constitutional violation (the warrantless entry into the shack)
> that in some sense set the table for the use of force.  That is wrong.  *The* framework
> for analyzing excessive force claims is set out in *Graham*.  If there is no excessive
> force claim under *Graham*, there is no excessive force claim at all.

*See Mendez*, 137 S. Ct. at 1547 (Alito, J.) (emphasis in original).

> (2) There is no mandatory burden to produce expert opinions resting on
>     reasonable medical probability to establish causation in excessive force
>     claims.

For similar reasons, Defendants' argument that Plaintiffs fail to establish causation

because none of their experts are qualified to provide an expert opinion resting on reasonable

medical probability is misplaced.  To be sure, the Fifth Circuit noted in *Gutierrez v. Excel Corp.*,

106 F.3d 683 (5th Cir. 1997), that when a party offers the expert opinion of a medical doctor to

provide evidence of causation in a state-law negligence claim, that expert opinion "must rest in

reasonable medical probability" to sufficiently establish causation.  *Excel Corp.*, 106 F.3d at 689.

However, in the paragraph immediately after the one Defendants quote, the Fifth Circuit also

clearly noted the following:

> We do not suggest that all plaintiffs bringing negligence claims for cumulative trauma disorders must present medical or other expert testimony specifically stating that there is a direct causal link between a defendant's actions and a plaintiff's injury. There are certain risk factors present in the work-environment that are known to be associated with cumulative trauma disorder. Further, there are particular injuries collectively referred to as cumulative trauma disorders that are caused by a combination of these risk factors. If a plaintiff can establish that she was exposed to enough of the risk factors for a sufficiently long period of time, and that she suffers from a specific injury defined as a cumulative trauma disorder, then it is not, as a matter of law, necessary to present evidence directly stating that the work environment caused the injury. A reasonable jury could infer causation in these circumstances.

*Id.* at 689.

Surely, the claimed injury in the instant case does not involve "cumulative trauma disorders." But the Fifth Circuit has similarly never required plaintiffs to bring expert *medical* testimony to establish causation in excessive force claims; much less, expert medical testimony resting on reasonable medical probability. In fact, the Fifth Circuit has at least twice unambiguously expressed the same. *See, e.g.*, *Wagner v. Bay City, Tex.*, 227 F.3d 316, 320 n.3 (5th Cir. 2000) (noting that "there is no requirement that medical testimony be presented to establish causation" in an excessive force claim); *Mouille*, 918 F.2d at 553 ("Defendants contend that [the 'directly and only' language'] requires plaintiffs to provide expert medical testimony showing that the plaintiff's injury was caused exclusively by the defendant's conduct. . . . [But] *Johnson* [*v. Morel*, 876 F.2d 477, 480 (5th Cir. 1989), *abrogated on other grounds*, *Harper v. Harris Cty., Tex.*, 21 F.3d 597 (5th Cir. 1994)[26],] did not impose a mandatory burden requiring

---

[26] In *Johnson*, the Fifth Circuit had initially stated that the test for qualified immunity for excessive force claims required (1) a *significant* injury (2) which resulted directly and only from the use of force that was clearly excessive to the need and (3) the force used was objectively unreasonable. *Id.* at 480. The Supreme Court subsequently overruled the "significant" injury prong in the context of a claim of excessive force under the Eighth Amendment in *Hudson v. McMillian*, 503 U.S. 1, 8 (1992). Applying *Hudson*, the Fifth Circuit later abrogated *Johnson* after concluding that the plaintiff is no longer required to show a "significant" injury in the Fourth Amendment context either. *Harper*, 21 F.3d at 600.

section 1983 plaintiffs to present expert medical testimony on causation[.]"); *accord Bailey*, 517 F. App'x at 268.

Most of the cases Defendants cite in support of their causation arguments rely on the causation standard for medical malpractice claims in Texas, which requires plaintiffs "to adduce evidence of a 'reasonable medical probability' or 'reasonable probability' that their injuries were caused by the negligence of one or more of the defendants, . . . meaning simply that it is 'more likely than not' that the ultimate harm or condition resulted from such negligence." *Kramer v. Lewisville Meml. Hosp.*, 858 S.W.2d 397, 400 (Tex. 1993) (citations omitted). Such requirement in medical malpractice claims—and in other types of state-law negligence claims—serves "to bar recovery where the defendant's negligence deprived the tort victim of only a 50% or less chance of avoiding the ultimate harm" because "the ultimate standard of proof on the causation issue is whether, by a preponderance of the evidence, the negligent act or omission is shown to be a substantial factor in bringing about the harm and without which the harm would not have occurred." *Id.* (citations omitted). But this requirement is not equally applicable to excessive force claims.

As noted above, the "directly and only" language in the excessive force analysis does not require a plaintiff to show that the officer's excessive use of force was *the* proximate cause of the claimed injury, or that the excessive use of force proximately contributed by 51% or more to the claimed injury. Instead, the plaintiff need only prove "*some* direct relation between the injury asserted and the injurious conduct alleged." *Mendez*, 137 S. Ct. at 1548–49 (emphasis added) (quoting *Paroline*, 572 U.S. at 444). In other words, the plaintiff "need only show that the [officer's] use of excessive force . . . was a 'contributory cause'" of the claimed injury. *Goode*, 811 F. App'x at 231 (quoting *Gutierrez*, 139 F.3d at 450 n.8)).

And this makes sense.  If there was a "mandatory burden" on plaintiffs to offer expert testimony resting on reasonable medical probability on causation, then this burden would bar all excessive force claims in which an officer's use of force contributed by 50% or less to the claimed injury *regardless if plaintiffs had successfully established that the use of force was both excessive and unreasonable.*  These implications go against the applicable "eggshell skull rule" in § 1983 excessive force cases.  *See Darden v. City of Fort Worth*, 880 F.3d 722, 728 (5th Cir. 2018).  But above all, the implications of such burden would clearly undermine the purpose of  § 1983 claims: "to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." *Wyatt v. Cole*, 504 U.S. 158, 161 (1992).  The Court is unaware of any federal statute or case that imposes such a burden, and thus, is not persuaded by Defendants' arguments.

(3) <u>A genuine dispute of fact exists as to whether Escajeda caused Ramirez's death.</u>

With all that in mind, in viewing the evidence in the light most favorable to Plaintiffs, the Court concludes that there is a genuine dispute of fact as to whether Escajeda's use of force caused Ramirez's death—namely, whether Ramirez was conscious when Escajeda deployed his taser on him.  To begin, the record shows that the relationship between Escajeda's use of the taser and Ramirez's death was not so remote or attenuated because both events happened in close temporal proximity to each other.[27]  Further, Dr. Rascon opines that, within a degree of reasonable medical probability, Ramirez's cause of death was by hanging.[28]  Dr. Ngai then offers an opinion that a reasonable jury could find complements Dr. Rascon's and provides context to

---

[27] PUF ¶¶ 83–84.

[28] *Id.* ¶ 2.

how Ramirez died by hanging.  She opines that when Escajeda fired his taser at Ramirez (who had around his neck a rope attached to a basketball net), the taser deployed two prongs, one into his chest and the other into his abdomen, which in turn set off electrical currents that caused flexion in those muscles.[29]  Those flexions then set off motions in Ramirez's body that, with a rope tied to his neck, could have sufficiently caused the type of neck injuries that Dr. Rascon diagnosed on him, which ultimately led to his death.[30]

It is true that Dr. Rascon also opines that the taser was not a contributing factor in Ramirez's death because he believes Ramirez was already unconscious or dead by the time Escajeda arrived at the scene.[31]  But when drawing all inferences in favor of Plaintiffs, the Court is of the view that there is sufficient evidence from which a reasonable jury could conclude that Ramirez was still alive and conscious as Plaintiffs contend.

Notably, the record contains many inconsistent statements about Ramirez's condition when Escajeda first approached him, and in particular, from Escajeda himself.  For example, in his deposition, Escajeda admits seeing Ramirez had "signs of life" when he first saw him.[32]  But he later contradicts himself by saying that he actually did not believe Ramirez was alive[33] when he saw him, and then again by saying that he remembered feeling a slight pulse after he got

---

[29] *Id.* ¶¶ 98–99.

[30] *Id.* ¶¶ 100–01.

[31] Mot., Ex. F. (Rascon Depo.) at 45:13–46:25; 49:3–51:13; 55:9–58:1, ECF No. 90-1 [hereinafter "Defendants' Exhibits"].

[32] Pls.' Ex. 8 (Escajeda Depo.) at 121:10–18.

[33] *Id.* at 150:19–21.  Escajeda's deposition testimony also seems at odds with the OME investigation report, which shows that Ramirez arrived at the Del Sol Medical Center at 11:06 p.m. but was pronounced dead until 11:24 p.m.  *Id.*, Ex. 120 (OME Investigation Report) at 3.

Ramirez off the rope.[34]  Further, in his supplemental report to Detective Aman, Escajeda

reported the following upon seeing Ramirez:

> [I]t did appear that [Ramirez] did have signs of life, due to the fact that his hands
> were squeezing tightly around the rope.  [I] also observed [Ramirez's] legs dangling
> as if it appeared that he was standing on the tip of his toes.  [I] kept on giving verbal
> commands, stating "let me see your hands.["][35]

In that same report, Escajeda also reported that he recalled feeling a slight pulse after he got

Ramirez off the rope.[36]  But then in his administrative interview with the Internal Affairs

Division, Escajeda twice answered the following about when he first approached Ramirez:

> I then noticed that [Ramirez] was standing underneath a basketball court.
> [Ramirez] looked like he was standing on the tip of his toes.  [Ramirez] also had a
> blank stare as he looked forward and he had both of his hands clenched in a fist
> with an angry look on his face.  His hands were positioned underneath his chin,
> next to each other, they were in a fist and looked like he was holding on to
> something.  My police training and experience is that "hands kill" and it's very
> important to always see the subject['s] hands.  I also thought to myself, if [Ramirez]
> is lifeless he would not be clenching his fist and would be in a daggling manner to
> where his neck would be to one side and his arms would also be dangling to the
> side of his body. Therefore, I gave stern verbal commands several times to show
> me his hands, [Ramirez] refused every time.  I would see [Ramirez] holding on
> tightly as he would clench his fists, look forward with a black stare and standing on
> the tip of his toes. [37]

In that same interview, Escajeda also answered that he felt a slight pulse after he got Ramirez off

the rope.[38]  Additionally, reports and statements from other people involved provide inconsistent

---

[34] *Id.*, Ex. 8 (Escajeda Depo.) at 166:4–11.

[35] *Id.*, Ex. 5 (Escajeda Suppl. Report) at 21–22.

[36] *Id.* at 22.

[37] Pls.' Resp. in Opp'n to Defs.' Mot. to Exclude, Ex. D (Escajeda Admin. Statement to IA) at 3, 6, ECF No. 96-1.  In their proposed undisputed facts, Plaintiffs cite to this particular page in their supporting exhibits, but the passages they cite are missing from that filing.  For that reason, the Court referred to the exhibits Plaintiffs submitted in their filings relevant to Defendants' motion to exclude Mr. Leonesio.

[38] Pls.' Ex. 6 (Escajeda Admin. Statement to IA) at 7.

versions of what Escajeda had observed that night, including that he saw Ramirez "moving when he first spotted him"[39] and that Ramirez began kicking Escajeda when he tried to bring him down[40].

But perhaps most importantly, Dr. Rascon's opinion that Ramirez was unconscious or dead at the time Escajeda tased him appears distinctively at odds with other evidence in the record.  For instance, at deposition, Dr. Rascon explained the basis behind the opinion in his report that the taser did not contribute to Ramirez's death:

> Q. And what is the basis of your opinion that the taser did not contribute to his death by hanging?
>
> A. My opinion is that he -- he probably was already in cardiac arrest by the time -- or unconscious -- he already was unconscious by the time the taser, you know, exerted its action on him, and, thus, did not really make a difference in the outcome. You -- you can lose consciousness in a matter of seconds after you hang, and then the loss of movement or muscle tone will follow very shortly after. So it doesn't really take that much time to -- to experience some irreversible damage.
>
> Q. So what is the basis of your understanding that Mr. Ramirez was unconscious at the time that he was tased?
>
> A. The basis of my understanding is that you wouldn't -- I mean, it takes less than 15 seconds to be unconscious. So if you are telling me that the officer was there at the scene 20 seconds before the tasing, then it means that he saw him actually climb the --whatever he climbed and he saw the physical act of being hanged. And the understanding that I have from the reports is that when the officer got there the decedent was already hanged from the -- from the hoop.[41]

. . .

---

[39] *Id.*, Ex. 119 (Aman Suppl. Report) at 39.

[40] *Id.*, Ex. 120 (OME Investigation Report) at 2–3 ("Detective Garcia stated that when the first officer arrived on scene[,] he found the decedent hanging with a rope from a basket ball hoop. The responding officer then attempted to bring the decedent down, but the decedent began to kick the officer[.] The officer then [tased] the decedent and was able to bring him down.").

[41] Defs.' Ex. F (Rascon Depo.) at 49:10–50:9.

A. As my report indicates, my opinion is that Mr. Ramirez died of hanging, and in the process of that he was tased by a law enforcement officer, and – and that tasing would not have changed the outcome.[42]

However, a review of the EPPD's dispatch record, Escajeda's observations after the tasing, and the investigation report from Dr. Rascon's own office reveals several facts which a reasonable jury could find undermines Dr. Rascon's opinion that Ramirez was either unconscious or dead at the time of the tasing.  First, the EPPD's dispatch record shows that (1) Maria Ramirez called 911 at around 10:36 p.m.;  (2) she described to the 911 operator that Ramirez was in the backyard and had a rope in his hand at 10:39:36 p.m.; (3) Escajeda arrived on scene at 10:40:01 p.m.; (4) the other EPPD units arrived around nineteen seconds later; and (5) Escajeda reported having custody of Ramirez at 10:41:05 p.m.[43]  Second, it is undisputed that during the tasing, Ramirez's body tensed, and that Escajeda saw Ramirez squeeze his fists even harder and also heard a "crunch".[44]  And third, the OME investigation report shows that Ramirez arrived to the emergency room in Del Sol Medical Center at 11:06 p.m., and that Dr. Burns pronounced him dead at 11:24 p.m.[45]

Ultimately, these facts indicate that (1) about *twenty-five seconds* elapsed between Maria Ramirez seeing her son holding the rope in his hand and Escajeda arriving on scene; (2) Escajeda observed and heard Ramirez's body react to the tasing in a manner not inconsistent with Dr.

---

[42] *Id.* at 55:10–13.

[43] Pls.' Ex. 7 (Dispatch Record) at 1–2.  The Court also notes that the record is unclear about exactly at what time Escajeda tased Ramirez.  According to the taser activity print-out for Escajeda's taser, the time when Escajeda tased Ramirez was "23:15:12" Mountain Daylight Time (UTC-06:00)—11:15:12 p.m.—which is in stark contrast to the entry in the EPPD's dispatch record of Escajeda's arrival time on scene of 10:40:01 p.m.  *Id.*, Ex 1 (Taser Activity Print-Out) at 24.

[44] PUF ¶ 81.

[45] Pls.' Ex. 120 (OME Investigation Report) at 3.

Ngai's opinions; and (3) Ramirez died about *forty-three minutes* after Escajeda tased him and *seventeen minutes* after arriving to Del Sol Medical Center.  As such, a reasonable jury could find that Ramirez in fact did not die before Escajeda found him and tased him because if not, Ramirez would neither have been transported to the emergency room nor pronounced dead at a later time that night.  Moreover, a reasonable jury could infer from these facts—when viewed together with Escajeda's observations of "signs of life" and the slight pulse he felt on Ramirez— that the tasing set off forces and motions that caused the diagnosed neck injuries which led to Ramirez's death, and that the cardiac arrest or unconscious state Dr. Rascon diagnosed could have occurred after the tasing and not before.

And finally, the record shows that Dr. Rascon in fact agrees with Dr. Ngai that if Ramirez was conscious when Escajeda fired the taser, then the taser could have contributed and played a role in Ramirez's death by hanging.[46]  Thus, Defendants' argument that Plaintiffs cannot produce any evidence from qualified experts supporting their version of the facts is meritless.[47]

---

[46] Defs.' Ex. F (Rascon Depo.) at 51:14–52:6, 56:9–18.

[47] In challenging Plaintiffs' causation arguments, Defendants strongly rely on *Batiste v. Theriot*, 458 F. App'x 351 (5th Cir. 2012).  But the Court finds *Batiste* distinguishable from the instant case.  In *Batiste*, the Fifth Circuit reversed a district court's denial of qualified immunity at summary judgment after it found that the plaintiffs failed to establish the causation prong.  *Id.* at 355, 361.  The officer in that case was pursuing the decedent on foot because he had an outstanding felony arrest warrant for burglary. *Id.* at 353.  At one point during the pursuit, the officer deployed his taser on the decedent, hitting him in the head and arm, and then shocked him with a five-second cycle.  *Id.*  Although an ambulance tried to transport him to the hospital as his condition worsened, the decedent died one hour after the incident due to a cardiac event.  *Id.*

The Fifth Circuit concluded that the plaintiffs failed to establish causation because neither the coroner nor the plaintiffs' expert opined that the decedent's death resulted from the tasing.  *Id.* at 355. The Fifth Circuit noted that the autopsy report indicated that the decedent died of "multidrug intoxication" and showed no other signs of physical injuries except for the two small cuts made by the taser prongs.  *Id.*  Further, it noted that the plaintiffs' expert witness only testified that the decedent died of "sickle cell trait", which was caused by physical exertion when he fled from the officers.  *Id.*  Hence, the Fifth Circuit found that at best, the evidence showed a causal connection between the decedent's death and the police foot pursuit.  *Id.*  But even then, chasing a fleeing suspect with an outstanding warrant who was resisting arrest was objectively reasonable.  *Id.*

Hence, in viewing the evidence in the light most favorable to Plaintiffs, their version of the facts is not so "blatantly contradicted" or "utterly discredited" by the evidence in the record. *Renfroe*, 964 F.3d at 599.  Therefore, the Court concludes that there is a genuine dispute of fact as to whether Escajeda's use of force caused Ramirez's death.

       *b.*   *Objective Reasonableness.*

As a genuine dispute of material fact already exists concerning the causation element in Plaintiffs' excessive force claim, the Court proceeds with its qualified immunity analysis by resolving such factual dispute in Plaintiffs' favor.

"A claim that law-enforcement officers used excessive force to effect a seizure is governed by the Fourth Amendment's 'reasonableness' standard."  *Plumhoff v. Rickard*, 572 U.S. 765, 774 (2014).  Reasonableness is judged "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  *Graham v. Connor*, 490 U.S. 386, 396 (1989).  "As in other Fourth Amendment contexts, however, the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."  *Id.* at 397.  It "requires careful attention to the facts and circumstances of each particular case, including [(1)] the severity of the crime at issue, [(2)] whether the suspect poses an immediate threat to the safety of the officers or others, and [(3)]

_____

Here, in contrast, the record does include the expert opinions of Dr. Ngai and Dr. Rascon, both of which provide some causal connection between Escajeda's taser deployment and Ramirez's death.  To be sure, Dr. Rascon does not appear to have rested his opinion that the taser played a role in Ramirez's death if Ramirez was conscious when Escajeda tased him on "reasonable medical probability."  But as discussed in detail above, Plaintiffs are not required to establish causation through expert testimony resting on reasonable medical probability for their excessive force claim.

whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396; *Cooper v. Brown*, 844 F.3d 517, 522 (5th Cir. 2016).

Courts must also make "allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97. Hence, courts "only consider facts that were 'knowable' to [the officer]." *Winzer v. Kaufman Cty.*, 916 F.3d 464, 474 (5th Cir. 2019) (quoting *White v. Pauly*, 137 S. Ct. 548, 550 (2017)); *see also Hegarty v. Somerset Cty.*, 53 F.3d 1367, 1379 n.11 (1st Cir. 1995) ("[O]mniscience is not the presumed mind set with which an objectively reasonable police officer approaches life-endangering situations.").

But courts must question whether the officer's use of force was objectively reasonable in light of the facts and circumstances confronting him, "not whether the force was justified based on [the officer's] claimed interpretation of the situation at the time." *Autin v. City of Baytown*, 174 F. App'x 183, 185 (5th Cir. 2005) (citing *Stroik v. Ponseti*, 35 F.3d 155, 158 (5th Cir. 1994); *see also Perez v. Suszczynski*, 809 F.3d 1213, 1219–20 (11th Cir. 2016) (noting that the "reasonable officer standard does not mean [courts] give the challenged officer's self-serving testimony more weight" than testimony of other witnesses or accept his subjective beliefs). That is because an officer's subjective beliefs, however induced, are irrelevant. *See Sevigny v. Dicksey*, 846 F.2d 953, 957 (4th Cir. 1988) (citing *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)); *see also Hobart v. Estrada,* 582 F. App'x 348, 355 (5th Cir. 2014) ("[R]egardless of whether an officer's mental state caused him to panic such that he unreasonably determined that a threat was present, that would not render his determination reasonable.").

Instead, the proper focus is upon whether another officer confronting the same objective facts could have also reasonably concluded that he or another person "was in danger *at the moment of the threat* that resulted" in the use of force.  *Bazan ex rel. Bazan v. Hidalgo Cty.*, 246 F.3d 481, 493 (5th Cir. 2001) (emphasis in original); *Gibson v. Officer, P.A.*, 44 F.3d 274, 277–78 (5th Cir. 1995); *see also Escobar v. Harris Cty.*, 442 S.W.3d 621, 629 (Tex. App. 2014) ("Whether a sufficiently serious threat exists is a matter of objective reasonableness, not subjective belief, which nonetheless takes into account the facts and circumstances faced by the individual officer." (citing *Graham*, 490 U.S. at 396–97)).  While an officer's mistaken decision to use force does not by itself transgress constitutional bounds, courts must still assess whether the officer's mistake, misapprehension, or ignorance of fact leading to his use of force was objectively reasonable in light of the facts and circumstances confronting him.  *See Romero v. City of Grapevine, Texas,* 888 F.3d 170, 178 (5th Cir. 2018) (holding that "[i]n light of the information available to him at the time of the shooting," officer's fear that subject was armed and his subsequent use of force were reasonable despite subject ultimately being found to have been unarmed).

After due consideration, when viewing the evidence in the light most favorable to Plaintiffs, the Court concludes that there is a genuine dispute of fact as to whether Escajeda's use of force was objectively reasonable—namely, whether Escajeda's misapprehension of the dispatch that there was "a suicidal subject with a weapon" was reasonable or even credible.

As a threshold matter, the Court notes that the record before it does not fit neatly within the *Graham* framework because this situation never involved a criminal arrest.  As such, the Court at best can only conclude that the first and third *Graham* factors plainly favor Plaintiffs here.  As to the first factor, Ramirez had committed no crime known to Escajeda.  Indeed,

Escajeda heard over dispatch that Plaintiffs had called 911 because Ramirez was suicidal and needed help. [48]  *See T.L. v. Cook Children's Med. Ctr.*, 607 S.W.3d 9, 64 (Tex. App. 2020) ("It is not and has not been a violation of law in Texas for a person to take his or her own life.") (citations omitted), *review denied* (Oct. 16, 2020), *cert. denied*, 20-651, 2021 WL 78187 (U.S. Jan. 11, 2021); *see also Estate of Armstrong ex rel. Armstrong v. Vill. of Pinehurst*, 810 F.3d 892, 899 (4th Cir. 2015) ("When the subject of a seizure 'has not committed any crime, this factor weighs heavily in the subject's favor.") (citations and alterations omitted).  Further, as to the third factor, nothing in the record supports a conclusion that Ramirez intended to flee, nor that he was actively resisting arrest, nor struggling with the police.  To the contrary, the record shows that Escajeda saw that Ramirez was restrained in the same position at all times by a rope around his neck that was attached to a basketball hoop.[49]

As to the second *Graham* factor, viewing the facts in the light most favorable to Plaintiffs, the Court concludes that the record presents a genuine dispute of material fact as to whether a reasonable officer in Escajeda's position could have believed Ramirez posed an immediate threat to his own safety or others—namely, whether Escajeda's misapprehension of the dispatch that there was "a suicidal subject with a weapon" was objectively reasonable or even credible.

       (1) <u>A genuine dispute of fact exists as to whether Escajeda's belief that Ramirez posed an immediate threat to his own safety or others.</u>

---

[48] PUF ¶ 67.

[49] *Id.* ¶¶ 75, 78.

The record shows Escajeda repeatedly stating that his "safety mindset" kicked in after mistakenly hearing from dispatch that there was "a suicidal subject with a weapon" involved.[50] Escajeda explains that he may have misapprehended the dispatch because "[a]s the dispatchers were giving information, other officers were on the radio cutting the dispatcher off to the point of a lot of radio traffic being generated."[51]  Consequently, Escajeda states that this misapprehension of the dispatch ended up altering his subsequent conduct and interpretation of his observations on scene.[52]  Simply put, Escajeda appears to posit that this initial misapprehension was the root of all his subsequent beliefs that the situation potentially involved an ambush or a "suicide by cop", and that Ramirez was potentially armed.[53]

But the Court finds that the record contains enough evidence from which a reasonable jury could conclude that his misapprehension was not reasonable or even credible.  For instance, the EPPD dispatch record shows that after Maria Ramirez called 911 at around 10:36 p.m., dispatch reported that the suicide involved a hanging with a rope at least *three times* between Maria Ramirez's call and the time Escajeda arrived on scene at 10:40:01 p.m.[54]  If anything,

---

[50] Pls.' Ex. 5 (Escajeda Suppl. Report) at 21; *id.*, Ex. 8 (Escajeda Depo.) at 79:2–6; Pls.' Resp. in Opp'n to Defs.' Mot. to Exclude, Ex. D (Escajeda Admin. Statement to IA) at 2, 5, 6.

[51] Pls.' Resp. in Opp'n to Defs.' Mot. to Exclude, Ex. D (Escajeda Admin. Statement to IA) at 2, 6.

[52] Pls.' Ex. 5 (Escajeda Suppl. Report) at 21–22; *id.*, Ex. 8 (Escajeda Depo.) at 79:2–6; Pls.' Resp. in Opp'n to Defs.' Mot. to Exclude, Ex. D (Escajeda Admin. Statement to IA) at 2, 5, 6.

[53] Pls.' Ex. 5 (Escajeda Suppl. Report) at 21–22; *id.*, Ex. 6 (*id.*, Escajeda Admin. Statement to IA) at 8; *id.*, Ex. 8 (Escajeda Depo.) at 79:2–6, 120:14–16; Pls.' Resp. in Opp'n to Defs.' Mot. to Exclude, Ex. D (Escajeda Admin. Statement to IA) at 2, 5, 6.

[54] *See, e.g.*, Pls.' Ex. 7 (Dispatch Record) at 1 (10:37:02 p.m.) ("SON OUTSIDE OF LISTED TRYING TO HANG HIMSELF"); *id.* (10:37:19 p.m.) ("IN BACKYARD THEY HAVE A BASKETBALL COURT AND HE IS TYING ROPE AROUND IT"); *id.* at 2 (10:39:36 p.m.) ("M1/2 IS DESCRIBING HE HAS ROPE IN HAND").

going by Escajeda's own deposition testimony that he arrived on scene within "seconds" after receiving the dispatch[55], a reasonable jury could infer that the dispatch reports Escajeda heard were those stating that Ramirez had a *rope* in hand and that Maria Ramirez was his mother reporting the emergency.[56]  What is more, the record also shows that the two other dispatched EPPD officers—who arrived on scene around nineteen seconds after Escajeda—reported no similar "radio traffic" issues and did not misapprehend any of the dispatch reports in the way Escajeda claims he did.[57]

The Court notes that in considering the remaining evidence from the incident, a jury's finding of whether Escajeda's use of force was objectively reasonable necessarily depends on its finding concerning Escajeda's misapprehension of the dispatch.  But solely for purposes of summary judgment and the qualified immunity analysis, the Court will proceed with its analysis by resolving this factual dispute in Plaintiffs' favor.

After viewing the remaining evidence of the incident in the light most favorable to Plaintiffs, the Court finds that a reasonable jury could conclude that no reasonable officer in Escajeda's position could have believed Ramirez posed an immediate threat to his own safety or others.  The record shows that before tasing Ramirez, for example, Escajeda (1) saw Ramirez at

---

[55] *Id.*, Ex. 8 (Escajeda Depo.) at 79:7–17.

[56] *See id.*, Ex. 7 at 2 (10:39:36 p.m.) ("M1/2 IS DESCRIBING HE HAS ROPE IN HAND"); *id.* (10:39:43) ("RP: MARIA RAMIREZ, MOTHER").

[57] *See id.*, Ex. 44 (Munoz Suppl. Report) at 1 ("Officers were en route to a missing person call when unit broke from the call due to a suicide in progress call. Comments stated the reporter stating her son was trying to hang himself in the back yard. Due to the nature of the call Sgt. Alferez told us to speed it up, to which I advised dispatch we were responding code three."); *id.*, Ex. 45 at 1 ("[A]t 2236 Hours[,] we were dispatched to a suicide in progress call at 234 Liberty, comments on the call notes stated of the reporter's son was trying to hang himself outside their residence. Additional comments informed that the reporter's son was tying a rope around a basketball court.  Officer B. Munoz was driving the assigned police vehicle and was told by Sgt. J. Alferez #2617 (3182) to respond code 3 to the listed address.").

all times clench the rope around his neck with both hands and that he was squeezing it tightly[58]; (2) approached Ramirez within five or six feet from him[59]; (3) never saw Ramirez move toward him in any way—much less, aggressively—and saw that his hands and feet stayed in the same position as they were when Escajeda first saw him[60]; and (4) never heard Ramirez say or yell anything, or threaten him verbally in any way[61].  Hence, a reasonable jury may infer from these facts that Ramirez was unable to "comply" with Escajeda's commands by speaking or showing him his hands because he was choking on the rope and complying would have worsened his situation.

And notably, the record also shows Escajeda testifying at deposition that, as Ramirez was not following his verbal commands to show him his hands, he tased Ramirez to "gain compliance" from him and "de-escalate [an unknown] threat"[62].  A reasonable jury could conclude from all these facts that Escajeda decided to use force despite having not yet ascertained whether Ramirez effectively posed an immediate threat to his own safety or others.  Thus, in viewing the evidence in the light most favorable to Plaintiffs, their version of the facts is not so "blatantly contradicted" or "utterly discredited" by the evidence in the record.  *Renfroe,*

---

[58] *See id.*, Ex. 5 (Escajeda Suppl. Report) at 21; Pls.' Resp. in Opp'n to Defs.' Mot. to Exclude, Ex. D (Escajeda Admin. Statement to IA) at 3, 6.

[59] *See* Pls.' Ex. 5 (Escajeda Suppl. Report) at 22; *id.*, Ex. 8 (Escajeda Depo.) at 136:19–21; Pls.' Resp. in Opp'n to Defs.' Mot. to Exclude, Ex. D (Escajeda Admin. Statement to IA) at 4, 5.

[60] *See* Pls.' Ex. 8 (Escajeda Depo.) at 135:7–19.

[61] *See id.* at 135:20–136:2.

[62] *See id.* at 146:15–22.  Indeed, in a different argument within its motion concerning Plaintiffs' alleged pattern of constitutional violations, the City appears to agree in its motion that the record indicates that Ramirez offered no resistance and that Escajeda "admitted" not seeing a weapon. Mot. at 21 ("All prior incidents involve efforts to subdue active resistance or flight.  Plaintiffs here actually focus on the **lack** of any action or resistance, and the officer's admission that he saw no weapon. The prior cases cannot be the same." (bold in original)).

964 F.3d at 599.  Put another way, resolving the factual dispute about the reasonableness of Escajeda's misapprehension of the dispatch reports in Plaintiffs' favor, a reasonable jury could conclude that Escajeda's use of force on Ramirez was excessive and unreasonable under *Graham*.  Therefore, the Court concludes that there is a genuine dispute of fact as to whether Escajeda's use of force was reasonable.

In sum, when resolving the two genuine disputes of material fact mentioned above in Plaintiffs' favor and viewing the evidence in the light most favorable to them, a reasonable jury could find that Escajeda violated Ramirez's constitutional right to be free from excessive force, and that Plaintiffs satisfy the first step of the qualified immunity analysis.

### ii.   *Step Two: Objective Reasonableness in Light of Clearly Established Law.*

For a right to be clearly established under the second step of the qualified immunity analysis, "[t]he contours of that right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  *Flores*, 381 F.3d at 400–01 (quoting *Creighton*, 483 U.S. at 640).  "To answer that question in the affirmative, we must be able to point to controlling authority—or a robust consensus of persuasive authority—that defines the contours of the right in question with a high degree of particularity." *Morgan v. Swanson*, 659 F.3d 359, 371–72 (5th Cir. 2011) (*en banc*) (internal quotation marks and citation omitted).  But "this does not mean that 'a case directly on point' is required."  *Id.* at 372 (quoting *Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011)).  Rather, "existing precedent must have placed the statutory or constitutional question *beyond debate*."  *Id.* at 372 (quoting *al–Kidd*, 563 U.S. at 741 (emphasis added)).

The central concept behind this step is "fair warning."  *Id.* at 372; *Newman v. Guedry*, 703 F.3d 757, 763 (5th Cir. 2012).  "The law can be clearly established despite notable factual

distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights." *Newman*, 703 F.3d at 763 (quoting *Kinney v. Weaver*, 367 F.3d 337, 350 (5th Cir. 2004) (*en banc*) (internal quotation marks omitted)).  "In other words, existing precedent must 'squarely govern[ ]' the specific facts at issue, such that only someone who is 'plainly incompetent" or who 'knowingly violates the law' would have behaved as the official did. *Bartlett*, 981 F.3d at 337 (quoting *Mullenix v. Luna*, 577 U.S. 7, 14 (2015)).  However, "'in an obvious case,' the *Graham* excessive-force factors themselves 'can [also] clearly establish the answer, even without a body of relevant case law.'" *Newman*, 703 F.3d at 764 (quoting *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004)) (internal quotation marks omitted).

The Court once again reiterates that the two genuine disputes of material fact identified above regarding causation and reasonableness are crucial in determining whether Escajeda's use of force was objectively reasonable in light of the clearly established law at the time of the incident.  But the Court cannot just stop its qualified immunity analysis here.  Thus, in reviewing the clearly established law at the time of the incident, the Court proceeds by resolving all factual disputes in Plaintiffs' favor and viewing the evidence in the light most favorable to them.  After doing so, the Court concludes that a reasonable jury could find that Escajeda's use of force violated clearly established law as of June 23, 2015.

First, it is clearly established that the amount of force an officer may use "depends on the severity of the crime at issue, whether the suspect posed a threat to the officer's safety, and whether the suspect was resisting arrest or attempting to flee."  *Bush v. Strain*, 513 F.3d 492, 502 (5th Cir. 2008) (citing *Graham*, 490 U.S. at 396).  As mentioned above, resolving all factual disputes in favor of Plaintiffs and viewing the evidence in the light of favorable to them, none of

the *Graham* factors justifies Escajeda's use of force on Ramirez. The record shows that Ramirez had committed no crime known to Escajeda, and that the reason for Escajeda's presence on scene was because Maria Ramirez requested help from the police to prevent her son's suicide. The record further shows that Escajeda saw that Ramirez clenched the rope around his neck with both hands at all times and neither saw Ramirez move toward him in any way nor heard Ramirez say or yell anything. And finally, the record shows that Ramirez never intended to flee or that he was actively resisting arrest or struggling with the police. Thus, resolving all disputes in Plaintiffs' favor and viewing the facts most favorable to them, Escajeda's use of force on Ramirez was objectively unreasonable in light of clearly established law at the time of the incident.

Additionally, Escajeda's use of force appears to have also violated more precise formulations of clearly established law within the Fifth Circuit. Specifically, surveying the state of the law as of June 23, 2015, the Court concludes that *Bush v. Strain*, 513 F.3d 492 (5th Cir. 2008), *Newman v. Guedry*, 703 F.3d 757 (5th Cir. 2012), and *Ramirez v. Martinez*, 716 F.3d 369, 379 (5th Cir. 2013), provided notice to any reasonable officer that it was unconstitutional to tase Ramirez in the manner Escajeda did here.

In *Bush*, the Fifth Circuit held it was objectively unreasonable for an officer to slam an arrestee's face into a vehicle when the handcuffed arrestee "was not resisting arrest or attempting to flee." *Bush*, 513 F.3d at 502. In *Newman*, the Fifth Circuit found that officers violated the Fourth Amendment by repeatedly striking and tasing an individual who "committed no crime, posed no threat to anyone's safety, and did not resist the officers or fail to comply with a command." *Newman*, 703 F.3d at 764. And in *Martinez*, the Fifth Circuit found that officers exerted force in violation of the Fourth Amendment by immediately tasing and forcing to the

ground a person whose only resistance was merely failing to comply with orders to put his hands behind his back, and pulling his arm away when an officer grabbed his hand. *Martinez*, 716 F.3d at 378.

Overall, these Fifth Circuit cases evince that, as of June 23, 2015, it is clearly established law that officers may not use a taser against a subdued[63] person who neither committed any crime nor who resisted the officers' authority. *See Bartlett*, 981 F.3d at 338 (Nov. 20, 2020) (holding that *Newman* and *Martinez* provided notice to any reasonable police officer that it was unconstitutional to tase and strike a subdued individual who committed no crime and at most, passively resisted the officers' verbal commands). Hence, as mentioned above, resolving all fact disputes in favor of Plaintiffs and viewing the evidence in the light most favorable to them, Escajeda's use of force was objectively unreasonable in light of clearly established law because he used his taser on an already subdued Ramirez (who had one end of a rope around his neck, which he tightly clenched with both hands, and the other end secured to a basketball hoop on a pole) to gain compliance from him and "de-escalate" an unknown threat.

Therefore, in view of the clearly established law as of June 23, 2015, and when resolving the two genuine disputes of material fact mentioned above in Plaintiffs' favor and viewing the evidence in the light most favorable to them, a reasonable jury could find that Escajeda is not entitled to qualified immunity.

---

[63] "Force must be reduced once a suspect has been subdued.[] Notably, 'subdued' does not mean 'handcuffed.' If the suspect lacks any means of evading custody—for example, by being pinned to the ground by multiple police officers—force is not justified." *Bartlett*, 981 F.3d at 335.

**B. Plaintiffs' *Monell* Claims Against the City.**

Next, the Court addresses Plaintiffs' claims against the City.  As these claims do not involve the qualified immunity analysis, the Court proceeds by returning to the regular standard of summary judgment.

**1.  <u>Municipal Liability in the Context of § 1983.</u>**

Before analyzing Plaintiffs' theories regarding municipal liability, some background on the cause of action itself is necessary.  Section 1983 instructs:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law.

42 U.S.C. § 1983.  In the seminal case of *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978), the Supreme Court considered whether municipalities may be subject to suit pursuant to § 1983.  *Id.* at 663.  The Court's answer was yes, though a qualified one. While the Court noted that the legislative history of § 1983 "compel[led] the conclusion that Congress did intend municipalities and other local government units to be included among those persons to whom § 1983 applies[,]" it found that "the language of § 1983, read against the background of the same legislative history, compel[led] the conclusion that Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort."  *Id.* at 690–91.  Specifically, the Court held that "a municipality cannot be held liable solely because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory."  *Id.* at 691. Consequently, it is only "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."  *Id.* at 694.

In requiring the existence of an official policy or custom before municipal liability pursuant to § 1983 may attach, the Court "intended to distinguish acts of the municipality from acts of employees of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986). In other words, municipal liability is "limited to acts that are, properly speaking, acts 'of the municipality'—that is, acts which the municipality has officially sanctioned or ordered." *Id.* at 480. As a result, the unconstitutional conduct for which the municipality is allegedly liable "must be directly attributable to the municipality through some sort of official action or imprimatur; isolated unconstitutional actions by municipal employees will almost never trigger liability." *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001) (footnote omitted).

In interpreting the Supreme Court's guidance on municipal liability, the Fifth Circuit Court of Appeals has derived "three attribution principles" that must be established in support of such a claim. *Id.* "A plaintiff must identify: '(1) an official policy (or custom), of which (2) a policymaker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose "moving force" is that policy or custom.'" *Valle v. City of Houston*, 613 F.3d 536, 541–42 (5th Cir. 2010) (quoting *Pineda v. City of Houston*, 291 F.3d 325, 328 (5th Cir. 2002)).

Regarding the first requirement, "[t]he existence of a policy can be shown through evidence of an actual policy, regulation, or decision that is officially adopted and promulgated by lawmakers or others with policymaking authority." *Id.* at 542. Even a single decision may qualify "if the municipal actor is a final policymaker." *Id.* A plaintiff may also demonstrate the existence of an official policy or custom based on a "persistent, widespread practice."

*Piotrowski*, 237 F.3d at 579 (quoting *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984) (*en banc*)).

As to the second requirement, "[a]ctual or constructive knowledge of [a] custom must be attributable to the governing body of the municipality or to an official to whom that body has delegated policymaking authority." *Valle*, 613 F.3d at 542 (alterations in original) (quoting *Webster*, 735 F.2d at 842). Such an official can either be a policymaker "who has 'the responsibility for making law or setting policy in any given area of a local government's business,'" *id.* (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 125 (1988)), or a decisionmaker who "possesses final authority to establish municipal policy with respect to the action ordered[,]" *id.* (quoting *Pembaur*, 475 U.S. at 481).

Finally, to satisfy the third requirement, a plaintiff must allege "'moving force' causation." *Id.* This is a two-part obligation. A plaintiff must show "that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Id.* (quoting *Brown*, 520 U.S. at 404). Additionally, a "plaintiff must demonstrate that a municipal decision reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision." *Id.* (quoting *Brown*, 520 U.S. at 411); *see also Snyder v. Trepagnier*, 142 F.3d 791, 796 (5th Cir. 1998) (noting that "*Monell* plaintiffs [must] establish both the causal link ('moving force') and the city's degree of culpability ('deliberate indifference' to federally protected rights)").

Operating in concert, these three requirements "distinguish individual violations perpetrated by local government employees from those that can be fairly identified as actions of the government itself." *Piotrowski*, 237 F.3d at 578.

###### i.    *EPPD Chief Greg Allen as the City's Policymaker or Final Decisionmaker.*

As a preliminary matter, the Court notes that the record shows that it is undisputed that

Chief Greg Allen of the EPPD is a policymaker who can be charged with actual or constructive

knowledge of the alleged official policies or customs within the EPPD.[64]  Indeed, the record

contains sufficient evidence establishing that Chief Allen is an official to whom the City "has

delegated policy-making authority" and who would have "[a]ctual or constructive knowledge of"

each alleged policy or custom that forms the basis of municipal liability for Ramirez's death.[65]

*See Piotrowski*, 237 F.3d at 579.

Therefore, after reviewing the record, the Court concludes that Chief Allen is a

policymaker who satisfies the second element for all of Plaintiffs' *Monell* claims for municipal

liability.  Accordingly, the Court will only address the first and third elements of each claim for

the remainder of its analysis.

### 2.    <u>The City's Use-Of-Force Policy.</u>

Plaintiffs first claim that the City's use-of-force policy is facially unconstitutional

because, at the time of the incident, it contained language that was at odds with the objective

reasonableness standard in *Graham*.  Pls.' Resp. in Opp'n at 1–2.  Plaintiffs assert that the policy

contained a "Situational Force Model" that directed EPPD officers to "rely upon *objective

reasoned discretion* to make the selection" of the amount of force to be used.[66]  *Id.* at 2.  They

---

[64] PUF ¶¶ 118, 307.

[65] Pls.' Ex. 19 (Allen June 27, 2018 Depo.) at 15:7–16:11, 44:22–45:14; *id.*, Ex. 20 (Chief Allen Aff.) ¶¶ 3, 15.

[66] It is undisputed that after Plaintiffs filed the instant lawsuit, the City changed its use-of-force policy and eliminated the relevant "Situational Force Model" paragraph altogether in June 2017.  PUF ¶ 117.  It is also undisputed that those changes in the policy now "clearly set[] forth the 'objective reasonableness standard'" from *Graham*.  *Id.*  But the City objects to the consideration of this change as evidence of a subsequent remedial measure.

contend this "objective reasoned discretion" language made the policy confusing and ambiguous because the policy (1) failed to provide a definition for such language and (2) blended two elements that conflicted with one another: "objective reasonableness" (an objective element) and "discretion" (a subjective element). *Id.* at 2–3. Consequently, Plaintiffs aver that this language authorizes officers to use force that may not be objectively reasonable under *Graham* in their interactions with the public, including those with people who are suffering from mental health crises, such as Escajeda's tasing of Ramirez. *Id.* at 2.

But the City argues that the evidence shows that its use-of-force policy is constitutional on its face because it requires objective reasonableness from officer conduct, consistent with the Fourth Amendment. Mot. at 26–27. The City maintains that the policy is consistent with *Graham* because it affords officers the ability to assess the situation and determine "which nondeadly technique or weapon the [o]fficer reasonably believes will best diffuse the incident and bring it under control in a safe manner." *Id.* at 27. The City also contends that Plaintiffs cannot establish that the use-of-force policy caused Ramirez's death because, regardless of whether Escajeda's use of force was objectively reasonable, the evidence shows that Ramirez committed suicide by hanging and that the taser did not contribute to his death. City's Reply at 7, ECF No. 121. In other words, the City merely reiterates Defendants' argument that Escajeda's use of force did not contribute to Ramirez's death.

---

At this time, the Court declines to consider whether the amended policy would be inadmissible evidence at trial as a "subsequent remedial measure" under Federal Rule of Evidence 407. *See* Fed. R. Evid. 407 ("When measures are taken that would have made an earlier injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove . . . culpable conduct.").

After reviewing the record in the light most favorable to Plaintiffs, the Court concludes that there is a genuine dispute of fact as to whether the City's use-of-force policy was the "moving force" behind Ramirez's death.

First, it is undisputed that the City's use-of-force policy at the time of Ramirez's death described a "Situational Force Model" that directed officers to "rely upon objective reasoned discretion to the make the selection" of the amount of force used.[67]  Specifically, the provision provided the following:

> **3-101.05 SITUATIONAL FORCE MODEL.** The Department recognizes that a Police Officer may have to immediately resort to any level of force appropriate for the situation at hand. The Situational Force Model is designed to show that an Officer has a variety of force levels available and will select the least violent means relative to the situation. The Officer will rely upon objective reasoned discretion to make the selection. The option an Officer uses will depend upon many factors, but is generally dictated by the amount of resistance offered by the subject. This model places the Officer in the center of the situation. The Officer is trained to evaluate and continually re-evaluate the situation and select the appropriate force option based on the Officer's knowledge, skills, and justification for the force used.[68]

Further, as mentioned above, it is undisputed that Chief Allen is the City's policymaker responsible for the EPPD policies, including the use-of-force policy above.  Hence, the record indisputably shows that Plaintiffs have met the first two *Monell* requirements.

Regarding the third requirement—moving force causation, it is undisputed that Chief Allen approved of this policy and that all EPPD officers, including Escajeda, were given a copy of it, which they had to obey.[69]  It is also undisputed that Chief Allen believes Escajeda handled

---

[67] PUF ¶¶ 100–01.

[68] *Id.* ¶ 102.

[69] *Id.* ¶¶ 118–20.

the situation according to policy.[70]  But the record shows that the parties dispute whether the Situational Force Model is facially constitutional.

For instance, the City provides affidavits from Chief Allen, Assistant Chief Peter Pacillas, and Robert Zavala, the EPPD's In-Service Training Coordinator, in which they all state that the EPPD trains cadets "in laws of the U.S. Constitution and the State of Texas, including but not limited to arrest, search and seizure, Texas Code of Criminal Procedure, Constitutional and Civil Rights, El Paso's Use of Force Policies and Texas State law governing use of force."[71] The City also provides as a supporting exhibit the course curriculum of the EPPD's use-of-force course, which reviews the use-of-force policy's language on a line-by-line basis and with instructional examples.[72]

However, in viewing the evidence in the light most favorable to Plaintiffs, their version of the facts is not so "blatantly contradicted" or "utterly discredited" by the evidence in the record. *Renfroe*, 964 F.3d at 599.  First, Plaintiffs provide the expert testimony of law enforcement expert Michael Leonesio, who reviewed the policy and opined that the "objective reasoned discretion" language is ambiguous and confusing because it does not provide clear guidance to officers on how to use force in an objectively reasonable manner under *Graham*.[73] Mr. Leonesio explains that this language blends in objective and subjective elements, and as the EPPD manual does not provide a definition for it, that leaves police officers with a lot of

---

[70] *Id.* ¶ 121.

[71] Defs.' Ex. A (Pacillas Aff.) ¶ 7; *id.*, Ex. B (Chief Allen Aff.) ¶ 7; *id.*, Ex. C (Zavala Aff.) ¶ 12.

[72] *Id.*, Ex. C (Zavala Aff.) ¶ 20 & Attachment C-2.

[73] Pls.' Ex. 17 (Leonesio Depo.) at 106:24–113:8; 118:7–22.

ambiguity.[74]  Further, Plaintiffs challenge the City's proffered evidence because, for one thing, the course curriculum the City proffers is dated September 9, 2015—several months after Escajeda tased Ramirez.[75]  Moreover, Plaintiffs argue that the language the City's three witnesses use, which is substantially the same, suggests that the EPPD trains cadets in the use of force under the EPPD's use-of-force policy interpretation of the objective reasonableness standard but not the actual standard itself.[76]

But perhaps most importantly, as the Court mentioned in its qualified immunity analysis above, there are two other genuine dispute of facts that a jury must necessarily resolve before determining whether the City's use-of-force policy was the moving force behind Ramirez's death.  That is, a jury must resolve first, whether Escajeda's tasing caused Ramirez's death; and second, whether Escajeda's use of force was objectively reasonable.  If a reasonable jury resolves either of these two disputes against Plaintiffs, then the answer for the instant issue would be clear: The City's use-of-force policy could not be the moving force behind Ramirez's death.  But if it resolves *both* disputes in favor of Plaintiffs, then that reasonable jury is more likely to rule in favor of Plaintiffs on this instant issue.  Hence, the Court is of the view that there is a genuine dispute of fact as to whether the EPPD's use-of-force policy is facially constitutional.

And finally, the Court notes that resolving this genuine dispute of fact is necessary to determine whether Plaintiffs also need to establish the second part of the moving force causation element, "deliberate indifference".  As noted above, to establish moving force causation,

---

[74] *Id.*

[75] Defs.'  Ex. C (Zavala Aff.), Attachment C-2.

[76] PUF, Resp. ¶¶ 11, 15.

Plaintiffs have a two-part obligation: to first establish "a direct causal link between the municipal action and the deprivation of federal rights" (where a genuine dispute of fact lies here), and to then establish the City's "deliberate indifference" to federally protected rights.  *Valle*, 613 F.3d at 542.  If a reasonable jury determines that Plaintiffs successfully establish that the use-of-force policy is facially unconstitutional, then they need not establish the City's "deliberate indifference".  *See Doe v. United States*, 831 F.3d 309, 318 (5th Cir. 2016) ("Where the claim is that the policy '*itself* violates federal law, or directs an employee to do so,' it is unnecessary to prove a heightened level of culpability on the part of the policymakers.  (emphasis in original) (quoting *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 404–05)).  Otherwise, Plaintiffs must establish that the City's use-of-force policy "reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow[.]"  *Valle*, 613 F.3d at 542 (quoting *Brown*, 520 U.S. at 411).

   3.  **The City's Failure to Implement Policies and Procedures to Deal with People Suffering from Mental Health Crises.**

   Plaintiffs next claim that the City failed to implement policies and procedures that could have reduced the risk of excessive force when its police officers encounter people with mental health issues.  Pls.' Resp. in Opp'n at 12–13.  Particularly, Plaintiffs state that at around the time of Ramirez's tasing, police departments from other major cities in Texas, including Austin, Houston, Dallas, and San Antonio, had all implemented Crisis Intervention Team (CIT) units "to increase their officers' capacity to de-escalate situations involving the mentally ill" and avoid the use of force.  *Id.* at 13.  A CIT unit is a multifaceted comprehensive law enforcement program pairing a uniformed officer with a licensed mental health professional to respond to field officers' calls for assistance in situations involving individuals suffering from mental health

crises.[77]  Plaintiffs aver that Chief Allen knew about these CIT units and their effect "in lowering

the use of force against persons with mental health issues," for which even a non-profit

organization voiced to him the urgent need for them seventeen months before Escajeda tased

Ramirez, but that he nonetheless deliberately chose not to implement them in the EPPD.  *Id.*  at

13–14.  And thus, they contend that the choice not to implement these CIT units was a moving

force of the tasing and death of Ramirez.  *Id.* at 12.

    In contrast, the City argues that "Plaintiffs cannot establish that the failure to implement

any particular policy could have prevented Daniel Ramirez from hanging himself."  City's Reply

at 7.  In support, the City advances two arguments.  First, it argues that the record shows that all

EPPD officers, including Escajeda, were provided with "Crisis Intervention Training"

curriculum as part of the Basic Police Officer course.  Mot. at 28; *see also id.*, Ex. C, Attach. C-4

(Escajeda TCOLE Report) at 5–7.  And second, it argues that Plaintiffs fail to establish a causal

link between its alleged failure to implement the CIT units and Ramirez's death because, even if

the City had adopted the CIT units at the time, "there was no time to call [them], and [Ramirez]

was not amenable to interactive techniques for de-escalation."  Mot. at 28–29; City's Reply at 7.

---

[77] PUF ¶¶ 421–22.

    Plaintiffs' briefing and exhibit submissions indicate that "CIT" is also used to describe particular
training, tactics, and officers who have received such training.  Plaintiffs additionally direct the Court to
consider the significant evidence presented in *Valle* regarding CIT training.  Specifically, Plaintiffs quote
testimony discussed in *Valle* by a lieutenant in the Houston police department's Mental Health Unit that
CIT training is "180 degrees different than . . . typical police officer and law enforcement training."  *Id.* ¶
423 (quoting *Valle*, 613 F.3d at 545).

    Plaintiffs also explain what CIT training entails by referring to the evidence discussed in *Valle*.
"For instance, situations involving mentally ill persons require a greater degree of patience and can
require use of CIT tactics for periods as long as twenty-four hours."  *Id.* ¶ 424 (quoting *Valle*, 613 F.3d at
545).  "CIT-trained officers are trained not to 'let the pressure of time be a factor in [their]
decisionmaking [sic].'"  *Id.* ¶ 425 (quoting *Valle*, 613 F.3d at 545).  As another *Valle* witness explained,
CIT training provides police officers with "appropriate de-escalation and communication tactics."  *Id.* ¶
426 (quoting *Valle*, 613 F.3d at 545).

After due consideration, the Court concludes that a reasonable jury could find that the City made a policy decision not to implement a CIT program which could have otherwise prevented Ramirez's death, and that Chief Allen supported this policy decision while deliberately indifferent to the risk that EPPD officers may use excessive force against mentally ill individuals.

### i.   Policy

"The existence of a policy can be shown through evidence of . . . [a] decision that is officially adopted and promulgated by lawmakers or others with policymaking authority." *Valle*, 613 F.3d at 542.  "A municipal 'policy' must be a deliberate and conscious choice by a municipality's policy-maker." *Rhyne v. Henderson Cty.*, 973 F.2d 386, 392 (5th Cir. 1992) (citing *City of Canton v. Harris*, 489 U.S. 378, 389 (1989)).

"While the municipal policy-maker's failure to adopt a precaution can be the basis for § 1983 liability, such omission must amount to an intentional choice, not merely an unintentionally negligent oversight." *Id.* (citing *City of Canton*, 489 U.S. at 387).  That is, "municipal liability under § 1983 attaches where—and only where— a deliberate choice to follow a course of action is made from among various alternatives by city policymakers." *Goodman v. Harris Cty.*, 571 F.3d 388, 396 (5th Cir. 2009) (quoting *City of Canton*, 489 U.S. at 389).  Accordingly, a department's decision not to implement a policy set forth in a proposal may constitute an official policy of failing to implement such policy.  *See Valle*, 613 F.3d at 545 (holding that plaintiff presented sufficient summary judgment evidence to raise a jury issue as to "whether the department's decision not to implement the CIT training recommendations in [an internal] proposal constituted an official policy of failing to adequately train.").

Here, viewing the evidence in the light most favorable to Plaintiffs, the record shows that a reasonable jury could conclude that Chief Allen was aware of the need for CIT units but chose not to implement them.  To begin, the record undisputedly shows that the EPPD had not implemented CIT units at the time of Ramirez's death.[78]  It also undisputedly shows that Chief Allen had been Chief of the EPPD for seven and a half years prior to Ramirez's death[79], during which time Houston, Dallas, Austin, and San Antonio "already had crisis intervention teams to increase their officers' capacity to deescalate situations involving the mentally ill to avoid the use of deadly force."[80]  It is even undisputed that before he became Chief of the EPPD in December 2007, Chief Allen had already been put on notice that city leaders and other members of the public had a long-standing concern that the "department was ill-equipped to deal with mental health issues."[81]

Further, the record contains other undisputed pieces of evidence concerning Chief Allen's awareness of how these CIT units worked, their purpose, and that they were recognized for their effect in lowering the risk of an officer's use of force on a mentally ill individual.  This evidence includes: (1) his testimony regarding familiarity with the "Memphis Model"—a CIT program the City of Memphis created in 1988 after its police officers shot and killed a mentally ill man who was cutting himself and threatening suicide[82]; (2) his participation in multiple CIT trainings for

---

[78] PUF ¶ 427.

[79] *Id.* ¶ 430.

[80] *Id.* ¶ 431.  At deposition, Chief Allen testified that at the time he knew Houston had a CIT unit had heard Austin had one as well.  Pls.' Ex. 19 (Allen June 27, 2018 Depo.) at 67:4–8.

[81] *Id.* ¶ 428.

[82] *Id.* ¶¶ 442–44.

Texas chiefs of police from 2008 to 2010[83]; and (3) his testimony that he reads publications by the International Association of Chiefs of Police and the Major Cities Chiefs Associations, which share new trends in police work and other useful information to help chiefs develop better police policies, including a discussion of a Community Policing Award given to a program within the Houston CIT in 2010.[84]

The record also undisputedly shows that on January 17, 2014 (seventeen months before Escajeda tased Ramirez), Chief Allen received a detailed review from a non-profit organization, Disability Rights Texas, informing him of the results of an in-depth investigation it conducted of an incident involving his officers using excessive force against a person with mental health problems, Michael Sosa.[85]  In this review, an attorney from Disability Rights Texas represented that although Sosa's parents had told the responding EPPD officers that their son was intellectually disabled and suffered from mental illness, they still tased, physically restrained, and punched Sosa in the face despite him not being armed or threatening anyone.[86]  The attorney was of the opinion that "the EPPD had the opportunity to consider or take other more appropriate measures short and prior to the use of force, to deescalate the situation and failed to do so." [87]  Accordingly, Disability Rights Texas:

> Ask[ed] the EPPD to re-examine its policies, procedures, and practices . . . [and ensure that] any in-house mental health/crisis response teams, e.g., CIT teams, certified mental health deputies, mobile crisis intervention units, are readily available, properly trained, and fully prepared to respond immediately and when

---

[83] *Id.* ¶¶ 434–39.

[84] *Id.* ¶¶ 440–41.

[85] *Id.* ¶ 448.

[86] *Id.* ¶¶ 449–54.

[87] *Id.* ¶ 454.

necessary to address calls involving individuals with a mental health illness or [intellectual developmental disability] and in crisis.[88]

Finally, the record also shows that Chief Allen testified that the EPPD ultimately created the CIT program in 2017[89] because of "the perception by certain members of the public that the department was ill-equipped to deal with mental health issues."[90]  As Chief Allen elaborated, "This had been a concern over the years from various members of the community and city council members, not only on my term, but during past administrations of the police department."[91]   In addition, a 2017 report noted that the Deputy City Manager also acknowledged there was a need for a CIT program:

> The last five officer involved shootings involved an individual who had mental health issues in the past and/or manifested mental health issues that required a police response that escalated into a deadly force incident. During calendar years 2014- 2016, the El Paso Police Department responded to over 11,000 calls that required officers to take an individual into custody under an Emergency Detention Order (EDO) or a Protective Custody Order (PCO).[92]

In sum, after viewing the evidence in the light most favorable to Plaintiffs, their version of the facts is not so "blatantly contradicted" or "utterly discredited" by the evidence in the record. *Renfroe*, 964 F.3d at 599.  Hence, the Court is of the view that a reasonable jury could

---

[88] Pls.' Ex. 110 (Rosa Torres, Esq. Letter) at Bates No. 21311.

[89] The City also appears to object to this evidence on the basis that it constitutes evidence of a subsequent remedial measure.  But once again, the Court declines to consider whether the implementation of a CIT program in 2017 is inadmissible evidence at trial as a "subsequent remedial measure" under the Federal Rule of Evidence 407.  And for purposes of summary judgment, the Court considers Chief Allen's pertinent deposition testimony admissible to the extent it relates to his mindset prior to the incident here.

[90] *Id.* ¶ 429.

[91] *Id.*

[92] *Id.* ¶ 460.

conclude from these facts that Plaintiffs established that Chief Allen made a deliberate choice not to implement the CIT units despite the recommendation that the EPPD implement such units.

### ii.  *Moving Force Causation*

Plaintiffs "must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Valle*, 613 F.3d at 542 (quoting *Brown*, 520 U.S. at 404).  "[T]he connection must be more than a mere 'but for' coupling between cause and effect." *Id.* at 546 (citing *Thompson v. Connick*, 578 F.3d 293, 300 (5th Cir. 2009)).  Rather, the deficiency must be the "actual cause of the constitutional violation." *Id.*

Plaintiffs argue that evidence of the overall effectiveness of the CIT units combined with the events leading to the tasing and resulting death of Ramirez raise significant fact issues that Chief Allen's failure to implement such units was a 'moving force' in Ramirez's death.  Pls.' Resp. in Opp'n at 15–16.  Specifically, Plaintiffs claim that a CIT trained officer or paired mental health professional "would have recognized the obvious, that Ramirez was taking steps to take his own life and no use of force was authorized or remotely appropriate under the circumstances confronting Escajeda at that time." *Id.* at 16.  Simply put, Plaintiffs aver that "[a] CIT trained officer or a paired mental health professional would have likely resolved the encounter without tasing Ramirez and contributing to his death." *Id.*

As noted above, the City contends that Plaintiffs "cannot show that even if the City had adopted a CIT unit, that it would have been on scene prior to . . . Escajeda's arrival", City's Reply at 7, or that CIT de-escalation tactics would have worked because Ramirez "was not amenable" to them, Mot. at 28.

At this juncture, the Court must reiterate that two genuine issues of material fact exist that a jury must necessarily resolve before being able to resolve the instant issue: (1) whether

Escajeda's tasing caused Ramirez's death; and (2) whether Escajeda's use of force was objectively reasonable under *Graham*.  Similar to Plaintiffs' claim about the City's use-of-force policy, if a reasonable jury resolves either of these two disputes against Plaintiffs, then the answer for the instant issue would be clear: The City's failure to implement the CIT units at the time could not be the moving force behind Ramirez's death.  But if it resolves *both* disputes in favor of Plaintiffs, then that reasonable jury is more likely to rule in favor of Plaintiffs on this instant issue.  Hence, the Court is of the view that there is a dispute of fact as to whether the City's failure to implement the CIT units was a moving force behind Ramirez's tasing and subsequent death.

In proceeding with its analysis by resolving these factual disputes in favor of Plaintiffs, the Court is of the opinion that a reasonable jury could conclude that the City's failure to implement the CIT units was a moving force behind Ramirez's tasing and death.  As repeatedly stated above, the record shows that (1) Maria Ramirez requested help from the police to prevent her son's suicide; (2) Ramirez had committed no crime known to Escajeda; (3) Escajeda saw Ramirez clench the rope around his neck with both hands at all times and neither saw Ramirez move toward him in any way nor heard Ramirez say or yell anything; and (4) Ramirez never intended to flee, nor that he was actively resisting arrest or struggling with the police.  A reasonable jury could infer from these facts that had the EPPD deployed a CIT team to the incident here, a CIT trained officer or mental health professional would have recognized that Ramirez was taking steps to take his own life, without endangering others but himself, under circumstances for which no use of force was remotely necessary.  Indeed, a reasonable jury could conclude from these facts that Escajeda's subsequent use of excessive force was the very thing CIT units were designed to prevent.

Therefore, in resolving all factual disputes in favor of Plaintiffs and viewing the evidence in the light most favorable to them, the Court concludes that a reasonable jury could determine that Plaintiffs establish the causal link ("moving force") between the City's failure to implement a CIT program and Ramirez's tasing and subsequent death.  Because this "policy" does not facially violate a federal right, the Court next addresses the City's degree of culpability or "deliberate indifference" in not implementing this CIT program.

### iii. Deliberate Indifference

When a policy does not facially violate a federal right, a plaintiff "must show that the policy was adopted or maintained with deliberate indifference to the known or obvious fact that such constitutional violations would result." *Johnson v. Deep E. Texas Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 309 (5th Cir. 2004).  In other words, a plaintiff must show the municipal action reflects "the requisite degree of culpability"—that is, "deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision." *Valle*, 613 F.3d at 542 (quoting *Brown*, 520 U.S. at 404, 411).  "Deliberate indifference is a high standard—'a showing of simple or even heightened negligence will not suffice.'" *Id.* (citing *Piotrowski*, 237 F.3d at 579).  Establishing deliberate indifference "generally requires that a plaintiff demonstrate at least a pattern of similar violations." *Johnson*, 379 F.3d at 309 (quoting *Burge v. St. Tammany Parish*, 336 F.3d 363, 370 (5th Cir. 2003)).

The Fifth Circuit's opinion in *Valle* is particularly instructive here.  In *Valle*, the Fifth Circuit held that the plaintiffs failed to link the "potential for constitutional violations" in situations involving mentally ill persons "to a pattern of actual violations sufficient to show deliberate indifference." *Valle*, 613 F.3d at 548.  Notably, the internal proposal recommending additional CIT training did "not detail any prior specific instances of the use of excessive force

by non-CIT officers." *Id.* Additionally, the *Valle* plaintiffs failed to "elicit testimony that City officials were aware of prior shootings of unarmed mentally ill individuals." *Id.* Though the *Valle* plaintiffs presented testimony demonstrating the assistant police chief was "aware of two shootings of mentally ill persons that occurred after [the victim] was killed," it was deemed not sufficient evidence to survive summary judgment. As the *Valle* Court explained: "[E]ven assuming that these later shootings involved excessive force, they are not sufficient to show that the City was on notice of similar constitutional violations before [the decedent] was killed." *Id.*

Furthermore, evidence that merely suggested that "prior shootings of mentally ill persons in fact had occurred" was deemed insufficient when it failed to "establish a pattern of constitutional violations." *Id.* Additionally, "[p]rior instances must point to the specific violation in question; 'notice of a pattern of similar violations is required.'" *Id.* (quoting Davis, 406 F.3d at 383). Accordingly, based on *Valle*, in order to show deliberate indifference, Plaintiffs must allege a pattern of actual constitutional violations similar to the alleged violations in this cause and demonstrate that the City's officials were aware of those constitutional violations.

### a. *Establishing a Pattern.*

In support of Plaintiffs' theory of *Monell* liability based on Chief Allen's choice not to implement a CIT unit, Plaintiffs propose a "pattern of cases" involving the EPPD by identifying five instances where EPPD officers acted in accordance with an alleged "pattern of excessive force against the mentally disturbed." Pls.' Resp. in Opp'n at 15. These five instances encompass the following victims: (1) Daniel Rodrigo Saenz (2013); (2) Fernando Gomez (a.k.a. Mercedes de Marco) (2013); (3) Erik Emmanuel Salas-Sanchez (April 2015); (4) David Alejandro Gandara (May 2015); (5) Francisco Ramirez (2016). Plaintiffs support each instance

with facts on the record.  Notably, Plaintiffs present events that took place both *before* and *after* the incident at issue here, which pushes the Court beyond *Valle* and into new territory.

The City objects to Plaintiffs' pattern of cases because it argues that "*Valle* makes clear [that] . . . subsequent incidents are not probative of causation for 'conscious and deliberate indifference' [because] [e]ach of the incidents in a 'pattern' must be prior."  Mot. at 21 (citing *Valle*, 613 F.3d at 548).  The City also alternatively objects to the evidence of those instances occurring *after* the incident here based on relevancy grounds under Federal Rule of Evidence 403.  *Id.* at 20–21.  The Court notes that substantially similar arguments were made at the summary judgment stage in the companion case of *Sanchez, et. al. v. Gomez, et. al.*, EP-17-CV-133-DCG[93].  *See Sanchez et al. v. Gomez et al.*, EP-17-CV-133-PRM, 2020 WL 1036046, at *15 (W.D. Tex. Mar. 3, 2020).

After considering *Valle* and Judge Martinez's opinion in *Sanchez*, the Court agrees with Judge Martinez's reasoning in *Sanchez* that the City's interpretation overstates the Fifth Circuit's reasoning in that case.  To be sure, *Valle* and other governing case law make clear that the pattern of cases must necessarily include *prior* instances so that a plaintiff can sufficiently establish "proof that a municipal actor disregarded a known or obvious consequence of his action."  *Valle*, 613 F.3d at 547 (quoting *Brown v. Bryan Cty.*, 219 F.3d 450, 457 (5th Cir. 2000)).  "That is common sense, for the Court is unaware of any city official who can divine the future."  *Sanchez*, 2020 WL 1036046, at *16.

But similar to the *Sanchez* plaintiffs, Plaintiffs here provided instances occurring prior to and shortly after the incident here.[94]  *Id.*  Thus, as Judge Martinez's eloquently wrote in *Sanchez*,

---

[93] After the sudden and unfortunate passing of the Honorable Judge Philip R. Martinez last February, *Sanchez* was transferred to the undersigned judge for management.

[94] The *Sanchez* plaintiffs are represented by the same counsel representing Plaintiffs in this case.

[T]he inquiry is nuanced: might the future instances permit a reasonable jury to conclude that any prior instance was part of a pattern, and, if there was such a pattern, could Chief Allen have known a pattern existed at the time of Mr. Salas-Sanchez's death?[]

To answer this question in the case at bar, the Court must now consider when the character of a prior instance changes from that of an isolated incident into that of one of a pattern of instances. It is possible that the pattern might only reveal itself after Mr. Salas-Sanchez's death, a distinction that may be significant. Alternatively, this distinction may be inconsequential if Chief Allen had sufficient information at his disposal to know that any prior instance was part of a pattern, even if the pattern had not run its course. Furthermore, if future instances were admissible, a jury would have more evidence of a pattern to consider than Chief Allen had at the time of Mr. Salas-Sanchez's death.

These issues underscore the difficulty the Court has balancing what it perceives as the dual purposes of finding a pattern. On the one hand, a pattern is evidence regarding [the City's] actions prior to Mr. Salas-Sanchez's death. It enables a jury to determine the scope of available evidence that informed [the City's] actions at the time of the events giving rise to the cause of action. On the other hand, a pattern is a legal requirement forming the basis of a claim for relief. It defines the very nature of Mr. Salas-Sanchez's death pursuant to the laws of the United States. The Court questions whether a jury should be limited to considering only evidence relevant to the former at the expense of abundant evidence relevant to the latter. Unfortunately, the Court is of the opinion that the law provides few answers to these concerns.

Simultaneously, the Court is uncertain whether the fact that Mr. Salas-Sanchez's death occurred early in a possible pattern would impact Plaintiffs' claim for relief, rendering his death as the basis for a future plaintiff's *Monell* claim while insulating [the City] from municipal liability in this case. Were the Court limited to only past instances, a hypothetical plaintiff from a future instance in the pattern could rely on Mr. Salas-Sanchez's death to survive summary judgment, while Plaintiffs in this case might lose summary judgment should the prior instances not reveal a pattern on their own.[] Thus, the Court contemplates how many instances of excessive force are necessary before [the City] has earned the "requisite degree of culpability" for possible municipal liability. Furthermore, the law is unclear on whether it requires [the City] to answer for all instances forming the pattern, or only the final few. This challenge gets to the heart of the nebulous and ill-defined "deliberate indifference" standard, one that is difficult to apply when prior instances do not indicate an obvious conclusion. Therefore, the Court is reluctant to deny a plaintiff access to justice when the law does not so require.

*Id.* Further, none of the cases the City cites to support its interpretation of *Valle* appear to

undermine the reasoning above.

In view thereof, the Court declines to expand the Fifth Circuit's existing jurisprudence on this issue until the complete factual record is better developed at trial.  At that point, the City may request the Court to revisit the issue once the record is complete and move for judgment as a matter of law.  *See* Fed. R. Civ. P. 50 (permitting a party to move for judgment as a matter of law during a jury trial, "specify[ing] the judgment sought and the law and facts that entitle the movant to the judgment").  Thus, the Court will proceed by analyzing each of the cases contained in Plaintiffs' proposed "pattern of excessive force against the mentally disturbed" to determine whether they in fact constitute a pattern sufficient for *Monell* liability.

### b.  *Excessive Force.*

In determining whether the cases Plaintiffs propose establish a "pattern of excessive force against the mentally disturbed", the Court analyzes the facts of those cases—as provided by Plaintiffs in their accompanying exhibits—under *Graham*'s objective reasonableness standard. *See also* Section A(2)(i) & (i)(b) *supra* (outlining in detail the objective reasonableness standard).[95]

### (1) Daniel Saenz.[96]

In Saenz's case, the record shows that, on March 8, 2013, EPPD Officer Jose Flores and G4S employees were assigned to transport prisoners, including Saenz, to the County Jail.[97]

---

[95] In contrast to the Court's application of the objective reasonableness standard above in its qualified immunity analysis, the Court's application of the same to each of these cases will be in accordance with the regular summary judgment standard.

[96] The Court is mindful that it previously presided over part of the subsequent civil suit that Mr. Saenz's family filed against the City and the individuals involved.  *See Saenz v. Flores*, EP-14-CV-244-DCG (W.D. Tex. Sept. 27, 2019). Accordingly, the Court has taken great care to only consider those facts presented for summary judgment, and today's Order is based solely on the record in this case.

[97] PUF ¶ 129.

Saenz was initially arrested at the Del Sol Medical Center Emergency Room for assault.[98]  He remained handcuffed with both hands behind his back at all times since then.[99]  Upon first seeing Saenz, Flores noticed "something wasn't right" because Saenz was partially unclothed after he had "urinated himself two to three times."[100]  Upon arrival at the jail, Flores and a G4S officer escorted Saenz down the ramp to the basement entrance of the jail, where Saenz inexplicably lunged at the door and struck his head as the officers were attempting to get him inside the jail.[101]  Saenz started to bleed from this head injury and the officers had to drag him into the jail because he was unable or unwilling to walk.[102]  Once inside, the jail nurse refused to accept Saenz and directed Flores to take him out of the jail.[103]  The officers then dragged Saenz outside and called for medical assistance.[104]  Saenz, whose hands were still handcuffed behind his back, began to struggle against officers.[105]  Flores determined that the best course of action was to "get my gun,

---

[98] *Id.* ¶ 130.

[99] Pls.' Ex. 54 (Saenz SRT Case Summary) at 2.

[100] Pls.' Ex. 56 (DRB Flores Testimony) at 3:17–20.  Indeed, Sergeant Rathman, who interacted with Saenz first, was also under "the impression that [Saenz] was under some form of a narcotic or substance, under the influence of any medication substance."  PUF ¶ 131.

[101] Pls.' Ex. 54 (Saenz SRT Case Summary) at 2.

[102] *Id.*

[103] *Id.* at 3.

[104] *Id.*

[105] PUF ¶ 133.

point at him, let him know, hey, stop, stop, and he would react and would stop."[106]  Flores then

draw his service weapon and shot Saenz, who had his hands cuffed behind his back.[107]

Viewing the evidence in the light most favorable to Plaintiffs, a reasonable jury could

conclude that Flores was aware that Saenz was mentally unstable[108], physically incapacitated,

and could not pose a serious threat of harm to him or the GS4 officer.  It is true that Flores knew

Saenz was arrested for assault and that Saenz started to struggle against the officers.  But rather

than de-escalate the situation, Flores responded to the slightest amount of resistance from an

already subdued Saenz with deadly force.[109]  As such, a reasonable jury could further infer that

the outcome may have been different had there been a CIT team to communicate with Saenz and

gain his cooperation at any point that day.  Therefore, a reasonable jury could determine that the

shooting death of Saenz is part of a pattern of constitutional violations as relevant to this case.

(2) Fernando Gomez (aka Mercedes de Marco).

In Gomez's case, the record shows that on October 12, 2013, around 4:00 a.m., EPPD

Officer Rinker was dispatched to 1217 North Mesa in reference to a report of "family violence"

---

[106] *Id.*  ¶ 134.

[107] *Id.*  ¶ 135. The Court is mindful that the City disputes whether Flores intentionally shot Saenz. But viewing the evidence in Plaintiffs' favor, their version of the facts is not so "blatantly contradicted" or "utterly discredited" by the evidence in the record.  *Renfroe*, 964 F.3d at 599.

[108] To be clear, the Court is not considering Saenz's mental crisis as a factor in the objective reasonableness standard regardless of which party it benefits.  The Court declines to expand the Fifth Circuit's existing jurisprudence on this issue until that court decides its legal significance.  *See, e.g.*, *Bartlett*, 981 F.3d at 334 ("[T]he legal significance [in the objective reasonableness standard] of an officer's awareness of a suspect's mental health is murky.").  The Court only considers Saenz's and the other decedents' mental crises at the time solely to the extent these establish that the decedents in these cases were "mentally disturbed" at the time the EPPD officers allegedly used excessive force against them.

[109] "Force must be reduced once a suspect has been subdued.[]  Notably, 'subdued' does not mean 'handcuffed.'  If the suspect lacks any means of evading custody—for example, by being pinned to the ground by multiple police officers—force is not justified."  *Bartlett*, 981 F.3d at 335.

in progress.[110]  Upon arrival to the scene, Rinker heard a female screaming nearby and saw

Gomez standing next to a vehicle approximately 40 yards away from him.[111]  Rinker quickly

approached Gomez and yelled "Are you OK?".[112]  Gomez looked towards Rinker giving him "a

thousand yard stare" and took off running across the street to the parking lot of a nearby hotel.[113]

Rinker chased Gomez and commanded him to stop running.[114]  At this point, Rinker believed

Gomez was the possible offender from the "family violence" dispatch report because Gomez was

ignoring his verbal commands and kept running towards the hotel's office door.[115]  Rinker

requested backup assistance immediately thereafter.[116]

Rinker saw Gomez trying to open the hotel's locked office door and heard him scream "I

got to get out of here".[117]  Rinker continued to give verbal commands for Gomez to calm down

and sit down, but Rinker states that Gomez kept acting erratically by screaming loudly, breathing

heavily, clawing at the glass of the door, and pacing quickly in front of the door.[118]  Gomez then

began to run towards the front of the hotel into a courtyard area.[119]  Rinker called for more

---

[110] Pls.' Ex. 31 (Rinker Suppl. Report) at 1.

[111] *Id.*

[112] *Id.*

[113] *Id.*

[114] *Id.*

[115] *Id.*

[116] *Id.*

[117] *Id.*

[118] *Id.*

[119] *Id.*

backup assistance before tackling Gomez to the ground.[120]  Gomez, a large individual who weighed about 300 pounds[121], began to kick his legs and try to roll on his side, and grabbed Rinker's shirt and equipment belt.[122]  Rinker then made a double-arm bar on Gomez and sat down on Gomez's lower back area until EPPD Officers Guillen and Carreon arrived at the scene.[123]  The three officers attempted to handcuff Gomez, but he kept struggling and resisting, even grabbing Rinker's inner thigh.[124]  After the officers were able to remove Gomez's grip from Rinker after a short struggle, they successfully handcuffed Gomez.[125]

More EPPD officers arrived on scene for assistance, totaling about six or seven officers.[126]  The officers picked up Gomez, stood him up, and walked him towards the front of a vehicle nearby.[127]  Once there, Gomez once again began to scream and attempt to break away from the officers.[128]  The officers then attempted to get Gomez inside the back of a patrol vehicle but Gomez let his body go limp and dropped to the ground.[129]  Gomez again kicked his legs, screamed, and grabbed the officers.[130]  One officer drove a patrol vehicle closer to Gomez's

---

[120] *Id.*

[121] *Id.*; Pls.' Ex. 32 (Guillen Admin. Statement to IA) at 3, 4.

[122] Pls.' Ex. 31 (Rinker Suppl. Report) at 2.

[123] *Id.*

[124] *Id.*

[125] *Id.*; Pls.' Ex. 32 (Guillen Admin. Statement to IA) at 2.

[126] Pls.' Ex. 31 (Rinker Suppl. Report) at 2; Ex. 32 (Guillen Admin. Statement to IA) at 2.

[127] Pls.' Ex. 31 (Rinker Suppl. Report) at 2

[128] *Id.*

[129] *Id.*

[130] *Id.*

location so that all the officers could get Gomez into the back.[131]  The officers asked Gomez to stand up and enter the vehicle, but Gomez told them to leave him alone and that he was not going anywhere.[132]  The officers tried to get Gomez into the vehicle, but Gomez kicked his legs, swung his head, and shifted his body weight to the point the officers were unsuccessful in their endeavor.[133]  The officers then placed Gomez on the ground after becoming tired and losing strength due to the struggle.[134]

Guillen then warned Gomez three times to stop fighting, stand up, and get into the back of the patrol vehicle, or otherwise he would tase him.[135]  After the third warning, Gomez said "you are going to have to taser me."[136]  Guillen then drive-stunned Gomez's upper torso without effect.[137]  Guillen again warned Gomez that he would tase him again if he did not stop fighting.[138]  Gomez continued to struggle and Guillen drive-stunned him a second time on the shoulder area but again without effect.[139]  The officers were later able to lift Gomez and place him into the back of the patrol vehicle while he kept kicking his legs.[140]

---

[131] *Id.*

[132] Pls.' Ex. 32 (Guillen Admin. Statement to IA) at 3.

[133] Pls.' Ex. 31 (Rinker Suppl. Report) at 2

[134] *Id.*

[135] *Id.*

[136] *Id.*

[137] *Id.*; Pls.' Ex. 32 (Guillen Admin. Statement to IA) at 3.

[138] Pls.' Ex. 32 (Guillen Admin. Statement to IA) at 3.

[139] Pls.' Ex. 31 (Rinker Suppl. Report) at 2; Ex. 32 (Guillen Admin. Statement to IA) at 3.

[140] Pls.' Ex. 31 (Rinker Suppl. Report) at 2; Ex. 32 (Guillen Admin. Statement to IA) at 3.

Inside the patrol vehicle, Guillen and another officer tried to sit Gomez upright and put on his seatbelt without success due to Gomez's continued resistance.[141]  Guillen decided to just close the rear doors and drive to the police station nearby.[142]  On the way to the station, Gomez was quiet and did not speak the entire time.[143]  After arriving at the station and opening the rear doors, Guillen asked Gomez to exit the vehicle but he did not respond.[144]  Guillen noticed that Gomez was unconscious and not breathing.[145]  Rinker, who also drove to the station, checked for a pulse but did not feel one.[146]  The officers immediately administered chest compressions and called for medical assistance.[147]  Gomez was eventually transported to Las Palmas, where he was pronounced dead later that day.[148]

After reviewing the evidence in the light most favorable to Plaintiffs, the Court is of the view that no reasonable jury could conclude that Guillen's tasing of Gomez was objectively unreasonable under *Graham*.

---

[141] Pls.' Ex. 32 (Guillen Admin. Statement to IA) at 3.

[142] *Id.*

[143] *Id.* at 4.

[144] *Id.*

[145] *Id.*

[146] *Id.*

[147] *Id.*

[148] Pls.' Ex. 59 (Gomez Incident Report) at 2.  Nothing in the record indicates Gomez's cause of death and whether the tasing contributed to it.  However, in *Sanchez*, the plaintiffs presented summary judgment evidence about Gomez's case in support of establishing a pattern of excessive force against the mentally ill.  The *Sanchez* opinion notes that the record in that case indicated that "[a]n autopsy determined his cause of death to be 'cocaine toxicity'" and that Gomez's death was not the result of Guillen's use of a taser.  *Sanchez*, 2020 WL 1036046, at *24 n.21.

As to the first factor, the record shows that Rinker was responding to a dispatch report of possible "family violence". *See generally* Tex. Penal Code § 22.01 ("Assault"). The record also shows that Gomez was chasing two of his friends with a stick.[149] It is unclear whether his friends were the ones who reported this event to 911 and whether Rinker knew about the specifics of the incident. But even when drawing all inferences in favor of Plaintiffs, the record shows that upon arrival, Rinker did not immediately believe Gomez to be the "perpetrator" because Rinker even asked him if everything was "ok" upon his arrival on scene. Rinker only changed his mind and believed Gomez to be the "perpetrator" when Gomez began yelling "I got to get out of here", ignored Rinker, and ran away from him. Further, Guillen and the others who arrived to assist Rinker saw him struggling with Gomez in handcuffing him. From these facts, the only reasonable inferences a fact finder could draw are that Guillen and the others: (1) also heard the dispatch report on "family violence"; (2) knew that Rinker had responded to that dispatch; (3) were responding to Rinker's call for backup; and (4) reasonably believed that Gomez was the suspected "perpetrator" of the "family violence" reported because Rinker was trying to handcuff him. Hence, the first *Graham* factor weighs in favor of Guillen.

As to the second factor, it is undisputed that Gomez was unarmed at all times during his interactions with the EPPD officers.[150] It is also undisputed that Gomez was already in handcuffs on the ground and surrounded by six or seven officers when Guillen tased him both times. To be sure, in drawing all inferences in favor of Plaintiffs, a reasonable jury could infer from these facts that Gomez posed no immediate threat to Guillen or any of the other six or seven officers on scene. Thus, the second *Graham* factor weighs against Guillen.

---

[149] Pls.' Ex. 30 (Thompson Suppl. Report) at 2.

[150] PUF ¶ 148.

But as to the third factor, the record shows that Gomez, at *all* times, failed to comply with any of the officers' commands, resisted arrest, and struggled with the EPPD officers.  In other words, Gomez was actively—not passively—resisting arrest during the entire incident.  It is true that, drawing all inferences in favor of Plaintiffs, the EPPD had arguably subdued Gomez because he lacked any means of evading custody as he was handcuffed on the ground and surrounded by six or seven officers.  That fact alone demands that the degree of "[f]orce [to be used] must be reduced".  *Bartlett*, 981 F.3d at 335.  Moreover, "even if [Gomez] failed to comply and struggled against the officers at certain points throughout the encounter, that resistance did not justify force indefinitely."  *Id.*

However, the Fifth Circuit has also held that the "[u]se of a taser is appropriate when a suspect continues to resist arrest[,] . . . particularly when it is not 'the first method to gain . . . compliance.'"  *Cadena v. Ray*, 728 F. App'x 293, 297 (5th Cir. 2018).  "While 'a suspect's refusal to comply with instructions' may indicate that physical force is justified, officers must also select the appropriate 'degree of force'."  *Bartlett*, 981 F.3d at 332 (citations omitted).  "To stay within constitutional bounds, an officer must use force 'with measured and ascending actions that correspond to a suspect's escalating verbal and physical resistance.'"  *Id.* at 332–33 (citations and alterations omitted).

The record here shows that Guillen and the other officers repeatedly asked Gomez to stand up and walk to the patrol car with them.  Gomez failed to comply and continued to actively resist arrest.  Guillen further warned him three times to stop fighting, stand up, and get into the back of the patrol vehicle, otherwise, he would get tased.  Despite the warnings, Gomez—who weighed about 300 pounds—remained combative, uncooperative, and actively resisted the efforts of six or seven officers successfully.  Only at that point did Guillen first use his taser on

Gomez, which in fact proved ineffective because he kept struggling and actively resisting the officers.  Even then, before he tased Gomez a second time, Guillen warned Gomez that he needed to stop resisting if he did not want to be tased again.

In short, Guillen and the officers gave Gomez ample warning and opportunity to cease resisting before gradually resorting to more forceful measures.  *See Buckley v. Haddock,* 292 F. App'x 791, 796 (11th Cir. 2008) (holding that an officer's use of a taser three times, with prior warnings before each use, on a handcuffed arrestee who resisted to get into the back of the officer's patrol vehicle by letting his body go limp on the ground was objectively reasonable). As such, even when viewing the evidence in the light most favorable to Plaintiffs, the third factor weighs in favor of Guillen.  And therefore, in balancing the *Graham* factors, the record indicates that Guillen's use of force on Gomez was objectively reasonable.

Surely, the record indisputably shows that Guillen knew Gomez had a history of mental health illness and drug use, and that he had in fact interacted with Gomez several times in the past.[151]  A reasonable jury could infer from these facts that Gomez was unable to cooperate and remained combative due to his mental illness and drug use.  That jury could even arguably infer from those facts that had a CIT unit arrived, the situation would have been handled differently. But that is beside the point because an officer is not precluded from *reasonably* using force against a mentally ill individual.  *See Bates v. Chesterfield Cty.*, 216 F.3d 367, 372 (4th Cir. 2000) ("Knowledge of a person's disability simply cannot foreclose officers from protecting themselves, the disabled person, and the general public.").  Indeed, Plaintiffs neither appear to contend the same nor do they point to any governing case law that expressly requires that an officer must consider an individual's mental illness under *Graham*.

---

[151] PUF ¶¶ 153–55.

In sum, since the record shows that Guillen's use of force was objectively reasonable under *Graham* (hence, not excessive), then Gomez's case cannot be part of Plaintiffs' alleged pattern of constitutional violations as relevant to this case.

(3) <u>Erik Salas-Sanchez.</u>

In Sanchez's case, the record shows that on April 29, 2015, EPPD officers were dispatched to Jesuit Street to investigate a report by Ms. Romero, Sanchez's neighbor, that Sanchez had entered her home uninvited.[152]  Officer Rivera first arrived to speak with Romero.[153]  She told Rivera that she had found Sanchez in her home, but that he did not threaten her or her family or take anything.[154]  Romero told Rivera that she did not want to press charges against Sanchez, but that she only wanted the officers to ask him not to enter her home again.[155] After talking to Romero, Rivera went to Sanchez's home not to arrest him, but to speak with his mother.[156]  At this time, Officer Gomez arrived at the scene and Rivera informed him of what Romero had told him.[157]

When both officers arrived at the Sanchez home, Sanchez's mother, Celia, went outside to speak with them.[158]  She told them that Sanchez was inside, and in response to the officers' questions, she explained her efforts to find mental health services for Sanchez.[159]  Sanchez's

---

[152] *Id.* ¶ 158.

[153] *Id.* ¶ 159.

[154] *Id.* ¶¶ 159–60.

[155] *Id.* ¶ 161.

[156] *Id.* ¶ 162.

[157] *Id.* ¶ 163.

[158] *Id.* ¶ 164.

[159] *Id.* ¶ 168.

sister, Nora, was also inside the home carrying her one-year-old son and saw that Celia was outside and heard her talking to the officers.[160]

At this point, the Court pauses to note that the record contains *vastly* different accounts about what happened that night.  Not only does the Sanchez's version of the facts vastly differ from the officers', but the officers' own accounts also significantly differ from one another.  As such, the Court is of the view that the record raises multiple material fact disputes that make its review of the record uniquely difficult in determining whether the record establishes a pattern of excessive use of force against the mentally disturbed.[161]  Nonetheless, the Court proceeds with its analysis by resolving all factual disputes in Plaintiffs' favor solely for purposes of their *Monell* claim at summary judgment.

In construing the evidence in the light most favorable to Plaintiffs, the evidence shows that Sanchez was in his room at the time all of this was happening.[162]  Nora then went to Sanchez's room and told him that the officers were asking about him.[163]  Sanchez came out of his room, saw the officers, told his mother to go back inside because nothing was going on, and went back to his room.[164]  He later came back from his room again and repeatedly told the officers that they should leave.[165]  In doing so, Sanchez also used derogatory language towards

---

[160] *Id.* ¶¶ 165–66.

[161] As mentioned above, the *Sanchez* case has been transferred to the undersigned judge for management.  The jury trial for that case is set for April 4, 2022.

[162] PUF ¶ 167.

[163] *Id.* ¶ 169.

[164] *Id.* ¶ 170.

[165] *Id.* ¶ 171.

the officers and became agitated by their presence.[166]  Celia told her son to stay away several times because the officers were there to talk to her, not to him.[167]

At some point, the officers claim to have seen Sanchez holding something in his hands.[168] Rivera drew out his taser and Gomez drew out his firearm for "lethal cover".[169]  The officers then entered the Sanchez home without a warrant and without consent.[170]  They moved past Celia and towards Sanchez.[171]  Sanchez turned and headed back towards the back of the home away from the officers towards the kitchen.[172]  Rivera then deployed his taser on Sanchez but only one of the taser prongs hit him.[173]  Sanchez complained loudly after being tasered and exited the kitchen.[174]  Sanchez then turned right to head into the hallway leading to his bedroom away from where Gomez was standing with his firearm drawn in the living room.[175]  Gomez then discharged his weapon several times, hitting Sanchez three times in back of his body: twice

---

[166] *Id.* ¶ 172.

[167] *Id.* ¶ 176.

[168] *Id.* ¶ 177.

[169] Pls.' Ex. 33 (Smith Admin. Statement to IA) at 11; Ex. 61 (Rivera Suppl. Report) at 2; Ex. 65 (Gomez Suppl. Report) at 3.

[170] *Id.* ¶ 179.

[171] *Id.* ¶ 180.  The City appears to dispute whether the officers pushed Celia out of the way to move towards Sanchez and whether Sanchez was about to take his baby nephew in his arms from his sister.  The Court rephrased Plaintiffs' proposed fact based on the portions therein that Defendants do not dispute.

[172] *Id.* ¶ 181.

[173] *Id.* ¶ 182.

[174] Pls.' Ex. 36 (Nora Salas-Sanchez Depo.) at 68:22–69:22

[175] *Id.* at 69:23–70:24; 118:11–18.

close to the middle of his back and once in the buttocks.[176]  Sanchez died as a result of these

gunshot wounds.[177]

After resolving all factual disputes in favor of Plaintiffs and viewing the evidence in the

light most favorable to them, the Court is of the view that a reasonable jury could conclude that

the two types of force used by Rivera and Gomez were both objectively unreasonable under

*Graham*.

As to the first factor, it is undisputed that the officers were responding to reports of a

burglary in progress.  Yet, it is also undisputed that Romero—the reporter of the incident—told

the officers that she was not seeking to press charges against Sanchez because he had not

threatened her or her family or taken anything with him.  She also told them that she only wanted

them to speak with Celia to make sure it did not happen again.  A reasonable jury could infer

from these facts that Sanchez had committed no offense for which an arrest was necessary.[178]

Hence, the first factor weighs against Rivera and Gomez.

As to the second factor, the record contains multiple disputes of fact that make it uniquely

difficult to determine whether Sanchez posed an immediate threat to the officers or others.  The

witnesses' vastly different accounts about what transpired complicates the Court's *Graham*

---

[176] *Id.* at 69:25–70:24; 101:11–25; PUF ¶ 185.

[177] PUF ¶ 187.

[178] "Under Texas law the general rule is that one cannot be convicted of burglary unless he entered the premises *without the owner's consent*."  *United States v. Prejean*, 494 F.2d 495, 498 (5th Cir. 1974) (emphasis added); *see also* Tex. Penal Code § 30.02(a) ("Burglary").  It is unclear whether Texas law would deem Romero's decision not to press charges as *effective* "after the fact" consent negating Sanchez's purported burglary offense.  To date, it does not appear that Texas law precludes such conclusion. *See* Tex. Penal Code § 1.07 ("Effective consent" includes consent by a person legally authorized to act for the owner. Consent is not effective if: (A) induced by force, threat, or fraud; (B) given by a person the actor knows is not legally authorized to act for the owner; (C) given by a person who by reason of youth, mental disease or defect, or intoxication is known by the actor to be unable to make reasonable decisions; or (D) given solely to detect the commission of an offense.").

analysis because the Court is precluded from weighing the evidence and determining the credibility of these accounts for summary judgment purposes. *See Deville v. Marcantel*, 567 F.3d 156, 164 (5th Cir. 2009). Simply put, the Court is unable to readily determine which facts it should impute on the officers' awareness for it to analyze such facts "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396.

For instance, one of the most salient factual disputes between the parties is the kind of language Sanchez used in telling the officers to leave. The officers claim that Sanchez repeatedly insulted them and threatened them by challenging them to come inside and telling them he would take away their weapons to kill them.[179] But Celia and Nora instead claim that at most, Sanchez insulted them by calling them "dogs" and telling them to leave; but that at no point did Sanchez ever threaten them or make any of the statements which the officers attribute him.[180] This dispute is indeed material to the issue because if a reasonable jury concludes that Sanchez merely insulted the officers but did *not* threaten, then no reasonable police officer could have objectively determined that Sanchez posed an immediate threat to the officers or others.

Another similarly important factual dispute is whether, at the time the officers claimed to have seen he had something in his hands, Sanchez was either (1) in the hallway giving his back towards the police officers and about to grab his baby nephew from Nora's arms[181]; or (2) in the hallway facing towards the officers and holding a blunt item that looked like a weapon[182]. If a

---

[179] *See, e.g.*, Pls.' Ex. 33 (Smith Admin. Statement to IA) at 2–5; Ex. 61 (Rivera Suppl. Report) at 1–2; Ex. 65 (Gomez Suppl. Report) at 1–3.

[180] *Id.*, Ex. 35 (Celia Sanchez Depo.) at 64:7–65:15, 68:13–25; Ex. 62 (Nora Salas-Sanchez Criminal Trial Tr.) at 140:2–9.

[181] *Id.*, Ex. 62 (Nora Salas-Sanchez Criminal Trial Tr.) at 144:1–7, 145:6–14, 146:7–147:5.

reasonable jury believes the former, then it could also infer that the officers were capable of seeing that Nora was about to give her one-year-old son to Sanchez, and that he—despite giving his back to the officers—was not holding a weapon posing an immediate threat to anyone.

But the most salient factual dispute on the record, and perhaps most troubling, is the credibility of the officers' accounts of the incident because the three officers' accounts all significantly differ from one another.  To begin, the record is unclear about the time a third officer, Smith, arrived at the scene.  According to Smith herself, she arrived at the scene when Gomez and Rivera had already started talking to Celia—who acknowledged her presence upon arrival—about Sanchez's mental issues but before Sanchez began yelling at them.[183]  But then Gomez claims that Smith actually arrived after Celia had already purportedly went inside to tell Sanchez to stop his behavior.[184]  But then Rivera reported that Smith was already with them by the time they started asking Celia about Sanchez's mental issues.[185]  And to complicate matters further, Celia claims that she does not recall seeing Smith arrive until after Sanchez had been shot.[186]

What is more, the record is also unclear as to where exactly the officers—regardless of when Smith arrived—spoke with Celia.  Rivera reported that they were talking to Celia in her driveway while she leaned against a vehicle there.[187]  Rivera also reported that Celia only walked

---

[182] *Id.*, Ex. 33 (Smith Admin. Statement to IA) at 6; Ex. 61 (Rivera Suppl. Report) at 2; Ex. 65 (Gomez Suppl. Report) at 2.

[183] *Id.*, Ex. 33 (Smith Admin. Statement to IA) at 3; Ex. 64 (Smith Depo.) at 100:12–23.

[184] Ex. 64 (Smith Depo.) at 100:12–23.

[185] Ex. 61 (Rivera Suppl. Report) at 2.

[186] *Id.*, Ex. 35 (Celia Sanchez Depo.) at 68:1–12.

[187] *Id.*, Ex. 61 (Rivera Suppl. Report) at 2.

inside the house again after the officers had purportedly seen Sanchez walking out the door "brandishing a black object in his hands."[188]  In contrast, Smith first reported that they talked to Celia "standing directly in front of the main door to the residence".[189]  But in her interview with Internal Affairs almost a year later, Smith said that they were talking to Celia "in the front yard".[190]  On the other hand, Gomez reported that they talked to Celia in the porch area, about 10 to 12 feet from the front door, and that Celia would go and close the door each time Sanchez opened the door, remaining behind it, to taunt and threaten the officers.[191]

To make matters worse, the record indisputably shows that after the shooting, Smith, Rivera, and Gomez were allowed to talk to each other and were not separated after the incident.[192]  Thus, in viewing the evidence in the light most favorable to Plaintiffs, a reasonable jury could infer from all these facts viewed together that the officers' significantly different versions of the facts suggest collusion.  Therefore, in resolving all factual disputes in favor of Plaintiffs, the second *Graham* factor also weighs against Rivera and Gomez.

And as to the third factor, in drawing all inferences in favor of Plaintiffs, the record does not indicate that Sanchez was ever resisting arrest or failing to comply with the officers' verbal commands.  If anything, the record shows that the officers never intended to arrest Sanchez and

---

[188] *Id.*

[189] *Id.*, Ex. 66 (Smith Witness Statement) (April 30, 2015) at 1.

[190] *Id.*, Ex. 33 (Smith Admin. Statement to IA) (June 1, 2016) at 3.

[191] *Id.*, Ex. 65 (Gomez Suppl. Report) at 1–2.

[192] PUF ¶ 188.

even suggests that they may have used force (tasing and shooting) without any previous verbal warnings.[193]  Hence, the third factor also weighs against Rivera and Gomez.

In sum, resolving all factual disputes in favor of Plaintiffs, a reasonable jury could conclude that the force used by Rivera and Gomez was excessive and objectively unreasonable. Moreover, from all these facts, a reasonable jury could further infer that the outcome may have been different had there been a CIT team to deal with the situation differently.  Therefore, a reasonable jury could determine that the shooting death of Sanchez is part of a pattern of constitutional violations which are relevant to this case.

(4) <u>David Gandara.</u>

In Gandara's case, the record shows that on May 21, 2015, Officers Castañon and Peña received a call of a suicidal subject with a gun to his head.[194]  The comments on the call advised that the subject had a rifle or shotgun to his own head.[195]  Upon arriving at the scene, the officers came up to an alley with their M4 rifles and found David Gandara urinating.[196]  The officers pointed their rifles at Gandara, who was about 10-15 yards from them, as he urinated on the wall of a daycare in the location.[197]  At that point, the officers could see that Gandara had no weapons

---

[193] Once again, Rivera and Gomez offered different accounts that appear to contradict each other. For example, Rivera purportedly did give verbal commands to Sanchez to "put the weapon down" but did not recall any other officer giving any verbal commands. Pls.' Ex. 34 (Rivera Admin. Statement to IA) at 2.  Similarly, Gomez reported that he (not Rivera) was the one who gave the verbal commands and does not recall any other officer giving any commands.  *Id.*, Ex. 65 (Gomez Admin. Statement to IA) at 20.

[194] PUF ¶ 239.

[195] Pls.' Ex. 39 (Peña Suppl. Report) at 1; Ex. 40 (Castañon Suppl. Report) at 1.

[196] PUF ¶ 241.

[197] *Id.* ¶ 242.

within his immediate reach.[198]  They then gave Gandara verbal commands to show them his

hands, but he ignored them and continued urinating.[199]

After he finished urinating, Gandara then started walking towards the officers and put his

right hand behind his back at waist level.[200]  Neither Castañon nor Peña lowered their weapons;

rather, they continue to yell at Gandara to stop while he walked toward his pick-up truck.[201]  At

this point, other officers had arrived, including Orozco, and surprised Gandara, who started

walking and pacing in circles.[202]  The officers continued giving Gandara verbal commands to

stop, show them their hands, and get on the ground, but he kept ignoring their commands and

headed towards the back of his pick-up truck.[203]

Orozco, who was initially behind Castañon and Peña, started slowly approaching

Gandara and drew out his taser.[204]  Castañon then asked the other officers if anyone had a

beanbag launcher, to which Orozco replied "no" but that he had his taser.[205]  As Orozco

continued to approach him, Gandara was now reaching into the bed of his pick-up truck and

grabbed what the officers believed to be a long black gun case like the ones issued to them at the

---

[198] *Id.* ¶ 243.

[199] Pls.' Ex. 39 (Peña Suppl. Report) at 2; Ex. 40 (Castañon Suppl. Report) at 2.

[200] *Id.*, Ex. 39 (Peña Suppl. Report) at 2; Ex. 40 (Castañon Suppl. Report) at 2.

[201] PUF ¶ 246.

[202] *Id.* ¶¶ 247–48.

[203] Pls.' Ex. 39 (Peña Suppl. Report) at 2; Ex. 40 (Castañon Suppl. Report) at 3; Ex. 41 (Orozco Suppl. Report) at 1.

[204] *Id.*, Ex. 41 (Orozco Suppl. Report) at 1.

[205] *Id.*

EPPD academy.[206]  Castañon told Gandara "don't do it, don't do it, I'm going to shoot".[207]  But Gandara pulled the case open and reached inside it.[208]  Castanon and Peña fired their weapons at Gandara, who later died as a result of the gunshots.[209]

After reviewing the evidence in the light most favorable to Plaintiffs, the Court is of the view that no reasonable jury could conclude that the force used by Castañon and Peña was objectively unreasonable under *Graham*.

As to the first factor, it is true that the officers were merely responding to a suicide in progress, and as mentioned above, committing suicide is not a criminal offense in Texas.  *See Cook Children's Med. Ctr.*, 607 S.W.3d at 64 ("It is not and has not been a violation of law in Texas for a person to take his or her own life.") (citations omitted).  Hence, the first factor weighs against Castañon and Peña.[210]

As to the second factor, however, even when viewing the evidence in the light most favorable to Plaintiffs, the record indicates that a reasonable officer at the scene would have believed that Gandara posed an immediate threat to the safety of the officers and others in the area.  While the officers continued to aim their M4 rifles at Gandara despite observing that he had no rifle or shotgun—the type of weapon reported by dispatch—within his immediate reach,

---

[206] *Id.*, Ex. 39 (Peña Suppl. Report) at 2; Ex. 40 (Castañon Suppl. Report) at 3; Ex. 41 (Orozco Suppl. Report) at 1.

[207] *Id.*, Ex. 39 (Peña Suppl. Report) at 2; Ex. 40 (Castañon Suppl. Report) at 3; Ex. 41 (Orozco Suppl. Report) at 1.

[208] *Id.*, Ex. 39 (Peña Suppl. Report) at 2; Ex. 40 (Castañon Suppl. Report) at 3; Ex. 41 (Orozco Suppl. Report) at 1.

[209] PUF ¶¶ 251–52.

[210] Further, nothing from the record suggests that the officers were responding to a suspected offender "display[ing] a firearm or other deadly weapon in a public place in a manner calculated to alarm."  Tex. Penal Code § 42.01(a)(8) ("Disorderly Conduct").  Nor does the record suggest that a reasonable police officer would have believed Gandara to be doing the same.

Gandara also began walking towards the officers and his pick-up truck with his hand behind his back.  A reasonable officer at the scene, having heard on dispatch that Gandara had a rifle or shotgun in his possession, could have believed Gandara had some kind of firearm and that he was trying to grab it.  Despite these observations, the officers still did not fire and continued to give Gandara verbal commands to stop and show them his hands.  Nonetheless, Gandara ignored their commands and grabbed the long black gun case in the bed of his pick-up truck.  Needless to say, a reasonable officer at the scene, after hearing on dispatch that Gandara had a rifle or shotgun aimed to his head, upon seeing the long gun case would have also believed he posed an immediate threat to safety of those in the area.  Indeed, no reasonable juror could draw from these facts that "it was clear to the officers that Gandara did not have a weapon"[211] as Plaintiffs contend.  As such, the second factor weighs in favor of the officers.

And as to the third factor, the record indisputably shows that Gandara never complied with any of the officers' verbal commands.  To be sure, the officers were not at the scene to arrest Gandara for committing a crime and he was not technically resisting arrest.  Yet, no reasonable jury could conclude from these facts that the third *Graham* factor weighs against the officers, especially when considering that a reasonable officer could have believed Gandara posed an immediate threat after considering the dispatch, his erratic behavior, and his repeated failure to comply with their commands.  Therefore, in balancing the *Graham* factors, the record indicates that the officers' use of force on Gandara was objectively reasonable.

---

[211] *See* Pls.' Resp. in Opp'n at 15 n.11 (urging the Court to rule differently than Judge Martinez in *Sanchez*, in which he concluded that Gandara's case did not raise a fact issue because no reasonable juror could conclude that the officers' actions in that case were unconstitutional).

In sum, since the record shows that the forced used by Castañon and Peña was objectively reasonable under *Graham* (hence, not excessive), then Gandara's case cannot be part of Plaintiffs' alleged pattern of constitutional violations as relevant to this case.

### (5) Francisco Ramirez.

In Francisco Ramirez's[212] case, the record shows that on November 5, 2016, at 1:28 p.m., the EPPD received a call from Vanessa Duarte requesting that someone conduct a check-in on her ex-husband, Francisco Ramirez, who had left her home and gone to his mother's home at 152 S. Glenwood Ave.[213]  Duarte reported that Francisco Ramirez had been talking about suicide but did not make any mention of a weapon.[214]  Officer Fonseca responded to the call.[215]  Upon his arrival to the home address, Fonseca went directly to the backyard where he found Francisco Ramirez sitting on the back bumper of a parked van.[216]  Fonseca stood next to a dumpster that was next to the van, about 7 to 9 feet away from Francisco Ramirez.[217]  Fonseca saw Francisco Ramirez holding a boxcutter with a blue handle to his neck.[218]  Fonseca then drew out his gun and began pointing it at Francisco Ramirez.[219]

---

[212] The Court shall refer to Francisco Ramirez by his full name to differentiate between the events in his case and those from Daniel Ramirez's.

[213] PUF ¶ 259.

[214] *Id.* ¶ 260–61.

[215] *Id.* ¶ 263.

[216] *Id.* ¶¶ 264–65.

[217] *Id.* ¶ 266; Pls.' Ex. 81 (Fonseca Suppl. Report) at 2.

[218] Pls.' Ex. 81 (Fonseca Suppl. Report) at 2.

[219] PUF ¶ 267.

As in the Sanchez case, the Court pauses here to note that there are vastly different accounts about what transpired here.  Specifically, Fonseca's account of the facts significantly differs from those of Francisco Ramirez's family members who witnessed part of the incident. As such, the Court is of the view that the record raises multiple material fact disputes that make its review of the record uniquely difficult in determining whether the record establishes a pattern of excessive use of force against the mentally disturbed.[220]  Nonetheless, the Court proceeds with its analysis by resolving all factual disputes in Plaintiffs' favor solely for purposes of their *Monell* claim at summary judgment.

In construing the evidence in the light most favorable to Plaintiffs, the evidence shows that Francisco Ramirez's brother, Javier, walked outside after his mother told him that the police were in the front.[221]  Javier saw Fonseca pointing the gun at Francisco Ramirez and yelled at Fonseca that Francisco Ramirez was not all there and for him not to shoot.[222]  Francisco Ramirez allegedly told Fonseca to leave him alone because he was tired.[223]  But in contrast, Fonseca claims that Francisco Ramirez moved "the knife in an upward and downward motion"  and that he yelled "[y]ou better call more [p]olice [o]fficers, I'm going to kill you", to which Fonseca

---

[220] The Court further notes that the Honorable Kathleen Cardone stayed Francisco Ramirez's § 1983 case against Fonseca and the City of El Paso nearly a year ago pending the state criminal jury trial against Francisco Ramirez for his alleged conduct relevant to this incident.  *See Ramirez v. Fonseca et al.*, 3:18-cv-00033-KC, Order, ECF No. 66 (W.D. Tex. April 16, 2020).  To date, the state criminal jury trial is currently set for August 23, 2021.  *See Ramirez v. Fonseca et al.*, 3:18-cv-00033-KC, Fifth Joint Status Report, ECF No. 71 (W.D. Tex. June 28, 2021).

[221] Pls.' Ex. 80 (Javier Romero Suppl. Report) at 2.

[222] *Id.*

[223] Pls.' Ex. 80 (Javier Romero Suppl. Report) at 2.

replied by warning him to drop his knife.[224]  According to Fonseca, Francisco Ramirez ignored his commands and lunged at him while reaching behind his back with his left hand.[225]

Ultimately, Fonseca fired his firearm at Francisco Ramirez.[226]  Francisco Ramirez then moved towards the side of the van while Fonseca walked towards the back of it.[227]  When Francisco Ramirez got close to the front of the van, Fonseca fired his firearm again.[228]  Francisco Ramirez fell to the ground by a tree near the front passenger side of the van.[229]  Fonseca had shot him below his right eye, and the bullet traveled through his mouth and exited on the right side of his neck where it then re-entered his right shoulder.[230]

After resolving all factual disputes in favor of Plaintiffs and viewing the evidence in the light most favorable to them, the Court is of the view that a reasonable jury could conclude that Fonseca's use of force was objectively unreasonable under *Graham*.

As to the first factor, it is undisputed that Fonseca was merely responding to a suicide in progress, and as mentioned above, committing suicide is not a criminal offense in Texas.  *See Cook Children's Med. Ctr.*, 607 S.W.3d at 64 ("It is not and has not been a violation of law in

---

[224] *Id.*, Ex. 81 (Fonseca Suppl. Report) at 2.

[225] *Id.*

[226] PUF ¶ 273.

[227] Pls.' Ex. 80 (Javier Romero Suppl. Report) at 2.

[228] *Id.*  Notably, Fonseca's account is significantly different because he reported that he remembered firing three times while advancing towards the back of the van.  He further claims to have been between the van and the dumpster by the time he finished firing and saw Francisco Ramirez laying on the ground.  *Id.*, Ex. 81 (Fonseca Suppl. Report) at 2.

[229] PUF ¶ 276.

[230] *Id.* ¶¶ 282–83.

Texas for a person to take his or her own life.") (citations omitted).  Hence, the first factor weighs against Fonseca.

As to the second factor, as in the Sanchez case, the record contains multiple disputes of fact that make it uniquely difficult to determine whether Francisco Ramirez posed an immediate threat to Fonseca or others.  The witnesses' vastly different accounts about what transpired complicates the Court's *Graham* analysis because the Court is precluded from weighing the evidence and determining the credibility of these accounts for summary judgment purposes.  *See Deville*, 567 F.3d at 164.  Simply put, the Court is unable to readily determine which facts it should impute on the officers' awareness for it to analyze such facts "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  *Graham*, 490 U.S. at 396.

For instance, one of the most salient factual disputes between the parties is Francisco Ramirez's behavior and statements to Fonseca.  As noted above, while Javier claims that his brother was holding the boxcutter to his neck and told Fonseca to leave him alone, Fonseca claims that he actually threatened him and later lunged at him after ignoring Fonseca's verbal commands to drop the weapon.

Another salient factual dispute is where and when Fonseca fired his firearm at Francisco Ramirez.  Fonseca claims he fired his weapon behind the dumpster three times and advanced towards the back of the van, finding Francisco Ramirez laying on the ground.  But Javier claims that Fonseca actually fired his firearm behind the dumpster and then again after he was behind the van.  In fact, the record contains some ballistic evidence, such as the location of the bullets Fonseca fired, from which a reasonable jury could side with Plaintiffs' version of the facts.[231]

---

[231] PUF ¶¶ 284, 286 (noting that "[t]he second bullet was found in a tree branch parallel to the south property fence and the third was found in an arch of the neighboring house" and that Detective

And finally, another factual dispute in the record is what happened after Fonseca shot Francisco Ramirez and how his family responded to the event. Fonseca, for instance, claims that he holstered his handgun and that the family members started threatening him and repeatedly telling him they were going to "fuck him up".[232] An EPPD sergeant who later arrived at the scene similarly stated that he saw certain family members cussing at Fonseca and at other officers, but he did not mention any threats.[233] In contrast, Javier and another family member stated that they were angrily yelling at Fonseca asking why he shot Francisco Ramirez so many times, while Fonseca was backing away with his gun still unholstered and aimed at them.[234] And to complicate matters further, a family acquaintance who walked into the scene after hearing the gunshots similarly stated that the family members were asking Fonseca why he shot Francisco Ramirez in the torso and not the legs, and that Fonseca was walking backwards with his gun unholstered but aimed towards the ground.[235] Thus, in viewing the evidence in the light most favorable to Plaintiffs, a reasonable jury could side with Plaintiffs' versions of the facts. Therefore, in resolving all factual disputes in favor of Plaintiffs, the second *Graham* factor also weighs against Fonseca.

And as to the third factor, in drawing all inferences in favor of Plaintiffs, the record does not indicate that Francisco Ramirez was ever resisting arrest. Indeed, the record shows that Fonseca never intended to arrest Francisco Ramirez because he was responding to a suicide call,

---

Aman's report reveals that "it appears [that only] two bullets were shot while the officer was parallel to the fence.").

[232] Pls.' Resp in Opp'n, Ex. 81 (Fonseca Suppl. Report) at 3.

[233] *Id.*, Ex. 83 (Borges Suppl. Report) at 1.

[234] *Id.*, Ex. 80 (Javier Romero Suppl. Report) at 1; *id.* Ex. 84 (Gilbert Romero Suppl. Report) at 1.

[235] *Id.*, Ex. 85 (Sagastume Suppl. Report) at 1.

not an ongoing offense.  At best, the record suggests that Francisco Ramirez failed to comply with Fonseca's verbal commands to drop the boxcutter he was holding against his own neck. But even then, the record also shows that rather than de-escalate the situation, Fonseca responded to the slightest amount of resistance with deadly force.  Hence, the third factor also weighs against Fonseca.

In sum, resolving all factual disputes in favor of Plaintiffs, a reasonable jury could conclude that the force used by Fonseca was excessive and objectively unreasonable.  Moreover, from all these facts, a reasonable jury could further infer that the outcome may have been different had there been a CIT team to deal with the situation differently.  Therefore, a reasonable jury could determine that the shooting of Fonseca is part of a pattern of constitutional violations as relevant to this case.

Considering all of the above, should Plaintiffs succeed in proving that the matters of Saenz, Sanchez, and Francisco Ramirez are instances of unconstitutional excessive use of force, Plaintiffs will have presented substantial evidence that the EPPD relied too frequently on tasers and handguns when responding to mental health crises.  A reasonable jury could conclude that EPPD officers chose to use force because a CIT response was not an option.

Further, the record suggests that Chief Allen may have been able to recognize this pattern after the deaths of Saenz and Sanchez.  Even before the time of those deaths, he was already well aware of concerns the community had regarding EPPD responses to mental illness, as well as other cities' implementation of CIT teams.  Accordingly, a reasonable jury could determine that these two deaths should have put Chief Allen on notice that a change was necessary, such that he was deliberately indifferent to the risk of constitutional violations by the time of Ramirez's death.  Additionally, the subsequent shooting of Francisco Ramirez supports the conclusion that

not only was Chief Allen deliberately indifferent at the time of Ramirez's death, but that he continued to be deliberately indifferent thereafter.

Accordingly, the Court finds that a reasonable jury could determine that (1) the City chose not to implement a CIT program; (2) a CIT program may have prevented the unconstitutional use of force against Ramirez; and (3) Chief Allen supported this decision while deliberately indifferent to the risk that EPPD officers would use excessive force against individuals suffering from a mental health crisis. Therefore, the Court concludes that Plaintiffs have satisfied the *Monell* requirements to survive summary judgment on their claim that the City failed to implement policies and procedures that could have reduced the risk of excessive force when its police officers encounter people with mental health issues.

### 4. **The City's Failure to Train EPPD Officers to Deal with People Suffering from Mental Health Crises.**

Plaintiffs next claim that the City failed to train EPPD officers on how to respond to situations involving people suffering from mental health crises. They argue that Escajeda's actions at the incident and his testimony about "being clueless" that an individual who is attempting to commit suicide is in fact suffering from a mental health issue, as well as being unable to remember anything of substance about any mental health training, demonstrate that City's failure to train EPPD officers. Pls.' Resp. in Opp'n at 30–32. Plaintiffs also appear to generally contend that EPPD officers receive little, if any, relevant training on handling persons suffering from mental health crises based on "[a] review of training records of the officers involved in the Sanchez tasing and shooting"—Officers Gomez and Rivera. *Id.* at 32–33.

In response, the City generally contends that EPPD officers do receive training helping them recognize situations involving mental health crises and develop the communications skills necessary to respond to them. The City further contends that in fact, the EPPD's training in

general, and specifically in terms of mental health training, exceeds the training hours required by the Texas Commission on Law Enforcement (TCOLE) and has never been found to be deficient.  Mot. at 7–9.

The standard for establishing liability for failure to train is the same standard for establishing municipal liability in general.  *Valle*, 613 F.3d at 544 (citing *Roberts v. City of Shreveport*, 397 F.3d 287, 293 (5th Cir. 2005)).  "A plaintiff must show that (1) the municipality's training policy or procedure was inadequate; (2) the inadequate training policy was a 'moving force' in causing [a] violation of the plaintiff's rights; and (3) the municipality was deliberately indifferent in adopting its training policy."  *Id.* (citing *Sanders–Burns v. City of Plano*, 594 F.3d 366, 381 (5th Cir. 2010)).  "Moreover, 'for liability to attach based on an "inadequate training" claim, a plaintiff must allege with specificity how a particular training program is defective.'"  *Goodman v. Harris Cty.*, 571 F.3d 388, 395 (5th Cir. 2009) (quoting *Roberts*, 397 F.3d at 293).

After due consideration, the Court concludes that a reasonable jury could find that the City had an inadequate training policy on how EPPD officers can respond to situations involving mental health crises, that its inadequacies were a moving force behind Ramirez's death, and that Chief Allen was deliberately indifferent in implementing an appropriate training policy.

### i.  Deficient Training

After viewing the evidence in the light most favorable to Plaintiffs, the record shows that a reasonable jury could conclude that the City had an inadequate training policy for EPPD officers responding to situations involving mental health crises.  First, the record indisputably shows that Escajeda was unable to answer whether he believed Ramirez was suffering from a

mental health crisis.[236]  Notably, Escajeda testified the following when asked about his

perceptions about mental health and relevant training:

> Q: I mean, people don't try to commit suicide unless they have a mental health
>   issue or some mental crisis. Can we agree on that?
> A: No, sir.
> Q: No? So you didn't think this involved a mental health issue?
> A: I wouldn't be able to answer that, sir.
> Q: And I'm asking you sort of what you thought as you arrived at the scene with
>   the information that you were given. Did you feel that you were arriving to a
>   situation that involved a mental health issue?
> A: I felt I was arriving to a suicide subject with a weapon.
> Q: And you didn't feel that that necessarily involved a mental health issue?
> A: I wouldn't be able to tell you, sir.
> *Q: The training you received at the El Paso Police Department didn't allow you to
>   make that determination?*
> *A: No, sir.*[237]

Second, the record also indisputably shows that Escajeda was unable to remember

anything of substance about any mental health training he purportedly received.  For example,

despite taking a "Mental Impairment course" seven days before he tased Ramirez, Escajeda

testified that he had mental health training but could not remember anything from the training

other than there was a PowerPoint presentation "with several bullets on mental illness."[238]  He

also testified that he did not remember if he had received any "in service" training on how to

recognize if someone is suffering from a mental health crisis and how to interact with such

people.[239]  He further testified that he (1) took "LEMS" training on mental health issues but did

not remember what issues were covered; (2) could not remember or did not know if he ever

---

[236] PUF ¶ 127.

[237] *Id.* ¶ 128 (emphasis added).

[238] *Id.* ¶ 122.

[239] *Id.* ¶ 123.

received quarterly training on how to interact with mentally disturbed people; (3) had never

heard of CIT teams; and (4) could not remember if he received any mental health training after

Ramirez's death.[240]

Third, viewing the record in the light most favorable to Plaintiffs, a reasonable jury could

infer from a review of the training records of the officers involved in *Sanchez*—Officers Gomez

and Rivera—that EPPD officers receive little, if any, relevant training on handling persons

suffering from mental health crises.  Specifically, their training records indicate that they

received (1) Crisis Intervention training in 2004 that was not updated until 2018; (2) the Texas-

required refresher on the mandatory 24-hour Mental Health Officer *a decade* after first taking the

original training; and (3) a one-day course on "Mental Impairment" in April 2010 and February

2015 which, while focused on recognizing the symptoms of post-traumatic stress disorder, did

not seem to satisfy the Texas requirements for the Mental Health Officer refresher training.[241]

Indeed, Rivera—like Escajeda—also testified at depositions that he could not recall the content

of any of these mental health courses and claimed to have never received training for CIT,

despite such training appearing on his records between 2006 and 2015.[242]

And fourth, the record also indisputably shows that, while acknowledging at deposition

the importance of mental health training and "its implications for the job of [EPPD] officers",

Chief Allen was also unable to describe the required training EPPD officers receive to recognize

when a person is having a mental health issue.[243]  Yet, Chief Allen also indisputably testified that

---

[240] *Id.* ¶¶ 124–26.

[241] *Id.* ¶¶ 225–31.

[242] *Id.* ¶ 232.

[243] *Id.* ¶ 224; Pls.' Ex. 19 (Allen June 27, 2018 Depo.) at 82:9–19.

he believes Escajeda acted appropriately and consistent with EPPD training, despite Escajeda himself conceding that EPPD training did not allow him to determine whether the incident involved a mental health crisis.[244]

To be sure, the City is correct that "when officers have received training required by Texas law, the plaintiff must show that the legal minimum training was inadequate." *Sanders-Burns v. City of Plano*, 594 F.3d 366, 381-82 (5th Cir. 2010).  But while the Fifth Circuit instructs that courts should "consider compliance with state requirements as a factor counseling against a 'failure to train' finding", it makes no suggestion that a plaintiff is precluded from still being able to "establish[] that the City's training practices are inadequate." *Zarnow v. City of Wichita Falls*, 614 F.3d 161, 171 (5th Cir. 2010).

Thus, even when assuming the EPPD's mental health training complied with TCOLE requirements, for the reasons above, the record shows that a reasonable jury may still find that such training possibly contained gaps and deficiencies.  Moreover, resolving all disputes in Plaintiffs' favor, a reasonable jury could further find that, despite compliance with TCOLE, Escajeda still used excessive force after failing to identify and de-escalate a mental health crisis

---

[244] Specifically, Chief Allen testified:

Q: Based on the information you have been provided, do you feel that [sic] Escajeda acted appropriately?
A: Yes, I do.
Q: Do you feel that he handled the situation in accordance with policy?
A: Yes, sir.
Q: Do you feel that he dealt with the situation consistent with his training that was provided by --
A: Yes, sir.
Q: -- by the police department?
A: Yes, sir.

*Id.* ¶¶ 88, 121, & 469.  Indeed, Chief Allen went further, also testifying that "in this case, I feel Officer Escajeda acted very appropriately and he performed in a professional level that I think is exemplary of many officers in this department."  *Id.*

through decision-making that Chief Allen described as "exemplary of many officers" in the EPPD and consistent with its training.

### ii.  Moving Force Causation

As discussed in its analysis on whether the City's failure to implement CIT units was the moving force behind Ramirez's death, two genuine issues of material fact exist that a jury must necessarily resolve before being able to resolve the instant issue: (1) whether Escajeda's tasing caused Ramirez's death; and (2) whether Escajeda's use of force was objectively reasonable under *Graham*.  Only if a jury resolves these issues in their favor will Plaintiffs be able to establish the moving force causation element for this *Monell* claim.  Hence, the Court is of the view that there is a dispute of fact as to whether the City's alleged failure to train EPPD officers to respond to situations involving mental health crises was a moving force behind Ramirez's tasing and subsequent death.

In proceeding with its analysis by resolving these factual disputes in favor of Plaintiffs, the Court is of the opinion that a reasonable jury could conclude that the failure to train EPPD officers to respond to situations involving mental health crises was a moving force behind Ramirez's tasing and death.  Particularly, the record shows that (1) Escajeda conceded that the EPPD training he received did not allow him to determine whether a suicide involved a mental health crisis; (2) Maria Ramirez requested help from the police to prevent her son's suicide—thereby giving notice that the situation involved a mental health crisis; (3) Escajeda saw Ramirez clench the rope around his neck with both hands at all times and neither saw Ramirez move toward him in any way nor heard Ramirez say or yell anything; (4) Ramirez never intended to flee, that he was actively resisting arrest or struggling with the police; and (5) Chief Allen testified that Escajeda's actions during the incident with Ramirez were "exemplary" and

consistent with EPPD training.  A reasonable jury could infer from these facts that had the EPPD

adequately trained Escajeda, he would have recognized that Ramirez suffered from a mental

health crisis for which no use of force was remotely necessary and that he would have conducted

himself differently to save Ramirez's life instead of violating his constitutional rights.

Therefore, in resolving all factual disputes in favor of Plaintiffs and viewing the evidence

in the light most favorable to them, the Court concludes that a reasonable jury could determine

that Plaintiffs have established the causal link ("moving force") between the City's failure to

train EPPD officers to respond to situations involving mental health crises and Ramirez's tasing

and subsequent death.  Because this "policy" does not facially violate a federal right, the Court

next addresses the City's degree of culpability or "deliberate indifference" in failing to train

EPPD officers to deal with people suffering from mental health crises.

### iii. Deliberate Indifference

"Deliberate indifference of this sort is a stringent test, and 'a showing of simple or even

heightened negligence will not suffice' to prove municipal culpability."  *Piotrowski*, 237 F.3d at

579 (quoting *Brown*, 520 U.S. at 407).  Additionally, deliberate indifference requires "a systemic

failure attributable to the [municipality]."  *Sanchez v. Young Cty.*, 866 F.3d 274, 280 (5th Cir.

2017).  To show deliberate indifference, it must be "obvious that the likely consequences of not

adopting a policy will be a deprivation of constitutional rights."  *Rhyne v. Henderson Cty.*, 973

F.2d 386, 392 (5th Cir. 1992).  For example, arming officers with guns but failing to train them

on the constitutional limits of the use of deadly force would amount to deliberate indifference.

*Id.*  In such circumstances, "'the need for more or different training is obvious . . . [and] the

policymakers of the city can reasonably be said to have been deliberately indifferent to the

need.'" *Connor v. Travis Cty.*, 209 F.3d 794, 796–97 (5th Cir. 2000) (quoting *City of Canton*, 489 U.S. at 390).

Viewing the record in the light most favorably to Plaintiffs, the record shows that Chief Allen has been aware of various shortcomings regarding the EPPD's responses to situations involving mental health crises, most notably in terms of its officers' use of force.  First, as mentioned above, Chief Allen was aware of "the perception by certain members of the public that the [EPPD] was ill-equipped to deal with mental health issues."[245]  Second, a reasonable jury could also conclude, should Plaintiffs prove that this matter and those of Saenz, Sanchez, and Francisco Ramirez are all instances of unconstitutional excessive use of force, that Chief Allen failed to improve mental health training despite being aware of several instances of excessive use of force against people suffering from a mental health crisis.  Indeed, despite these incidents, Chief Allen saw no need to improve mental health training because he (1) believes that Escajeda's actions during the incident with Ramirez were "exemplary" and consistent with EPPD training on mental health[246]; and (2) placed Gomez as a training instructor at the training academy a few weeks after he shot and killed Sanchez—sending a powerful message that his actions were in accordance with his training[247].

And third, during Chief Allen's tenure, EPPD police officers have used the code "10-7", which means "out of service", to refer to situations that involve a person suffering from a mental health crisis.  Chief Allen specifically testified the following when asked about the subject:

Q: What does 10-7 mean?
A: Out of service.

---

[245] PUF ¶ 429.

[246] *Id.* ¶¶ 88, 121, & 469.

[247] *Id.* ¶ 221.

Q: Why - - how is that connected with - -
A: It's - - it's the phraseology we use among ourselves. It's been in place for a number of years, *where you say 10-7 it's just shortened version of indicating you had to deal with someone who was having a mental issue and/or the situation was nonsensical, didn't have any relative value.* And so you put down 10-7 out of service. It's a code that is pretty much used on a log sheet and/or maybe a radio communication. But, in writing a document, then it'll go to the formal designation of PCO/EDO and not 10-7 because *that's a term primarily understood by police officers.*[248]

As such, a reasonable jury could infer from this "lingo" that EPPD officers derided situations involving people suffering from mental health crises and that this practice was condoned by Chief Allen.

In sum, the Court agrees with Judge Martinez's pertinent holding in *Sanchez* that "[i]t would appear fundamental to even the most casual of observers that these concerns might be best addressed through proper training." *Sanchez*, 2020 WL 1036046, at *37. "When evidence exists that EPPD officers are inadequately trained, it would seem to fall on . . . Chief [Allen] to improve training programs." *Id.* Thus, "[a] reasonable jury could determine that Chief Allen not only failed to improve training programs but did so despite the clear risk of constitutional violations that failing to train poses." *Id.*

Accordingly, a reasonable jury could conclude that the facts indicate that the need for different training is plainly obvious. *See City of Canton*, 489 U.S. at 390. Furthermore, a reasonable jury, viewing the facts in the light most favorable to Plaintiffs, could conclude that Chief Allen's failure to train the EPPD was so systemic as to hold the City liable for the consequential violations of Ramirez's rights. *See Sanchez*, 866 F.3d at 280. Therefore, the Court concludes that Plaintiffs have satisfied the *Monell* requirements to survive summary

---

[248] Pls.' Ex. 19 (Allen June 27, 2018 Depo.) at 80:13–81:2 (emphasis added).

judgment on their claim that the City failed to train EPPD officers to respond to situations involving people suffering from mental health crises.

**5.**  **The City's Failure to Investigate and Discipline Officers for Excessive Use of Force.**

Plaintiffs' final *Monell* claim alleges that the City failed to properly investigate and discipline officers who used excessive force, which they contend established "an unwritten policy of leniency" that "emboldened officers to engage in the unconstitutional conduct resulting in the tasing death of Ramirez."  Pls.' Resp. in Opp'n at 17.  In support of their argument, Plaintiffs offer a number of Chief Allen's alleged decisions in support of this policy: (1) protecting and failing to discipline former EPPD Officer Jorge Gonzalez [hereinafter "Gonzalez"] despite him having a notorious history of misconduct; (2) failing to implement proper investigative techniques to ensure that the Shooting Review Board ("SRB") has a complete record on which to rely when making a determination on whether an officer's use of force was excessive; (3) preventing the El Paso District Attorney's Office from participating in EPPD investigations of officer-involved shootings; (4) failing to properly use an internal system to monitor allegations of excessive uses of force; and (5) failing to discipline the EPPD officers involved in the pattern of cases identified in the prior section of this Order.  *Id.* at 18.

In response, the City merely contends that "[a]ll instances of alleged misconduct are investigated" and that "all officers who have deployed their taser are routinely assigned to Internal Affairs for investigation."  Mot. at 10–11.  It further asserts that "[t]here is no evidence showing that failure to investigate *similar* scenarios caused . . . Escajeda to act in a manner that violates the Constitution or that Chief Allen had actual factual knowledge that this reality would cause illegal actions" by EPPD officers.  *Id.* at 5 (emphasis in original).

Courts have held that a failure to investigate or discipline can be the basis for *Monell* liability.  *See McGregory v. City of Jackson*, 335 F. App'x 446, at 449–450 (5th Cir. 2009) (considering a claim that the Jackson City Police Department's failure to investigate and discipline officers, as well as that it protected officers through a "code of silence," permitted the excessive use of force "without fear of repercussions"); *Piotrowksi*, 237 F.3d at 581 (considering an instance where the Houston Police Department did not act on a report of officer misconduct). As it is undisputed that Chief Allen is a policymaker directly overseeing investigations and discipline, Plaintiffs must also allege: (1) a policy of failing to investigate or discipline, that (2) was the moving force causation for constitutional violations against Ramirez, and (3) the risk to which Chief Allen was deliberately indifferent when he adopted the policy.

### i.  *Policy*

As stated above, Plaintiffs present five grounds in support of their argument that Chief Allen's failure to investigate or discipline EPPD officers who engage in the unconstitutional use of force amounts to a policy sufficient to confer *Monell* liability in this case.  Accordingly, the Court considers each of these in turn, concluding in the end that Plaintiffs have alleged facts that could permit a reasonable jury to determine that such a policy existed.

### a.  *Former EPPD Officer Jorge Gonzalez*

Plaintiffs first argue that Chief Allen's disciplinary decisions with respect to Gonzalez, a former EPPD officer with a notorious history of misconduct across nine years, establishes that "the EPPD maintained a culture of leniency wherein officers engaging in excessive force would be protected by leadership."  Pls.' Resp. in Opp'n at 19.  These disciplinary decisions include either imposing no disciplinary review or minor suspensions which did not match the gravity of

Gonzalez's thirty-five documented incidences of misconduct over his ten-year career in the EPPD, which generated an internal affairs file on him spanning more than 14,000 pages.[249]

After reviewing the record in the light most favorable to Plaintiffs, the Court agrees that Gonzalez has a colorful record of alleged misconduct involving excessive use of force.[250] Additionally, the Court is mindful that Plaintiffs have not provided evidence of how many complaints would be considered "typical" for an EPPD officer, a number that should ideally be "zero." Simultaneously, the Court presumes that it is uncommon for an off-duty EPPD officer to have multiple excessive force complaints. As Plaintiffs represent, "Gonzalez was the first officer indicted in an off-duty officer involved shooting in El Paso in almost 30 years."[251] This status distinguishes Gonzalez from other officers, providing possible insight into Chief Allen's response to high-profile instances involving the alleged excessive use of force.

That said, the Court agrees that not every instance involving Gonzalez's alleged misconduct may be relevant in the context of this case. For example, possible misconduct involving intraoffice antisocial behavior may not be probative as to how Chief Allen considers misconduct involving excessive force.[252] As such, for purposes of summary judgment, the Court considers the facts of, and Chief Allen's response to, the following instances to be particularly relevant: (1) the March 1, 2008 incident tasing of Joseph Sanchez; (2) the April 1, 2010 shooting of Andres Cortez; (3) the March 3, 2011 shooting at a motorist on the University of Texas El

---

[249] PUF ¶¶ 333–35.

[250] *See* Pls.' Ex. 26 (Chart of Gonzalez's Disciplinary History) (demonstrative aid purporting to list every allegation and outcome in Gonzalez's career in the EPPD), *see also id.*, Ex. 94 (Gonzalez's Internal Affairs Records).

[251] PUF ¶ 332.

[252] *See generally* Pls.' Ex. 26 (Chart of Gonzalez's Disciplinary History).

Paso [hereinafter "UTEP"] campus; and (4) the January 21, 2012 brandishing of a firearm at Johnny Reyes.

(1) <u>Joseph Sanchez.</u>

On March 1, 2008, Gonzalez tased Joseph Sanchez, who ran away from the scene after protesting the handcuffing of his girlfriend during a traffic stop.[253]  Sanchez was driving home and followed by his girlfriend and a friend at around 2:00 a.m., until they were stopped by Officers Roberto Looney and Gonzalez.[254]  After searching his car and writing him a ticket, Looney let Sanchez go back home, which was about three to four blocks away, but Gonzalez stayed with the other vehicle.[255]

Sanchez dropped off his car at home, walked back to the scene, and saw Gonzalez asking his girlfriend to call someone to pick her up.  Sanchez yelled that his mom could come and give her a ride home if she needed one.  But Gonzalez suddenly changed his tone with Sanchez's girlfriend and got his handcuffs to put them on her.  Sanchez yelled that arresting her was not right, for which Gonzalez then told Sanchez to get out of there.  After Sanchez said "that [was] messed up", Gonzalez began walking towards him.  Sanchez began running home but slipped and fell in a nearby alley.   When he stood up, Gonzalez ordered him to stop, which Sanchez did.[256]  But then Gonzalez tased Sanchez and then tackled him to the ground, handcuffed him, and kicked him on the side.[257]

---

[253] PUF ¶ 350.

[254] Pls.' Ex. 94 (Joseph Sanchez Admin. Statement to IA) at Bates No. 25132.

[255] *Id.*

[256] *Id.* at Bates Nos. 25132–33.

[257] *Id.* at Bates No. 25194.

After Sanchez submitted a formal complaint, Gonzalez told Internal Affairs investigators that he tased Sanchez because he was fleeing arrest for interference with public duties and, at one point, pushed Gonzalez with both hands and took a fighting stance.[258]  Yet, Looney told investigators that he never saw Sanchez "square off" or take a fighting stance towards Gonzalez, and that from his viewpoint, he would have seen it had it happened.[259]  He further told investigators that the affidavit purporting to contain his narrative was inaccurate and that it was both written and signed by Gonzalez, not him.[260]  Moreover, an EPPD sergeant also noted that a supervisory taser use report under his name documented that Gonzalez's taser discharge was accidental after "falling backward after being pushed by . . . Sanchez."  The sergeant told investigators that Gonzalez had typed the narrative for that taser use report, not him.[261]

Despite those findings, the EPPD nevertheless concluded that Gonzalez had acted within policy when he used his taser against Sanchez, exonerating him from those allegations and finding all other allegations as "unfounded" or "not sustained".[262]

(2) Andres Cortez.

On April 1, 2010, while off-duty, Gonzalez shot Andres Cortez after a traffic incident, paralyzing him from the neck down.[263]  While Gonzalez was in his personal car, traveling with his girlfriend—another EPPD officer—and stopped at a red light, Cortez rear-ended Gonzalez's

---

[258] *Id.* at Bates No. 25133.

[259] *Id.* at Bates Nos. 25194–95.

[260] *Id.* at Bates No. 25195.

[261] *Id.* at Bates Nos. 25195, 25201.

[262] *Id.* at Bates No. 25175.

[263] PUF ¶ 368.

vehicle.[264]  Gonzalez and his girlfriend exited their vehicle and approached Cortez.  Shortly

thereafter, Cortez accelerated his vehicle, in what Gonzalez and independent witnesses described

at his girlfriend's general direction.  In response, Gonzalez used his personal firearm.[265]

Witnesses could not confirm that Gonzalez had identified himself as an EPPD officer before

using deadly force.[266]

    After investigating, the SRB concluded that Gonzalez had acted within policy when he

used force to prevent Cortez from driving into Gonzalez.[267]  Conversely, an El Paso grand jury

considered the same event and entered a two-count indictment for aggravated assault with a

deadly weapon.[268]  Shortly after the indictment, Chief Allen made public comments that he

wanted to "reassure the department, the personnel and the officers on the street, that we will

stand behind them regardless of the circumstances, of the findings of a grand jury."[269]

                    (3)  Shooting at a Motorist.

    On March 3, 2011, Gonzalez shot at a motorist on the UTEP campus despite being

unable to see inside the motorist's vehicle.[270]  Plaintiffs have not provided evidence of the events

leading up to the shooting, though Gonzalez's statement to SRB investigators suggests that he

---

[264] *Id.* ¶¶ 369–70.

[265] *Id.* ¶¶ 371–72.

[266] Pls.' Ex. 94 (EPPD SRB Report, June 28, 2010) at Bates No. 31358.

[267] PUF ¶ 376.

[268] *Id.* ¶ 386.

[269] *Id.* ¶ 409.

[270] *Id.* ¶¶ 379–80.

had responded to an alert involving reckless driving or an altercation.[271]  At some point, Gonzalez approached the motorist's vehicle from behind on foot.[272]

Standing just seven or eight feet to the rear, Gonzalez drew his service firearm and shot at the driver's side of the vehicle.  Gonzalez said he was "aiming at the driver" despite not being able to see into the vehicle and ascertain a threat.[273]  Additionally, Gonzalez stated that he did not believe the motorist "was going to use a weapon, other than the vehicle, to harm [him]" and that Gonzalez was concerned that the motorist would "drive forward away from [him]."[274]  After an investigation, Chief Allen accepted the SRB's recommendation that Gonzalez had acted outside of policy.[275]  While Gonzalez received a forty-hour suspension, Chief Allen later reduced it to twenty-eight hours, all of which Gonzalez was able to satisfy by forfeiting vacation time.[276]

(4) Johnny Reyes.

On August 4, 2013, while off-duty, Gonzalez brandished a firearm and pointed a gun "point blank" in Johnny Reyes's face after the two narrowly missed a vehicular collision.[277] Gonzalez followed Reyes into a Walmart parking lot after the near miss.  Reyes admitted that he brandished a knife in self-defense, though claimed that he dropped it once Gonzalez "pulled out

---

[271] Pls.' Ex. 94 (EPPD SRB Report, May 26, 2011) at Bates No. 32329 ("I didn't know if she was a victim or a subject at that time but her actions of yelling that the subject was crazy and drunk led me to believe that she was more of a victim th[a]n a threat.").

[272] *Id.* at Bates No. 32328.

[273] *Id.* at Bates No. 32328.

[274] *Id.* at Bates No. 32329.

[275] PUF ¶ 381.

[276] *Id.* ¶¶ 383, 385–86.

[277] *Id.* ¶ 394.

his gun and said 'El Paso Police.'"[278]  Conversely, Gonzalez told investigators that he was standing at least ten feet away from Reyes, who he described as a noncompliant aggressor who refused to drop the knife as he walked towards him.[279]  Subsequently, Chief Allen agreed to suspend any investigation or determination until "twenty business days following the disposition of the [Andres Cortez] criminal case."[280]

In sum, when considered in the light most favorable to Plaintiffs, the evidence presents an EPPD officer who is quick to resort to an excessive level of force.  Be it in an act of off-duty road rage, or when responding to a reported crime, Gonzalez does not appear to think twice before using a weapon to "de-escalate" a situation.  Additionally, Chief Allen allowed Gonzalez to continue to serve with the EPPD after each of these events.  Chief Allen did so despite overwhelming evidence that Gonzalez was not deterred from using his firearm on more than one occasion.  Furthermore, Chief Allen publicly supported Gonzalez after the indictment on the shooting of Cortez.  Accordingly, a reasonable jury could conclude that Chief Allen set the expectation that an EPPD officer could repeatedly resort to excessive levels of force without fear of serious repercussion.

In response, the City merely contends that Plaintiffs cannot establish their claim that "Chief Allen's lack of discipline in excessive force cases creating an 'environment devoid of caution' that emboldened officers to engage in the unconstitutional conduct resulting in the tasing death of Ramirez" because they cannot show that Ramirez died from tasing—essentially renewing their causation argument.  City's Reply at 8.  But as the Court has repeatedly stated, the

---

[278] Pls.' Ex. 94 (Reyes Admin. Statement to IA) at 1–2.

[279] *Id.*, Ex. 94 (Gonzalez Admin. Statement to IA) at 4.

[280] *Id.*, Ex. 94 (Tolling Agreement, Jan. 15, 2014).

record contains genuine material disputes of fact as to causation, and at the summary judgment stage, the Court must resolve such factual disputes in Plaintiffs' favor.

Therefore, the Court concludes that a reasonable jury could conclude that these incidents involving Gonzalez support Plaintiffs' claim that Chief Allen has a history of unwarranted leniency for EPPD officers using excessive force. Considering the evidence in the light most favorable to Plaintiffs, such a conclusion could support a jury determination that Chief Allen failed to investigate or discipline EPPD officers accused of using excessive force.

### b. *Failing to Implement Proper Investigative Techniques*

Next, Plaintiffs argue that "the manner in which [the] EPPD investigates officer-involved shootings further serves to insulate officers from discipline" creating an environment where "officers feel[ ] free to engage in excessive force without punishment." Pls.' Resp. in Opp'n at 22. This policy results from investigations Plaintiffs characterize as "far below recognized standards." *Id.* Specifically, the EPPD: (1) does not separate EPPD officers to prevent them from communicating during the investigation; (2) investigates all shootings as assaults on the EPPD officer, thereby "identifying the shooting officer as the victim and the deceased or person shot as the suspect"; and (3) fails to consider the testimonies of non-officer witnesses who contradict the EPPD officers' versions of events. *Id.* at 22–23. Supporting these conclusions, Plaintiffs' expert witness Ken Katsaris reviewed a sampling of the investigation files of the Saenz, Gomez, Sanchez, Gandara and Francisco Ramirez cases. From his review, he opines that the police department has a pattern of failing to investigate the incidences within accepted and recognized police procedures.[281]

---

[281] Pls.' Ex. 23 (Sworn Statement of Ken Katsaris) ¶ 29.

First, it is undisputed that after Erik Salas-Sanchez's death, the EPPD did not separate Officers Gomez and Rivera, counter to what Katsaris notes is "a recognized standard nationwide" in officer-involved shootings to avoid impartiality in the determination of each officer's role and view at the scene.[282]  According to Mr. Katsaris, his review also indicates that the EPPD only provides the testimony of officer witnesses in its presentation to the SRB, narrowing "the focus of the board members in a way that can and has resulted in findings based upon limited evidence and hence the high potential for bias, misleading and false assessment."[283] When considered in the light most favorable to Plaintiffs, a reasonable jury could conclude that the EPPD departed from a standard practice and compromised excessive force investigations.

Second, viewing the evidence in the light most favorable to Plaintiffs, a reasonable jury could conclude that the EPPD regularly and consistently investigates officer-involved shootings as assaults on the police officers who used force, which as Mr. Katsaris suggests occurred in the Sanchez's case, "would impact the implementation of the standard protocols and investigative inquiry/evidence evaluation for officer involved shootings."[284]  Accordingly, the EPPD's investigation would have been focused on building cases against those people on whom the officers used forced rather than investigating the circumstances leading to the officers' decision to use force.  For example, Mr. Katsaris notes that the EPPD (1) did not investigate a cell phone found next to Sanchez's body, (2) failed to memorialize in writing a conducted blood splatter analysis that might have indicated that Sanchez was shot in the back, and (3) submitted a false report to the Texas Attorney General's office claiming that Sanchez was instead shot in the

---

[282] PUF ¶¶ 188, 310–11.

[283] Pls.' Ex. 23 (Sworn Statement of Ken Katsaris) ¶ 32.

[284] *Id.* ¶ 11.

chest.[285]  Considering that this evidence did not make it to the SRB, Mr. Katsaris concluded that "the entirety of the investigative efforts appear to be conducted in a manner consistent with a finding favorable to Officer Gomez but [which] are inconsistent with proper protocols in an officer involved shooting."[286]  Once again, when viewing the facts in the light most favorable to Plaintiffs, a reasonable jury could conclude that this investigative approach prevented the EPPD from conducting proper and unbiased investigations of its officers' use of force.

And third, Plaintiffs allege that the EPPD did not gather sufficient evidence to help resolve witness contradictions or provide such evidence to the SRB.  Pls.' Resp. in Opp'n at 23–24.  For example, Sanchez's mother and sister witnessed the incident, but the SRB was not provided with their testimony.[287]  Mr. Katsaris opines that these decisions contributed to the SRB's determination that Gomez's use of force was within policy regardless of the investigation's "clear failure to test the officers' and witnesses' testimony against the evidence."[288]  Furthermore, in the shooting of Francisco Ramirez, multiple non-officer witnesses contradicted Fonseca's claims that he used his service firearm in self-defense.  According to Mr. Katsaris, "no effort was made to reconcile these very disparate accounts," despite the shot pattern evidence not supporting Fonseca's story. [289]  Mr. Katsaris opines that the failure to present contradictory testimony "narrows the focus of the board members" and limits evidence, creating

---

[285] *Id.* ¶¶ 18–19.

[286] *Id.* ¶ 25.

[287] *Id.* ¶ 24.

[288] *Id.* ¶ 25.

[289] *Id.* ¶ 31.

"the high potential for bias, misleading and false assessment."[290]  When considering these facts in the light most favorable to Plaintiffs, a reasonable jury could conclude that the EPPD's failure to collect contradicting testimony and present it to the SRB undermines the investigatory process.

But the City generally counters that none of these incidents are substantially similar to Ramirez's case for them to be considered relevant, particularly because these cases involve shootings, not tasings, and "[n]one involve suicidal situations [or] . . . a non-responsive subject". Mot. at 11.  But the City overlooks the fact that Plaintiffs claim that these prior incidents (shootings), like Ramirez's tasing, all involve EPPD officers using excessive force under the circumstances they faced and how Chief Allen and the EPPD responded to each incident.  Put differently, the evidence about these prior incidents is inherently relevant to how Chief Allen responds to allegations of excessive force generally and against mentally ill individuals (including those who are suicidal, such as Ramirez) specifically.  As such, a reasonable jury could consider the evidence presented and conclude that Chief Allen acts consistently regardless of whether the matter involves a mental health crisis.  Considering the evidence in the light most favorable to Plaintiffs, such a conclusion could support a jury determination that Chief Allen failed to investigate or discipline EPPD officers accused of using excessive force.

     *c.*   *Remaining Arguments*

Plaintiffs also indicate that shortly after Gonzalez's indictment, Chief Allen made the decision to exclude the El Paso District Attorney's Office [hereinafter "DA's Office"] from participating in EPPD investigations of officer-involved shootings.  Pls.' Resp. in Opp'n at 24–26.  Significantly, there is no dispute that Chief Allen excluded the DA's Office after the grand

---

[290] *Id.* ¶ 32.

jury indicted Gonzalez for the Cortez shooting.[291]   The record further indisputably shows that

Chief Allen testified that he publicly excluded the DA's Office because he was "[o]utraged" at

the indictment and that the DA's Office did not concur with the EPPD's findings of the same

incident.[292]   Viewing this evidence in the light most favorable to Plaintiffs, a reasonable jury

could consider the evidence and conclude that Chief Allen excluded the DA's Office to insulate

EPPD officers from scrutiny and the possibility of receiving consequences for their actions.

Additionally, Plaintiffs also indicate that the EPPD failed to use an internal affairs

monitoring system called the "Blue Team" system to track investigations into EPPD officer

misconduct.  Pls.' Resp. in Opp'n at 26–27.  The evidence indisputably shows that in 2010,

Chief Allen implemented the "Blue Team" system to address concerns about police misconduct

and excessive use of force.[293]   Chief Allen testified that the system was available within Internal

Affairs for several years to track excessive use of force complaints against individual officers.[294]

However, it is also undisputed that while the "Blue Team" system was supposed "to facilitate

officer oversight", the EPPD was not actually using it.[295]   Even Chief Allen testified that he "did

not use it personally" and "did not know" if it could retrieve reports on a yearly basis because, at

the time of his deposition, had "just recently found out" that it was not as efficient as they

thought.[296]

---

[291] PUF ¶ 411.

[292] *Id.* ¶¶ 414–16.

[293] *Id.* ¶ 324.

[294] Pls.' Ex. 19 (Allen June 27, 2018 Depo.) at 50:2–20.

[295] PUF ¶ 327.

[296] *Id.* ¶ 328.

Further, Plaintiffs present the investigations and disciplinary actions taken in the pattern of EPPD excessive force cases that the Court has considered above in support of their claim. Notably, Plaintiffs assert that "[i]n all cases presented, Chief Allen decided not to impose discipline, excluding the Saenz case where the summary judgment evidence shows he reluctantly imposed discipline."  Pls.' Resp. in Opp'n at 28.  Based on the Court's conclusions about such cases above, considering all facts in the light most favorable to Plaintiffs, a reasonable jury could conclude that Chief Allen failed to impose discipline in those cases where EPPD officers used excessive force.  Moreover, drawing all inferences in favor of Plaintiffs, a reasonable jury could infer from the evidence that Chief Allen's threshold for discipline requires there be significant public scrutiny when an EPPD officer uses excessive force and kills a subdued individual in custody.  Accordingly, the Court concludes that a reasonable jury could determine that Chief Allen's investigative and disciplinary approach to similar instances of police misconduct helps insulate EPPD officers from facing consequences for the excessive use of force.

In sum, when taken in the light most favorable to Plaintiffs, all of the above facts are sufficient for a reasonable jury to conclude that Chief Allen created a policy of failing to investigate or discipline EPPD officers accused of using excessive force, sufficient to establish a claim for *Monell* liability.

### ii.  *Moving Force Causation*

As to causation, Plaintiffs argue that the evidence shows that Chief Allen's failure to investigate or discipline uses of excessive force was a moving force behind Ramirez's death in that the evidence suggests that EPPD officers did not fear repercussions for their actions, such that they were "emboldened" to use force.  *Id.* at 18.  On that basis, Plaintiffs appear to contend

that had Escajeda been on notice that his use of force might have consequences, he may have been more restrained before deploying his taser on Ramirez.

Once again, the Court reiterates that two genuine issues of material fact exist that a jury must necessarily resolve before being able to resolve the instant causation issue: (1) whether Escajeda's tasing caused Ramirez's death; and (2) whether Escajeda's use of force was objectively reasonable under *Graham*.  Only if a jury resolves these issues in their favor will Plaintiffs be able to establish the moving force causation element for this *Monell* claim.  Hence, the Court is of the view that there is a dispute of fact as to whether the City's alleged failure to investigate and discipline EPPD officers for excessive force was a moving force behind Ramirez's tasing and subsequent death.

In proceeding with its analysis by resolving these factual disputes in favor of Plaintiffs, and having considered the law and the evidence, the Court is uncertain that, to meet this moving force burden, Plaintiffs must prove indeed that EPPD officers were "emboldened" to use force. *See Peterson v. City of Fort Worth*, 588 F.3d 838, 852 (5th Cir. 2009) (considering whether there was an "official policy of condoning excessive force so as to hold the city liable" (emphasis added)).  Certainly, a reasonable jury could conclude from the evidence that Gonzalez acted with impunity as he arguably continued to receive inadequate discipline for using excessive force.  Conversely, there is no evidence that the EPPD officers in the other instances went on to use force again or encourage others to do so.  Instead, a reasonable jury could look at the evidence and determine that Chief Allen's failure to discipline communicated to the EPPD that these actions were not punishable, let alone unconstitutional.  A reasonable jury could conclude that when faced with instances of excessive force, Chief Allen would communicate to the EPPD that

either (1) the officer had done nothing wrong, or (2) the officer's actions only warranted a minimal punishment.

Accordingly, viewing the evidence in the light most favorable to Plaintiffs, a reasonable jury could infer that Escajeda may have deemed that using force was an "easy fix" to complex situations like the one he encountered on June 23, 2015, because Chief Allen failed to reinforce the right behavior through discipline.  Put differently, EPPD officers were "emboldened" to act as such at least to the extent that they may have believed their use of force was acceptable.  A jury may not need to go the extra step and conclude that Chief Allen had encouraged the behavior, or that Escajeda acted with the express expectation that he would not be disciplined.  Instead, a jury could possibly conclude that Chief Allen's policy may have created an environment devoid of caution rather than purposely aggressive.  Therefore, the Court is of the opinion that a reasonable jury could conclude that Chief Allen's failure to adequately investigate or discipline EPPD officers who used excessive force was a moving force behind Ramirez's death.

### iii.  Deliberate Indifference

Finally, Plaintiffs argue that "as the final authority on all aspects of discipline, Chief Allen cannot reasonably claim that he was unaware of his own decisions not to discipline and the obvious consequence of those decisions."  Pls.' Resp. in Opp'n at 29.   The City counters that "[n]o incident prior to June 23, 2015[,] made it obvious to Chief Allen that violations of the law or policy about mental health subjects would predictable cause future wrongful injury".  Mot. at 25.  Hence, the City contends that "[t]here is no factual support for the claim that Chief Allen knew it was wrong and did not care."  *Id.* at 26.  After considering the evidence in the light most favorable to Plaintiffs, the Court concludes that a reasonable jury could conclude that an obvious

consequence of failing to investigate or discipline officers accused of using excessive force would be additional constitutional violations involving excessive force.

As noted above, to show deliberate indifference, it must be "obvious that the likely consequences of not adopting a policy will be a deprivation of constitutional rights." *Rhyne*, 973 F.2d at 392.  In this context, the Fifth Circuit has explained that "[w]here the city policymaker knows or should know that the city's police officers are likely to shoot to kill without justification and without restraint . . . the city should be liable when the inevitable occurs and the officers do so." *Grandstaff v. City of Borger*, 767 F.2d 161, 179 (5th Cir. 1985).

Here, drawing all inferences in favor of Plaintiffs, the summary judgment record suggests that Chief Allen knew or should have known that Gonzalez was an EPPD officer undeterred by prior punishment, of the DA office's decision to indict said officer, of complaints from the community, and of a pattern of unconstitutional uses of force against mentally ill individuals.  If proven at trial, a reasonable jury could conclude that Chief Allen was deliberately indifferent to the EPPD's failure to investigate or discipline EPPD officers accused of using excessive force.

The City appears to contend that the fact that it regularly conducts a "comprehensive . . . investigation, and competent post hoc review of officer conduct", which includes the "use of civilians to review police conduct, and . . . outside agency review . . . show commitment to community standards" and a lack of deliberate indifference.  Mot. at 29–30.  Yet, as the Fifth Circuit has previously explained, "conduct[ing] an internal investigation . . . appear[s] to cut against the argument that the City condoned the use of excessive force." *Peterson*, 588 F.3d at 852.  It has further found that a city "vaguely rul[ing] most of its complaints 'not sustained' or 'unfounded' is no assurance that these investigations exonerate [it]." *Id.*  As such, the Court is reluctant to conclude that the mere act of conducting an investigation justifies exonerating the

City when the evidence viewed in the light most favorable to Plaintiffs suggests the opposite conclusion.

Additionally, the evidence suggests that a reasonable jury could find that Chief Allen is deeply loyal to his officers and believes that he has an obligation to support them when they are accused of wrongdoing.  While this behavior could be otherwise admirable, the fact that Chief Allen is also responsible for investigating any accusations and disciplining his officers when they have in fact done wrong, a reasonable jury could conclude that he misapplied that loyalty to the degree that he was deliberately indifferent to the risk that this behavior might result in constitutional violations.

Overall, the Court is of the opinion that when taking the evidence in the light most favorable to Plaintiffs, a reasonable jury could determine that the EPPD failed to adequately investigate and discipline officers involved in shootings such that officers were insulated from the consequences of using excessive force.  Additionally, resolving all factual disputes in Plaintiffs' favor, a reasonable jury could find that such a "policy" was a moving force of Ramirez's death, and that Chief Allen was deliberately indifferent to the risk that this policy might result in constitutional violations.  Therefore, the Court concludes that Plaintiffs have satisfied the *Monell* requirements to survive summary judgment on their claim that the City failed to investigate and discipline its officers for excessive use of force.

## IV.   CONCLUSION

**IT IS THEREFORE ORDERED** that Defendants City of El Paso, Texas and Defendant Ruben Escajeda's "Amended Motion for Summary Judgement Joined in Part by Officer Ruben Escajeda as to Causation" (ECF No. 90) is **DENIED.**

So ORDERED and SIGNED this 20th day of August 2021.

DAVID C. GUADERRAMA
UNITED STATES DISTRICT JUDGE